1  McCormick, Barstow, Sheppard,
   Wayte & Carruth LLP
2  David R. McNamara, # 133302
    *dave.mcnamara@mccormickbarstow.com*
3  Shane G. Smith, # 272630
    *shane.smith@mccormickbarstow.com*
4  Vanessa M. Cohn, # 314619
    *vanessa.cohn@mccormickbarstow.com*
5  7647 North Fresno Street
   Fresno, California 93720
6  Telephone:    (559) 433-1300
7  Facsimile:    (559) 433-2300
8
9  *Attorneys for Plaintiff,*
   *DEERPOINT GROUP, INC.,*
10 *an Illinois corporation*

11              UNITED STATES DISTRICT COURT

12      EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

13 DEERPOINT GROUP, INC., an Illinois       Case No.
   corporation,
14                                          **COMPLAINT FOR:**
15          Plaintiff,                      **[1] TRADE SECRET
                                            MISAPPROPRIATION (18 U.S.C. §§ 1836
16          v.                              *ET SEQ.*)**
                                            **[2] TRADE SECRET
17 AGRIGENIX, LLC, a Delaware limited       MISAPPROPRIATION (CAL. CIV. CODE
   liability company; SEAN MAHONEY, a       §§ 3426.1 *ET SEQ.*)**
18 California individual; and EVA KWONG, a   **[3] FALSE ADVERTISING (15 U.S.C.
   California individual,                    §1125)**
19                                          **[4] BREACH OF SECRECY
20          Defendants.                      AGREEMENT**
                                            **[5] BREACH OF COVENANT OF GOOD
21                                          FAITH AND FAIR DEALING (SECRECY
                                            AGREEMENT)**
22                                          **[6] BREACH OF SETTLEMENT
23                                          AGREEMENT**
                                            **[7] BREACH OF COVENANT OF GOOD
24                                          FAITH AND FAIR DEALING
                                            (SETTLEMENT AGREEMENT)**
25                                          **[8] INTENTIONAL INTERFERENCE
26                                          WITH PROSPECTIVE ECONOMIC
                                            ADVANTAGE**
27                                          **[9] UNFAIR COMPETITION (CAL. BUS.**
28

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

COMPLAINT

**PROF. CODE §§ 17200 *ET SEQ.*)**

**Jury Trial Demanded**

Plaintiff DEERPOINT GROUP, INC. ("Deerpoint" or "Company"), by its attorneys, alleges as follows for its Complaint for Trade Secret Misappropriation, False Advertising, Breach of Secrecy Agreement, Breach of Settlement Agreement, Tortious Interference with Prospective Economic Advantage, and Unfair Competition against AGRIGENIX, LLC, SEAN MAHONEY, and EVA KWONG (collectively "Defendants"):

## NATURE OF THE ACTION

1.     This is an action seeking compensatory and punitive damages, and injunctive relief, arising out of Defendants' current and/or imminent theft of Deerpoint's proprietary and trade secret information for the benefit of a competing company, Agrigenix, LLC, that has quickly launched infringing copycat products and unfairly interfered with Deerpoint's long-standing customer relationships.

## PARTIES

2.     Plaintiff Deerpoint Group, Inc. ("Deerpoint") is a corporation organized and existing under the laws of the State of Illinois, and is licensed to do business in California with its principal place of business in Madera County at 1963 Independence Drive, Madera, CA 93637.

3.     Upon information and belief, Defendant Agrigenix, LLC ("Agrigenix") is a corporation organized and existing under the laws of the State of Delaware, and is licensed to do business in California with its principal place of business at 40365 Brickyard Drive, Suite 105, Madera, CA 93636-9520.

4.     Upon information and belief, Defendant Sean Mahoney ("Mahoney") is a resident and citizen of California with a business address of 40365 Brickyard Drive, Suite 105, Madera, CA 93636-9520. Mahoney is the former Chief Executive Officer of Deerpoint and, upon further information and belief, is now the President and Chief Executive Officer of Defendant Agrigenix.

5.     Upon information and belief, Defendant Eva Kwong ("Kwong") is a resident and citizen of California with a business address of 40365 Brickyard Drive, Suite 105, Madera, CA 93636-

1  9520. Kwong is the former Director of Business Operations/Logistics and Purchasing Manager of

2  Deerpoint and, upon further information and belief, is now the Operations Manager, Purchasing and

3  Logistics of Defendant Agrigenix.

4        6.       Deerpoint is informed and believes, and thereon alleges, that each defendant was a

5  principal, agent, or employee of each of the remaining defendants, and, in doing the things herein

6  alleged, was acting as such principal, or within the course and scope of such agency and took some

7  part in the acts and/or omissions set forth in this Complaint.

8  **JURISDICTION AND VENUE**

9        7.       This is a civil action to, among other things, vindicate Deerpoint's federal rights arising

10  under the trade secret protection laws of the United States, 18 U.S.C. §§ 1836, *et seq.*, and the false

11  advertising laws of the United States, 15 U.S.C. § 1125(a).

12        8.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

13  §§ 1331 and 1367(a).

14        9.       This Court has personal jurisdiction over the Defendants at least by virtue of the fact

15  that Defendants, and each of them, conduct business and/or reside in the State of California, have

16  availed themselves of the rights and benefits under California state law, and have engaged in

17  substantial and continuous contacts in the State of California.

18        10.      Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1391(b)

19  and 1391(c).

20  **ALLEGATIONS**

21  **A.**       **Deerpoint Crafts Success Over Many Years By Developing Fertigation Solutions**
   **Customized to the Needs of Agricultural Customers**

22

23        11.      Founded as a water treatment company in 1993 by veteran chemists Dr. John Miller

24  and Ms. Deborah Miller, Deerpoint has become an acknowledged industry leader in chemical water

25  treatment solutions for agriculture irrigation. Deerpoint was among the first companies to adopt a

26  precision approach to fertilization through drip irrigation systems when it developed mechanisms for

27  delivering nutrient-rich water to crops without the common problem of irrigation lines clogged by

28  salts. Today, Deerpoint deploys patented, precision-feeding units nicknamed "White Boxes" to

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

COMPLAINT

customer sites that enable Deerpoint technicians to inject proprietary nutrient and micronutrient blends into the grower's irrigation system. Customers in California, Arizona, and the world now recognize the "Deerpoint" name as synonymous with the term "continuous fertigation" (*i.e.*, the continuous injection of fertilizers through an irrigation system).

12. Over the past decade, Deerpoint has enjoyed explosive demand for its precision-fed, patented fertilizers at customer irrigation system sites. That growing business led Deerpoint to expand to increasingly larger warehouse facilities where it custom builds each chemical feed system for each customer site. The Company moved into a 10,000 square foot facility in northwest Fresno and shortly thereafter another 10,000 square foot facility down the street. Then in 2016, Deerpoint opened its doors at a new facility in Madera providing 46,000 square feet of office, warehouse, and blending facility space with an additional 30,000 square feet of foundation recently built out. The Company was featured in the Madera County Economic Development Commission's 2015-2016 Annual Report. Deerpoint currently employs 83 workers and is among the top 20-largest manufacturers, of any kind, in Madera County.

13. Deerpoint sells its products and services within the agricultural industry in California and Arizona, and utilizes the Internet to advertise its capabilities to customers and prospective customers everywhere. Moreover, on or about December 7, 2016, Deerpoint participated in discussions on a cross-border joint venture with Univar Canada to explore the development of new crop protection and micronutrient products for sale in northwestern Canada.

14. Deerpoint is committed to promoting agricultural education in the Valley, including by partnering with the Madera Community College Center and Sherman Thomas STEM Academy to provide career insights to students; hosting the 2017 Ag Camp providing Madera Unified School District students with exposure to careers in the agricultural industry; and supporting the Madera County Compact, which works to prepare local students for future careers in the agricultural industry.

**B. Deerpoint's Proprietary Fertilizer and Foliar Products Complement Its Patented Continuous Fertigation Systems To Solve Long-Standing Problems with Conventional Irrigation**

15. The agriculture industry adds fertilizers to plant environments, such as the soil, to fulfill the plant's nutritional requirements and thereby enhance crop growth and subsequent yields.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

4
COMPLAINT

The term "fertilizer" generally refers to the material compositions used to deliver nutrients to a crop. Conventional fertilizers typically contain materials that are extraneous to the crop's nutrient-uptake and soil condition ("yield-extraneous constituents") but which, for practical and/or other reasons, are necessary to the delivery of the nutrients. The process of delivering fertilizer nutrients to crops is referred to as "fertilization."

16.     Similarly, the application of nutrients by spraying liquid fertilizer directly on to plant leaves is called "foliar feeding."

17.     The term "fertigation" refers to a fertilization method whereby fertilizers are added to the water being used to irrigate crops, and reflects a combination of irrigation and fertilization. Fertigation reduces equipment, fuel and labor expended in the addition of fertilizers in comparison to mechanical delivery of fertilizers, and thus fertigation achieves a significant overall cost savings.

18.     When traditionally applied to micro-irrigation or drip systems, however, conventional fertilizers leave inorganic salt deposits within irrigation lines and emitters that, over time, frequently result in clogged systems (called "plugging").  Plugging results in uneven distribution of water and nutrients to the crop being irrigated, and in some cases, the complete shut-down of the micro-irrigation system.

19.     The term "formulation" refers to a mixture prepared according to a specific formula. For example, as pertinent here, a fertilizer formulation is a mixture of one or more plant nutrients combined with other ingredients according to a formula.

20.     In addition, the cost of commercial fertilizer formulations is itself significant, and commercially viable fertilizer formulations (*i.e.,* formulations sufficiently inexpensive for bulk agricultural use) typically include, as mentioned above, yield-extraneous constituents that do not contribute to or even harm plant nutrition or soil condition.  Further, the bulk weight of commercial fertilizer formulations typically is water, which increases the shipping costs.

21.     Like the agricultural community it serves, Deerpoint's success is founded on finding practical solutions to these problems faced by farmers.  It achieves that aim through an integrated system of fertilizers, custom-blended through proprietary methods, that are applied to crops through data-controlled mechanical delivery systems.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

5
COMPLAINT

22.     Proprietary blends of fertilizer and foliar products form the backbone of Deerpoint's product line.  Its fertilizer products are nutrient and micronutrient blends tailored by Deerpoint to a variety of crops and conditions.  Because of that tailoring process, Deerpoint's fertilizer and foliar products can provide an optimal menu of primary nutrients such as potassium, nitrogen, and phosphorus mixed with other elements the plant needs in smaller amounts.  Deerpoint's foliar and bloom products likewise provide blended nutrients tailored for on-leaf or on-bloom application at specific times in the crop's growth or bloom cycle.  Deerpoint avoids using ancillary materials in its fertilizer and foliar products that permit toxic materials to build up in soil and plant tissue over time.  The omission of such harmful materials by Deerpoint makes for healthier crops, more productive soil, and higher crop yields both in-season and over the long-term.

23.     Deerpoint's array of fertilizer and foliar mixes complements its mechanical systems for customized application of those products in the field or orchard.  At the heart of its "Continuous Fertigation" program is patented precision feeding equipment (affectionately nicknamed "the White Box" by Deerpoint's customers).  Once installed into an existing irrigation system, the White Box becomes an on-site fertilizer plant that enables Deerpoint's licensed technicians to inject proprietary nutrient and micronutrient blends that are impossible to achieve using standard fertilizer manufacturing methods.

24.     Dr. Miller and Ms. Miller of Deerpoint now hold at least 14 issued patents covering Deerpoint's "White Box" and fertigation technologies in the United States.

25.     Together, Deerpoint's integrated nutrient delivery systems comprise the industry standard and have enabled Deerpoint to grow its annual sales from $25 million in 2016 to $35 million in 2017.

**C.     Deerpoint Protects Its Cornerstone Fertilizer and Foliar Blends as Confidential, Proprietary, and Trade Secret Information**

26.     Deerpoint's success in the agricultural fertilizer industry relies, in large part, on its industry-leading catalog of proprietary fertilizer and foliar blends that it has developed over time through the contributions of Dr. Miller and his scientific team.  To that end, Deerpoint has invested millions of dollars customizing its fertilizer and foliar products and equipment to a wide range of

crops and crop environments so that it can have the best possible product offering for its clients in an extremely competitive marketplace.   For example, Deerpoint archives the fertilizer and foliar formulations it custom prepares for growers so that it can quickly understand the needs of other potential clients growing similar crops in a similar setting, and then cost-effectively produce a new custom blend based upon previous iterations of it.   In that way Deerpoint's proprietary formulation library, like all of Deerpoint's confidential information, enables Deerpoint to better understand customer needs, develop unique and unrivaled products, and then manufacture and sell those products at a price point that sets Deerpoint apart from its competitors.

27.   Whereas traditional fertilizer companies formulate various mixtures of inorganic salts for bulk application to soil or application one product-at-a-time through an irrigation system (*i.e.*, "slug addition"), Dr. Miller utilized his knowledge and background in chemistry, physics, engineering, pharmaceuticals, mining, agriculture, electronics, quality control, regulatory, and manufacturing to develop modified fertilizer formulations that reduce the unproductive binding of fertilizer components to soil particles or to each other and, thus, provide for enhanced uptake by the crop.   These chemistries and materials that Deerpoint uses to produce these formulations were developed over years of research and development, and comprise part of the confidential, proprietary, and trade secret knowledge on which the Company is founded.

28.   The list of ingredients that make up each of Deerpoint's fertilizer and foliar formulations, raw materials acquisition, the relative proportions of those ingredients, the methods of manufacturing Deerpoint's fertilizer and foliar products, and information and know-how surrounding manufacturing those products at-scale and troubleshooting problems with their production, among other things, comprise confidential, proprietary, and trade secret information belonging to Deerpoint.

29.   The confidential, proprietary, and trade secret nature of Deerpoint's fertilizer and foliar blends is essential to Deerpoint's business, and is the source of much of the goodwill that Deerpoint has built up in the agricultural industry over a period of years.

30.   To maintain its competitive position in the agricultural fertilizer industry, Deerpoint places a premium on the work ethic of its employees and executives, and on maintaining strict confidentiality over the Company's proprietary formulations, practices, methods, insights, intellectual

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

7
COMPLAINT

1  property, and other confidential information.  Indeed, Deerpoint does not release the constituents or

2  methods of making its fertilizer and foliar products in its literature or in communications with

3  customers, and complies with California labeling regulations by disclosing only guaranteed minimum

4  amounts of certain ingredients or by making reference to a Deerpoint file number that allows the

5  Company to maintain the confidential nature of the subject composition.

6          **1.**   **Deerpoint Secrecy Agreements**

7      31.    To ensure the highest level of protection for its confidential, proprietary, and trade

8  secret information, Deerpoint has, since its founding in 1993, required its employees and executives

9  (including Defendants Mahoney and Kwong) to execute detailed confidentiality agreements whose

10  secrecy requirements the Company is steadfast in enforcing.

11      32.    Today and since at least 2000, every employee who joins Deerpoint is asked to sign,

12  and does sign, an Employees Invention and Secrecy Agreement ("Secrecy Agreement") before they

13  may start working for Deerpoint.  Executed Secrecy Agreements are obtained from incoming

14  employees regardless of whether the development of confidential, proprietary, and trade secret

15  information will ordinarily fall within the employee's job responsibilities.

16      33.    Upon execution of that Secrecy Agreement, Deerpoint employees confirm their

17  understanding that:

18          [A]s an employee of Deerpoint Group, Inc., (hereinafter referred to as

19          "Company"), *I may be given access to or acquire information confidential*

20          *to Company* and may conceive and make inventions, discoveries,

21          improvements, and or designs that relate to the business of Company.

22          Accordingly, to obviate any misunderstanding at some future date regarding

23          Company's rights to such matters, *I accept the following obligations as*

24          *incident to and in consideration of my employment (or continuation of*

25          *employment as the case may be) with Company*:

26  (Preamble (emphasis added).)

27      34.    Deerpoint employees executing a Secrecy Agreement promised to preserve the

28  confidential nature of Deerpoint's confidential, proprietary, and trade secret information as follows:

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

8

COMPLAINT

1       *I agree that unless I have received authorization from Company to do so I*

2       *shall not either during or after my employment with Company (a) disclose*

3       *to any third party, (b) use, or (c) publish any information which is secret*

4       *and confidential to Company.  Such information, it is understood, may*

5       *include, but is not limited to, knowledge and data relating to processes,*

6       machines, *compounds and compositions, formulas,* business plans, and

7       marketing and sales information *originated, owned, controlled or possessed*

8       *by Company and which give Company an opportunity to obtain an*

9       *advantage over its competitors.* I further understand that as a guide I am to

10      consider information originated, owned, controlled, or possessed by

11      Company which is not disclosed in printed publications stated to be available

12      for distribution outside Company as being secret and Confidential to

13      Company.  In instances wherein doubt exists in my mind as to whether

14      information is secret and Confidential to Company, I will request an opinion,

15      in writing, from Company.

16  (¶ 3 (emphasis added).)

17      35.    Likewise, to secure Deerpoint's confidential and proprietary information and other

18  property from its competitors, Deerpoint required that its employees agree, as a condition of their

19  employment, that:

20      *I agree that items (including but not limited to, products, equipment, data*

21      *sheets, reports, memoranda, notes, records, plots, sketches, plans and other*

22      *tangible items) which I possess or to which I am given access to as a direct*

23      *result of my employment with Company shall at all times be recognized as*

24      *the exclusive property of Company.* I further agree that at no time, without

25      express authorization from Company, shall I make such items available to

26      third parties and that I shall upon leaving the employ of Company, deliver

27      promptly to Company any such items (including copies thereof) which I have

28      in my possession.

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7047 North Fresno Street
Fresno, CA 93720

COMPLAINT

1    (¶ 4 (emphasis added).)

2        **2.    Deerpoint's Employee Handbook**

3        36.    To further protect and maintain the integrity of its confidential, proprietary, and trade

4    secret information, Deerpoint provides a detailed a statement of its confidentiality policies in its

5    Employee Handbook.  The most recent version of Deerpoint's Employee Handbook was rolled out to

6    all employees in or about early 2016.

7        37.    The Employee Handbook provides:

8            *Some information about Deerpoint*, its employees, clients, suppliers, and

9            vendors *may be kept confidential by the Company as a matter of law.*

10           *Trade secrets* or confidential medical information of other employees *fall*

11           *into this category.  Information of this nature is to be kept confidential and*

12           *divulged only to individuals within the Company with both a need to receive*

13           *and authorization to receive the information.   Trade secrets may include*

14           *information that has been kept confidential from Deerpoint's competitors,*

15           such as strategic plans, pricing, customer lists, contractual terms with vendors

16           or customers, and certain financial records.

17       (Emphasis added.)

18       38.    The Employee Handbook also confirmed that Deerpoint preserved its rights to pursue

19   legal and equitable remedies that might be necessary to avoid further harm that would result from

20   disclosure of its trade secrets by affirming that:

21           *Employees who improperly use or disclose trade secrets* or other information

22           Deerpoint may, or is required to, keep confidential as a matter of law *will be*

23           *subject to disciplinary action, up to and including termination of*

24           *employment, even if they do not actually benefit from the disclosed*

25           *information.*  The *Company reserves the right to avail itself of all legal or*

26           *equitable remedies* to prevent impermissible use of such information or to

27           recover damages incurred as a result of the impermissible use of such

28           information.

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

10
COMPLAINT

1 | (Emphasis added.)

2 | **3.    Deerpoint's Extensive Employee Education Program**

3 | 39.    In or about early 2016, Deerpoint updated its Employee Handbook and then conducted

4 | a company-wide seminar for all employees to review all aspects of the Company's policies,

5 | emphasizing its confidentiality policies.  On or about May 2016, Deerpoint held a follow-up meeting

6 | providing each employee with a copy of the updated Employee Handbook.  At that time Deerpoint

7 | also executed an updated version of its Secrecy Agreement with each of its employees.  Mahoney, as

8 | Chief Executive Officer of Deerpoint, oversaw implementation of this company-wide refresh of

9 | Deerpoint's policies and secrecy protections given that the Company's director of human resources

10 | reported directly to him.

11 | 40.    On or about May 2016, Deerpoint implemented an hour-long seminar for all newly-

12 | hired employees in order to make the new hires aware of Deerpoint policies reflected in the Employee

13 | Handbook, including Deerpoint's Confidentiality policy.  Previously Deerpoint had conducted one-

14 | on-one training sessions for new employees.  During those seminars, Deerpoint's human resources

15 | staff ensured that each new hire understood her or his obligation not to disclose Deerpoint's

16 | confidential, proprietary, and trade secret information to anyone, whether for their benefit or not.

17 | Mahoney, as Chief Executive Officer of Deerpoint, oversaw implementation of this seminar program

18 | given that the Company's director of human resources reported directly to him.

19 | 41.    Information presented at these new hire seminars re-enforces the policies conveyed

20 | through Deerpoint's Employee Handbook.  For example, a PowerPoint slide typically presented by

21 | Deerpoint's human resources staff provides:

22 | • *Some information about Deerpoint,* its employees, clients, suppliers, and

23 | vendors *may be kept confidential by the Company as a matter of law.*

24 | *Trade secrets* or confidential medical information of other employees *fall*

25 | *into this category. Information of this nature is to be kept confidential and*

26 | *divulged only to individuals within the Company with both a need to receive*

27 | *and authorization to receive the information.*

28 | • *Trade secrets may include information that has been kept confidential from*

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

11
COMPLAINT

*Deerpoint's competitors, such as patents,* strategic plans, pricing, customer lists, contractual terms with vendors or customers, and certain financial records.

- *Employees who improperly use or disclose trade secrets* or other information Deerpoint may, or is required to, keep confidential as a matter of law *will be subject to disciplinary action,* up to and including termination of employment, even if they do not actually benefit from the disclosed information.

- The *Company reserves the right to avail itself of all legal or equitable remedies* to prevent impermissible use of such information or to recover damages incurred as a result of the impermissible use of such information.

(Emphasis added.)

42.   Moreover, Deerpoint requires and regularly takes steps to ensure that all slides prepared for presentations at Company meetings contain the legend "Deerpoint Group, Inc. – Company Confidential" when the slide's presenter has reason to know or believe that a slide contains Deerpoint's confidential, proprietary, or trade secret information.

43.   On or about May 9, 2016, Kwong executed an Acknowledgment and Agreement stating, among other things, that she received a copy of Deerpoint's Employee Handbook; understood that it set forth the terms and conditions of her employment as well as her duties, responsibilities, and obligations of employment with Deerpoint; and understood and agreed that it was her responsibility to read the Employee Handbook and abide by the rules, policies, and standards set forth therein.

### 4.   Vendor Secrecy Agreement

44.   Deerpoint also requires its vendors and suppliers to sign a secrecy agreement before it will do business with them, or even discuss potential projects involving Deerpoint's confidential, proprietary, and trade secret information.  That "Vendor Secrecy Agreement" contemplates that Deerpoint and the vendor or supplier will, as a part of their business arrangement, exchange "certain commercial, financial, and technical information" including "knowhow, technology, industrial and commercial data, designs, drawings, job specifications, standards, calculations, processes, research

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

12

COMPLAINT

1  programs, statistics and their results, research and development procedures, patents, inventions, and

2  formulas and all other information," such information the agreement terms "Confidential

3  Information."

4        45.    The Vendor Secrecy Agreement then provides for protection of such information as

5  follows:

> For a period of ten (10) years from the date of this Agreement, or the
> cessation of any agreement, whichever is later, *neither party hereto shall
> disclose to any third party, Confidential Information received from the
> Disclosing Party, nor use any Confidential Information for its own benefit,
> except in connection with its above said evaluation, or for the benefit of any
> third party,* provided that the foregoing shall not extend to any Confidential
> Information which:
>
> a). was known to the party to whom the disclosure is made prior to such
> disclosure, as evidenced by prior written records of the recipient;
>
> b). is at the time of disclosure or subsequently becomes generally available to
> the public through no fault of the party to whom disclosure is made; or
>
> c). is lawfully received in writing by the party to whom disclosure is made
> without restriction as to use, from a third party who has received or acquired
> it lawfully and is under no obligation of confidentiality or non-use.

20  (Emphasis added.)

21        46.    On occasion, a vendor will ask Deerpoint and/or its principals to instead execute a

22  confidentiality agreement composed by the vendor.  Deerpoint and/or its principals routinely decline,

23  and instead require the vendor to execute Deerpoint's Vendor Secrecy Agreement before proceeding

24  with any information exchange.

25        47.    In addition, Deerpoint has negotiated confidentiality protections into other agreements

26  with certain manufacturers, vendors, and suppliers.  A representative agreement between Deerpoint

27  and such an outside company automatically renews on an annual basis, with its confidentiality and

28  invention ownership provisions surviving any expiration or termination of that agreement.  In regard

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

13
COMPLAINT

to confidentiality, that agreement requires a manufacturer, vendor, or supplier to "hold in confidence any proprietary or commercially sensitive information provided by Deerpoint to [the outside company], including any Specifications, formulas or instructions (collectively, 'Confidential Information')." That agreement further provides that "[i]n no event shall [the outside company] disclose Deerpoint's Confidential Information to any third party except as required by law or with the written consent of Deerpoint. The Confidential Information shall be used by [the outside company] only in connection with the performance of this Agreement." Additionally, that agreement mandates that "[a]ll documents containing Confidential Information shall remain the property of Deerpoint and all such documents, and copies thereof, shall be returned or destroyed upon the request of Deerpoint." With regard to newly-created intellectual property, the agreement states that any inventions or other discoveries made by the outside company that are derived from or utilize Deerpoint's Confidential Information belong exclusively to Deerpoint.

### 5.   Deerpoint Imposes Extensive Regulations Regarding Employee Use of Company Computers

48.   In order to enable employees to quickly and efficiently access and exchange information throughout the Company and around the world, Deerpoint provides its management-level employees as well as employees in its accounting, field operations, grower relations, manufacturing, warehouse operations, engineering and assembly, logistics, laboratory diagnostic, research and development, and data analytics departments with desktop and portable computer systems, file servers, terminal servers, fax machines, Internet and World Wide Web access, voice mail, cell phones (including cell phone voicemail and text message capabilities), and electronic mail (e-mail). Those electronic productivity tools come in addition to information resources available on Deerpoint's intranet.

49.   To ensure that Deerpoint's confidential, proprietary, and trade secret information is secure and confined to Company-owned electronic devices, Deerpoint imposes detailed regulations that employees are obliged to maintain during work and non-work hours. With respect to electronic tools, Deerpoint's Employee Handbook directs that "[t]he Company's technical resources are provided for the benefit of the Company and its clients, vendors, and suppliers. These resources are

provided for use in the pursuit of Company business and are to be reviewed, monitored, and used only in that pursuit, except as otherwise provided in this policy." Deerpoint employees are reminded that when they "are using the Company's technical resources [the employee is] creating Company information using a Company asset." The handbook also specifically prohibits disclosure of confidential or trade secret information should employees use the Internet for non-business purposes.

50.     Deerpoint further safeguards its confidential, proprietary, and trade secret information by restricting employee access to it. That is accomplished in the first instance by limiting the scope of information a given employee may access to only that information necessary to her or his job function. Even then, Company confidential, proprietary, and trade secret information may only be accessed through Company-provided, password-protected computers that are set apart from the Internet by a firewall.

51.     Deerpoint maintains the formulations of its fertilizer and foliar products on a server that may only be accessed by personnel involved with the manufacturing and/or pricing of these products. This server is self-contained so that employees may only share information with other employees who have access to it and without taking that information off of the server. And when an employee has a business-related reason to manipulate files containing Deerpoint's proprietary formulations and pricing, they are directed to do so by moving the files to the Company's internal "U-drive" where each employee may keep and maintain files specific to their work. However, Deerpoint prohibits its employees from copying files containing its proprietary formulations and pricing to media outside of these internal systems such as external removable storage devices like a thumb or flash drive.

**D.     Deerpoint Hires Mahoney and Kwong, Who Execute Secrecy Agreements**

52.     On or about May 2013, Deerpoint's founders and co-owners Dr. and Ms. Miller hired Defendant Sean Mahoney to serve as the Company's Chief Executive Officer. Previously, Mahoney worked as a financial consultant and had no training in chemistry or mechanical engineering. The Millers nonetheless took a chance on him after Mahoney convinced the Millers that he could grow Deerpoint's customer base beyond its existing customers in California and Arizona. Consistent with his job responsibilities, Mahoney was granted access to all confidential, proprietary, and trade secret information belonging to Deerpoint, including information related to the formulation, manufacturing,

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

15
COMPLAINT

1    and pricing of its fertilizer and foliar products.

2          53.     Mahoney executed a valid and enforceable Secrecy Agreement with Deerpoint upon

3    starting his employment with the Company, and then executed an updated version of that agreement

4    on or about May 9, 2016.  The provisions of that valid and enforceable agreement are identical to

5    those called out in paragraphs 33-35 above.  A copy of Mahoney's executed Secrecy Agreement dated

6    May 9, 2016 is attached as Exhibit 1 hereto.

7          54.     On or about February 2008, Deerpoint hired Defendant Eva Kwong as its executive

8    assistant and later promoted her to Director of Business Operations reporting to Dr. and Ms. Miller.

9    In that role, Kwong coordinated all aspects of the manufacturing of Deerpoint's fertilizer and foliar

10   products, including raw materials acquisition, communicating the blend formulation from Dr. Miller's

11   laboratory to the outside manufacturing toller, and working with Deerpoint's accounting staff to price

12   these products for customers.  Consistent with her job responsibilities, Kwong was granted access to

13   all confidential, proprietary, and trade secret information belonging to Deerpoint, including

14   information related to the formulation, manufacturing, and pricing of its fertilizer and foliar products.

15         55.     Kwong executed a valid and enforceable Secrecy Agreement with Deerpoint upon

16   starting her employment with the Company, and then executed an updated version of that agreement

17   on or about May 9, 2016.  The provisions of that valid and enforceable agreement are identical to

18   those called out in paragraphs 33-35 above.  A copy of Kwong's executed Secrecy Agreement dated

19   May 9, 2016 is attached as Exhibit 2 hereto.

20         56.     During the time of Mahoney's employment as Deerpoint's Chief Executive Officer, Dr.

21   and Ms. Miller would primarily involve Mahoney, Kwong, and Manager, Technical Operations

22   Jeffrey Carr in matters related to the pricing and formulation of the Company's fertilizer and foliar

23   products.  Other employees were only included on an as-needed basis in order to further safeguard

24   against unauthorized disclosure or use of Deerpoint's confidential, proprietary, and trade secret

25   information.

26   **E.     Mahoney and Kwong Depart Deerpoint After Raiding Its Confidential**
          **Information**
27

28         57.     In plain violation of the terms of Deerpoint's stringent confidentiality protections set

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

16
COMPLAINT

1   out above, the acts of Mahoney and Kwong in this case bear the hallmarks of a carefully orchestrated

2   plan to abscond with bushels of confidential, proprietary, and trade secret information regarding the

3   composition and preparation of Deerpoint's proprietary fertilizer and foliar blends, procedures for

4   manufacturing those blends, the identity of raw material suppliers, the pricing of those blends, as well

5   as the workings of Deerpoint's mechanical "white box" systems, in order to then unfairly compete

6   with Deerpoint by utilizing that information for the benefit of themselves and Defendant Agrigenix.

7         58.    Namely, in the days, weeks, and months leading up to Mahoney and Kwong's

8   departures in autumn 2017, upon information and belief, these two Defendants acted in concert to gain

9   access to and download from a central computer information regarding Deerpoint's confidential,

10   proprietary, and trade secret technical and/or nontechnical data, formulas, patterns, processes,

11   machines, compounds and compositions, compilations, programs, laboratory or technical notebooks,

12   financial data, financial plans, software code, blueprints.  By way of example, computer forensic

13   analysis has revealed that, on or about September 26, 2017, Kwong accessed Deerpoint's server

14   containing the formulations, manufacturing protocols, and pricing of Deerpoint's proprietary products

15   from her desktop terminal.   She then downloaded approximately 230 spreadsheets and other

16   documents containing the precise details of Deerpoint's fertilizer and foliar blends, some of which had

17   not yet been commercialized and made available to customers for purchase. Recognizing the intrinsic

18   scientific and economic value of this information to herself and intended future employer (i.e.,

19   Mahoney and Agrigenix) Kwong downloaded the entirety of the product information accessed to a

20   removable thumb drive.   There was no legitimate business reason for Kwong to download this

21   information to an external, portable drive.

22         59.    As further revealed by computer forensic analysis, and upon information and belief, the

23   confidential, proprietary, and trade secret information taken by Kwong on or about September 26,

24   2017 included the blend specifications and pricing for Deerpoint's MTEK fertilizer products,

25   specifically including the MTEK-2100 product.

26         60.    Upon information and belief, and as confirmed by the totality of circumstances in this

27   case, Defendant Agrigenix and/or Defendant Mahoney came to possess the Deerpoint confidential,

28   proprietary, and trade secret information downloaded to Kwong's removable thumb drive sometime

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

17
COMPLAINT

1   on or after September 26, 2017 without authorization from Deerpoint.

2       61.    Kwong's actions were only the tip of the iceberg. Upon information and belief, and as

3   observed by Deerpoint personnel, Mahoney was seen, on separate occasions before the date of his

4   departure from the Company, removing briefcases filled with file folders or back packs and gym bags

5   containing documents from Deerpoint's offices on early mornings or at the end of the work day.

6   Upon information and belief, among the documents taken were files related to Deerpoint's

7   formulation manufacturers, vendors, and suppliers, such as documents revealing the formulation of

8   Deerpoint's fertilizer and foliar products and the original, executed copies of Deerpoint's vendor

9   secrecy agreements.

10       62.    Mahoney and Deerpoint mutually agreed that Mahoney's employment with Deerpoint

11   was mutually terminated on or about October 4, 2017. Kwong terminated her employment with

12   Deerpoint on or about November 10, 2017.

13   **F.**    **Mahoney Sues Deerpoint, and Then Agrees as a Term of Settlement to Abide By**
        **His Existing Secrecy Agreement with Deerpoint**

14

15       63.    On or about October 3, 2017 — the day before leaving Deerpoint — Mahoney filed a

16   lawsuit in the Superior Court of California, Fresno County, entitled *Sean Mahoney v. Deerpoint*

17   *Group, Inc., Deborah Miller, and John Miller.* The case was assigned Case No. 17CECG03416.

18   Then, on or about October 7, 2017 — three days after leaving Deerpoint — Mahoney filed an

19   administrative complaint with the California Department of Fair Employment and Housing alleging

20   additional claims against Deerpoint and the Millers. These actions were stayed by agreement of the

21   parties in order to allow for settlement discussions to occur.

22       64.    On or about January 8, 2018, Mahoney on the one hand and Deerpoint and the Millers

23   on the other hand executed a valid and enforceable Confidential Settlement Agreement and General

24   Release ("Settlement Agreement").

25       65.    As pertinent here, the Settlement Agreement permits a party to it to disclose certain

26   terms and conditions as necessary to enforce them. It also included an express acknowledgement by

27   Mahoney that his obligation to maintain the secrecy of Deerpoint's confidential, proprietary, and trade

28   secret information survived the general release in the Settlement Agreement as follows:

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

1     **14.3. Acknowledgement of DPG's Confidential, Proprietary, and Trade**

2     **Secret Information.** Plaintiff acknowledges that he had occasion to access,

3     acquire, and generate knowledge and information related to DPG's business

4     and technology, which DPG maintains as confidential or proprietary in order

5     to maintain its competitive value. ***Plaintiff further acknowledges that DPG***

6     ***considers this information proprietary within the meaning of Paragraph 3***

7     ***of Plaintiff's EIS Agreement with DPG attached as Exhibit "3" hereto, and***

8     ***<u>which remains in full force and effect</u> notwithstanding Paragraph 7 of this***

9     ***Agreement.***

10 (Emphasis added.) The term "DPG" refers to Deerpoint. The term "EIS Agreement" in the above

11 excerpt refers to the Employees Invention and Secrecy Agreement executed by Mahoney on or about

12 May 9, 2016, and attached as Exhibit 1 hereto. The phrase "Paragraph 7 of this Agreement" refers to

13 the "Complete General Release" to which the parties agreed under the Settlement Agreement.

14     66.     By way of the Settlement Agreement, Mahoney also expressly acknowledged that the

15 confidential, proprietary, and trade secret information belonging to Deerpoint that he has a continuing

16 obligation to protect includes Deerpoint's fertilizer and foliar formulations and more:

17     ***Plaintiff further acknowledges that the confidential and proprietary***

18     ***information belonging to DPG comprises Trade Secret information*** ("Trade

19     Secrets") belonging to DPG in that such information includes, without

20     limitation, technical or nontechnical data, formulas, patterns, processes,

21     machines, compounds and compositions, automated equipment, automated

22     information reporting to customers, compilations, programs, laboratory or

23     technical notebooks, financial data, financial plans, business plans, product or

24     service plans, and lists of actual or potential customers or suppliers which

25     (a) derive economic value, actual or potential, from not being generally

26     known to, and not being readily ascertainable by proper means by, other

27     persons who can obtain economic value from its disclosure or use, and (b) are

28     the subject of efforts that are reasonable under the circumstances to maintain

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

19
COMPLAINT

1  its secrecy.  By way of examples only, and not limitation, *Plaintiff agrees*
2  *that confidential, proprietary, and Trade Secret information belonging to*
3  *DPG that is subject to this Agreement includes: (1) DPG macro and micro*
4  *fertilizer formulations, whether applied via fertigation, foliar, or by ground;*
5  (2) DPG water treatment formulations; (3) All chemical delivery equipment,
6  systems and methods for DPG fertilizer and water treatment products;
7  (4) Commodity fertilizers delivered via DPG proprietary equipment, systems,
8  or methods and (5) Or modifications thereof which would be considered
9  obvious iterations of DPG IP.

10  (Emphasis added.)  The term "DPG IP" refers to Deerpoint's patent and trademark portfolio.

11      67.      Mahoney then promised to stand in a position of trust with Deerpoint, and to take

12  whatever actions were reasonably necessary to prevent the dissemination, communication, or use of

13  Deerpoint's confidential, proprietary, and trade secret information as follows:

14      **14.4. Non-Disclosure.** *Plaintiff shall not divulge, communicate, use to the*
15      *detriment of DPG or for the benefit of any other person or entity, or misuse*
16      *in any way, any confidential, proprietary, or Trade Secret information*
17      *belonging to DPG* (collectively "DPG Information") *identified in Paragraph*
18      *14.3 above.*  Any DPG Information now known or hereafter acquired by
19      Plaintiff shall be deemed a valuable, special, and unique asset of DPG that is
20      received by Plaintiff in confidence and as a fiduciary of DPG, and such
21      *Plaintiff shall remain a fiduciary to DPG with respect to all of such DPG*
22      *Information.*  In addition, Plaintiff (1) will receive and hold all DPG
23      Information in trust and in strictest confidence, (2) *will take reasonable steps*
24      *to protect the DPG Information from disclosure* and will, in no event, take
25      any action causing, or fail to take any action reasonably necessary to prevent,
26      any DPG Information from losing its character as DPG Information, and
27      (3) except as required by law, *will not, directly or indirectly, use,*
28      *misappropriate, disseminate or otherwise disclose any DPG Information to*

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

20
COMPLAINT

*any third party without the prior written consent of DPG,* which may be withheld in DPG's absolute and sole discretion.

(Emphasis added.)

68.     In regard to any of Deerpoint's tangible or intangible property remaining in Mahoney's possession, the Settlement Agreement provided that Mahoney's obligation to return such information survived that agreement's general release and, in fact, affirmatively required any such materials to be returned to Deerpoint as follows:

**14.5. Return of Tangible and Intangible Property Belonging to DPG.** Plaintiff agrees that all books, records, reports, writings, memoranda, notes, notebooks, computer programs, equipment, sketches and sketchbooks, products, data sheets, laboratory or technical notebooks, keys, badges, business plans, laptops, computer disks, flash drives, smart phones, proposals, contracts, customer and referral source lists, and other documents and/or tangible or intangible things relating in any manner to the business of DPG (including, without limitation, any of the same embodying or relating to any DPG Information), whether prepared by Plaintiff or otherwise coming into Plaintiff's possession, *shall be the exclusive property of DPG and shall not be copied, duplicated, replicated, transformed, modified, or removed from the premises of DPG and shall, upon discovery, be returned immediately to DPG.* Plaintiff further acknowledges *Paragraph 4 of the EIS Agreement attached as Exhibit "3" hereto, and which remains in full force and effect notwithstanding Paragraph 7 of this Agreement.* Plaintiff further agrees to irrevocably destroy and/or delete any electronically-maintained emails, documents, files, text messages, or copies thereof containing DPG Information or otherwise belonging to DPG. Within ten (10) calendar days of the Execution Date of this Agreement, Plaintiff shall provide a sworn declaration to DPG stating, under penalty of perjury, that he has fully complied with the requirements of this paragraph; a blank declaration that

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

shall be used for this purpose is attached as Exhibit "4" hereto.

(Emphasis added).)  Here again the Settlement Agreement states that the Employees Invention and Secrecy Agreement ("EIS Agreement") executed by Mahoney on or about May 9, 2016, and attached as Exhibit 1 hereto, remains in force and effect notwithstanding the "Complete General Release" to which the parties agreed under "Paragraph 7 of this Agreement."

69.     Mahoney submitted his executed declaration referenced as "Exhibit '4'" in the above passage to counsel for Deerpoint on or about January 8, 2018.  No outstanding documents or things, whether tangible or intangible, were identified by Mahoney in that declaration.  In addition, Mahoney promised in that declaration that he had "searched for and irrevocably destroyed and/or deleted any electronically-maintained emails, documents, files, text messages, or copies thereof, in [his] possession that contain [Deerpoint] Information or otherwise belong to [Deerpoint]."  However, upon information and belief, Mahoney breached the settlement agreement by failing to return documents that he took from Deerpoint's premises prior to his departure from Deerpoint, and further breached the agreement by failing to turn over to Deerpoint documents provided to him by former employees of Deerpoint after his departure from Deerpoint.

70.     As stated in the executed Settlement Agreement, upon his breach of any of the protections enumerated in Paragraphs 14.3-14.5 therein, Mahoney recognized and acknowledged that Deerpoint "shall be entitled to an injunction from any court of competent jurisdiction enjoining and restraining" Mahoney "or any company with which he is affiliated or in which he holds an ownership interest, and that such right to injunction shall be cumulative and in addition to whatever other rights and remedies [Deerpoint] may possess hereunder, at law or in equity."  Such injunctive remedies will not prevent Deerpoint from obtaining damages flowing from any breach as well.

71.     Lastly, as pertinent here, Mahoney agreed "that he will not make any statements, either verbal or written, including without limitation to any electronic or print news media or other publications or to any publicly-available forums or any community organizations that would disparage the reputation, image, goodwill or commercial interest of [Deerpoint], [Dr. Miller], or [Ms. Miller]."

///

///

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

22
COMPLAINT

**G.      Mahoney Founds Agrigenix as "Deerpoint with a Twist" and Intentionally Interferes with Deerpoint's Relationship with Its Customers with the Aid of Confidential, Proprietary, and Trade Secret Information Misappropriated from Deerpoint**

72.      With Deerpoint's treasure trove of confidential, proprietary, and trade secret information in hand, Mahoney and Kwong turned their attention to destroying their former employer by quickly launching a direct competitor, Defendant Agrigenix, that was founded the very same month that Mahoney departed Deerpoint in or about October 2017.  Upon information and belief, Mahoney holds the titles of President and Chief Executive Officer at Agrigenix, a role analogous to his former role at Deerpoint.  Upon further information and belief, Kwong holds the title Operations Manager, Purchasing and Logistics, a job descriptor analogous to her former role at Deerpoint.

73.      Billing itself as a purveyor of "The Science of Successful Farming," Agrigenix promotes itself as an alternative to Deerpoint through promotional statements such as "By feeding your crops precisely the nutrients they need, in exactly the right amounts, at just the right time for optimum growth, Agrigenix can help you achieve dramatic operational efficiencies.  Not to mention increased production and profitability."

74.      Apparently in service of that aim, Agrigenix states that it provides "a full line of nutrients and liquid fertilizer blends formulated with our proprietary chemistries."  In truth, the fertilizer and foliar blends manufactured, used, offered for sale, and sold by Agrigenix are pirated from the confidential files and information to which Mahoney and Kwong had access while employed by Deerpoint mere weeks before.

75.      As Agrigenix has advertised, and upon information and belief, in or about February 2018 Agrigenix launched a series of "Fertilizer Blends and Foliars" products that mimics the product line-up available from Deerpoint.  For example, Agrigenix offers a micronutrient fertilizer blend it dubs "Genesis® 210" that purports to contain substantially the same ingredients as Deerpoint's "DPG M-Tek 2100;" Agrigenix's "Fusion® Macro/Micro Fertilizer Blend 12-0-0 10% Ca" purports to contain substantially the same ingredients as Deerpoint's "DPG 12-0-0 + 10.0 Ca;" and the "Gen5 Compatibility™" chemistry advertised by Agrigenix as "inorganic compatibility capabilities formulated into [Agrigenix's] phosphorus blends that allow multiple chemistries to exist in water

1   simultaneously without binding up or precipitating out with varying water qualities" purports to

2   provide the same anti-plugging characteristics as the phosphorus-containing blends sold by Deerpoint

3   as DPG 0-21-0, DPG 7-21-0, DPG 0-42-0, and DPG 8-8-8.

4        76.    Moreover, as advertised by Agrigenix, and upon information and belief, Agrigenix has

5   disseminated false and/or misleading statements to the agricultural industry to the effect that

6   Agrigenix's branded fertilizer blends and foliars "Quantum®," "Genesis®," and "Fusion®" are

7   federally registered trademarks when, in fact, no such registrations exist.   These false and/or

8   misleading statements disseminated by Agrigenix to growers and other prospective customers during

9   in-person meetings, at trade shows, and over the Internet have had a material impact in diverting sales

10   from Deerpoint and other fertigation companies to their detriment because the appearance of federal

11   trademark registration gives the false impression that Agrigenix holds the goodwill associated with

12   established national brands when, in fact, it does not.

13        77.    It is no coincidence that Agrigenix was in a position to manufacture and launch a full

14   line of fertilizer and foliar products mirroring Deerpoint's own within three months of Agrigenix

15   opening its doors. Rather, Mahoney founded Agrigenix on confidential, proprietary, and trade secret

16   information that he and/or Kwong misappropriated from Deerpoint during the term of their

17   employment there.

18        78.    Upon information and belief, Mahoney has no training in any scientific discipline,

19   much less a discipline relevant to the design and manufacture of the fertilizer and foliar products

20   offered and sold by Agrigenix.  Upon further information and belief, Mahoney has boasted that he

21   hates chemistry and once earned a "D" in his chemistry class.

22        79.    As Agrigenix has advertised, and upon information and belief, Mr. Graham Towerton

23   has served as the Direct of Chemical Engineering for Agrigenix since November 2017, and is

24   responsible for formulations, production, equipment design, and analytical services.  Upon further

25   information and belief, Mr. Towerton has no graduate-level training in any field of chemistry, and has

26   worked previously as an executive and engineer at biofuel companies.  In other words, Mr. Towerton

27   holds the expertise to understand, interpret, and apply Deerpoint's confidential, proprietary, and trade

28   secret information to accomplish the industrial manufacturing of fertilizer and foliar products, but is

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

24

COMPLAINT

1   not himself trained to design fertilizer and foliar blends in the first instance.

2       80.     Agrigenix's blatant copying of Deerpoint's fertilizer and foliar products shows again

3   in, upon information and belief, Agrigenix's sale of a micronutrient blend it calls "Fusion 4-0-5 + 5%

4   Ca." That name identifies a mix having nitrogen:phosphorus:potassium ratios equivalent to 4-0-5 plus

5   5% calcium.  During the time of Mahoney and Kwong's employment at Deerpoint, Dr. Miller and his

6   scientific staff experimented with a mix having that nitrogen:phosphorus:potassium ratio and calcium

7   percentage.  That mix was shelved, however, because its constituents routinely aggregated out of

8   solution, making the product inappropriate for use in a continuous fertigation system.  Deerpoint's

9   unrealized "4-0-5 + 5% calcium" blend thus amounts to a mistake slavishly copied by Agrigenix.

10      81.     With its arsenal of copycat products in tow, Agrigenix and Mahoney and their agents

11  have systematically approached Deerpoint's customers and others in the agricultural industry to

12  deliberately and intentionally interfere with Deerpoint's relationships with its customers.  For

13  example, on information and belief, Mahoney and/or other representatives of Agrigenix have told

14  existing Deerpoint customers that Agrigenix is "the same as Deerpoint with a twist," and that

15  Deerpoint is failing and will lose all of its customers to Agrigenix.  On further information and belief,

16  these disparaging claims by Agrigenix and Mahoney or their agents have been paired with statements

17  that Agrigenix's products are 20% better than Deerpoint's while being 20% cheaper.

18      82.     Upon information and belief, when asked, Mahoney has told Deerpoint customers that

19  he does not have any secrecy obligations to Deerpoint.

20      83.     On or about January 29, 2018, Mr. Dave McNamara, counsel for Deerpoint, requested

21  via email to Mahoney's counsel that Mahoney abide by his obligations under his Secrecy Agreement

22  and his Settlement Agreement with Deerpoint.  Defendants' actions nonetheless continued.

23      84.     To-date, Agrigenix has succeeded in steering Deerpoint clients Agriglobe, Inc.,

24  Anderson Farms LLC, and Dalena Farms, Inc. to Agrigenix; resulting in Deerpoint losing millions of

25  dollars in sales in an amount according to proof at trial but currently estimated at $2.4 million.

26  ///

27  ///

28  ///

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

25
COMPLAINT

**H.    After a Deerpoint White Box is Stolen, Deerpoint Observes "White Boxes" Appearing on Customer Properties Now Served By Agrigenix**

85.    Circumstances indicate that Agrigenix intends to steal Deerpoint's mechanical business as well.

86.    On or about June 2016, it was discovered that a Deerpoint White Box deployed to the property of Anderson Farms was cut from its foundation and removed.  The person or persons responsible are unknown to Deerpoint at this time.  However, within a few days of Mahoney's departure from Deerpoint, Anderson Ranch cancelled its fertigation business with Deerpoint.  Upon information, when Mr. Jim Anderson called Deerpoint's grower relations manager, Jeff Carr, to cancel Deerpoint's services, Mr. Anderson stated that he was terminating his account with Deerpoint because "Sean Mahoney is my boy."

87.    Upon information and belief, prior to Mahoney's departure from Deerpoint on or about April 2017, former Deerpoint employees Nolan Sorenson and Diego Barrera assisted Mahoney with the installation of a White Box system in the onion fields of Dalena Farms.  Although the installation was ostensibly performed under Dalena Farm's then-existing service arrangement with Deerpoint, Mahoney was careful to shield other Deerpoint executives from the operation.  Upon information and belief, when Deerpoint's manager of field operations, Victor Martinez, asked his subordinate Mr. Barrera to explain the details of the White Box installation at Dalena Farms, Mr. Barrera replied that Mr. Martinez did not need to know and that Mahoney was handling the matter.  Upon further information and belief, Mr. Sorenson and Mr. Barrera now work for or with Agrigenix.

88.    Moreover, pursuant to Deerpoint policy, customers are not given keys to the locks securing a White Box on the customer's property, although the customer may shut-off the White Box system in case of an emergency.  Yet no key had been logged out for a White Box installed at Dalena Farms in or after April 2017; however, on information and belief, Deerpoint later learned that only Mr. Brian Dalena himself had keys to the White Box on his property given to him by Mahoney.

89.    Upon information and belief, on or about late February – early March 2018, Agrigenix installed at least four devices approximating the outward look of Deerpoint's White Box on property managed by Agriglobe in California.

# FIRST CAUSE OF ACTION

**(Trade Secret Misappropriation Under 18 U.S.C. §§ 1836 *et seq.* (Defend Trade Secrets Act))**

**(Against All Defendants)**

90.     For its first cause of action, Deerpoint incorporates by reference, as through fully stated herein, paragraphs 1-89 above.

91.     At all relevant times, Deerpoint owned and possessed certain confidential, proprietary, and trade secret information, including but not limited to, technical or nontechnical data, formulas, formulations, patterns, processes, machines, compounds and compositions, compilations, programs, laboratory or technical notebooks, financial data, financial plans, pricing information, software code, blueprints, business plans, product or service plans, and lists of actual or potential customers or suppliers, as alleged above.  These confidential, proprietary, and trade secret information relate to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and/or foreign commerce.

92.     This confidential, proprietary, and trade secret information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by the public, as alleged herein.

93.     Deerpoint has taken reasonable measures to maintain such information as confidential and secret, as alleged above.

94.     Upon information and belief, Defendants have, in violation of Deerpoint's rights under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*, actually misappropriated and/or threatened to misappropriate, disclosed, and/or used Deerpoint's confidential, proprietary, and trade secret information in the improper and unlawful manner alleged herein.  Specifically, Kwong and Mahoney misappropriated Deerpoint's confidential, proprietary, and trade secret information for the benefit of themselves and of Agrigenix, and as a result, Agrigenix now uses Deerpoint's confidential, proprietary, and trade secret information to unfairly compete with Deerpoint.

95.     As a direct and proximate result of Defendants' actual and/or threatened misappropriation, disclosure, and/or use of Deerpoint's confidential, proprietary, and trade secret information described herein, Deerpoint has suffered, and will continue to suffer, damages in excess

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

27

COMPLAINT

1    of the jurisdictional amount according to proof at trial.

2    96.    Deerpoint is entitled to damages for the actual loss caused by Defendants'

3 misappropriation of trade secrets and/or for any unjust enrichment Defendants have enjoyed by such

4 misappropriation, and in an amount not less than a reasonable royalty for Defendants' unauthorized

5 disclosure or use of Deerpoint's trade secrets.

6    97.    Defendants' misappropriation of Deerpoint's trade secrets was willful and malicious,

7 and so Deerpoint is entitled to an award of exemplary damages equal to twice its actual damages

8 caused by the misappropriation, as well as Deerpoint's reasonable attorneys' fees.

9    98.    Because Defendants' misappropriation and/or threatened misappropriation, disclosure,

10 and/or use of Deerpoint's confidential, proprietary, and trade secret information continues, Deerpoint

11 will continue to be irreparably harmed by Defendants' conduct and so is entitled to the issuance of an

12 injunction to prevent any actual or threatened misappropriation as permitted by 18 U.S.C. § 1836.

13    **<u>SECOND CAUSE OF ACTION</u>**

14    **(Trade Secret Misappropriation Under Cal. Civ. Code §§ 3426 *et seq.*)**

15    **(Against All Defendants)**

16    99.    For its second cause of action, Deerpoint incorporates by reference, as through fully

17 stated herein, paragraphs 1-98 above.

18    100.    At all relevant times, Deerpoint owned and possessed certain confidential, proprietary,

19 and trade secret information as defined by California Civil Code section 3426.1(d). That confidential,

20 proprietary, and trade secret information belonging to Deerpoint included, but was not limited to,

21 technical or nontechnical data, formulas, formulations, patterns, processes, machines, compounds and

22 compositions, compilations, programs, laboratory or technical notebooks, financial data, financial

23 plans, pricing information, software code, blueprints, business plans, product or service plans, and lists

24 of actual or potential customers or suppliers, as alleged above. These confidential, proprietary, and

25 trade secret information described herein are not and were not generally known to Deerpoint's

26 competitors in the agricultural industry.

27    101.    Deerpoint's trade secrets and confidential information are proprietary to Deerpoint, not

28 generally known to other persons who can obtain economic value from their disclosure or use, and

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

28

COMPLAINT

Deerpoint derives independent economic value from the fact that they are not so known because they enable Deerpoint to maintain a competitive advantage in its industry.

102.     Deerpoint has taken reasonable measures to maintain such information as confidential and secret, as alleged above.

103.     Upon information and belief, Defendants have, in violation of Deerpoint's rights under California's Uniform Trade Secrets Act, California Civil Code section 3426 *et seq.*, actually misappropriated and/or threatened to misappropriate Deerpoint's confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein.  Specifically, Kwong and Mahoney misappropriated Deerpoint's confidential, proprietary, and trade secret information for the benefit of themselves and of Agrigenix, and as a result Agrigenix now uses Deerpoint's confidential, proprietary, and trade secret information to unfairly compete with Deerpoint.

104.     As a direct and proximate result of Defendants' actual and/or threatened misappropriation of Deerpoint's confidential, proprietary, and trade secret information described herein, Deerpoint has suffered, and will continue to suffer, damages in excess of the jurisdictional amount according to proof at trial.

105.     Deerpoint is also entitled to damages for the actual loss caused by Defendants' misappropriation of trade secrets and/or for any unjust enrichment Defendants have enjoyed by such misappropriation.

106.     Defendants' misappropriation of Deerpoint's trade secrets was willful, wanton, malicious, and oppressive according to proof at trial, justifying an award of punitive and/or treble damages to Plaintiffs pursuant to California Civil Code Sections 3426.3(c) and 3426.4.

## **THIRD CAUSE OF ACTION**

### **(False Advertising Under 15 U.S.C. § 1125(a))**

### **(Against Agrigenix)**

107.     For its third cause of action, Deerpoint incorporates by reference, as through fully stated herein, paragraphs 1-106 above.

108.     At all times relevant, Agrigenix was, and remains, engaged in the business of selling and offering for sale products and services related to custom agricultural fertilizers and foliars, as well

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

29
COMPLAINT

1   as related fertigation systems.

2        109.    At all times relevant, Agrigenix owns and operates a website www.agrigenix.net

3 accessible over the Internet. Agrigenix uses that website in interstate commerce to advertise

4 Agrigenix's products and services, and to promote its business within the agricultural industry in

5 California, the Western United States, and beyond.

6        110.    As advertised by Agrigenix, and upon information and belief, Agrigenix has

7 disseminated false and/or misleading statements to the agricultural industry to the effect that

8 Agrigenix's branded fertilizer blends and foliars "Quantum®," "Genesis®," and "Fusion®" are

9 federally registered trademarks when, in fact, no such registrations exist. These false and/or

10 misleading statements disseminated by Agrigenix to growers and other prospective customers during

11 in-person meetings, at trade shows, and over the Internet have had a material impact in diverting sales

12 from Deerpoint and other fertigation companies to their detriment because the appearance of federal

13 trademark registration gives the false impression that Agrigenix holds the goodwill associated with

14 established national brands when, in fact, it does not.

15        111.    Agrigenix's false and/or misleading statements have caused Deerpoint to sustain actual

16 and incidental damages in an amount to be proven at trial.

17        112.    Upon information and belief, Agrigenix made and continues to make these and other

18 material misrepresentations willfully and in bad faith, so as to make Agrigenix's actions exceptional

19 and to justify an award of exemplary damages against it in an amount to be proven at trial.

20                     **FOURTH CAUSE OF ACTION**

21                     **(Breach of Secrecy Agreement)**

22                     **(Against Mahoney and Kwong)**

23        113.    For its fourth cause of action, Deerpoint incorporates by reference, as through fully

24 stated herein, paragraphs 1-112 above.

25        114.    On or about May 9, 2016, Deerpoint and Mahoney entered into a valid and enforceable

26 Secrecy Agreement, as alleged herein. On or about May 9, Deerpoint and Kwong entered into a valid

27 and enforceable Secrecy Agreement, as alleged herein.

28        115.    Under their respective Secrecy Agreements, Mahoney and Kwong understood that their

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

COMPLAINT

employment at Deerpoint may give them access to Deerpoint's confidential information, and that they were not to disclose, use, or publish any confidential information belonging to Deerpoint, either during or after their employment with the Company.  Mahoney and Kwong further understood that such information included, without limitation, knowledge and data relating to processes, machines, compounds and compositions, formulas, business plans, and marketing and sales information originated, owned, controlled or possessed by Deerpoint and which gave Deerpoint an opportunity to obtain an advantage over its competitors.  Mahoney and Kwong further understood that they were to consider information originated, owned, controlled, or possessed by Deerpoint that was not disclosed in printed publications available for distribution outside of Deerpoint as confidential and secret information belonging to Deerpoint.

116.    Also under their respective Secrecy Agreements, Mahoney and Kwong agreed that items such as products, equipment, data sheets, reports, memoranda, notes, records, plots, sketches, plans and other tangible items to which he or she had access as a direct result of their employment with Deerpoint are, at all times, the exclusive property of Deerpoint.  Mahoney and Kwong further understood that they were never to make such items available to third parties without the express authorization of Deerpoint, and that they would promptly return any such items in their possession (including copies thereof) upon leaving Deerpoint.

117.    With respect to Mahoney, he further understood that his obligations to Deerpoint under the Secrecy Agreement continued beyond his execution of the Settlement Agreement, as alleged herein, so that his obligations to refrain from disclosing, using, or publishing any confidential information belonging to Deerpoint remained in force and effect from the date of the Settlement Agreement and continuing thereafter.

118.    On or about January 29, 2018, Mr. Dave McNamara, counsel for Deerpoint, requested via email to Mahoney's counsel that Mahoney abide by his obligations under his Secrecy Agreement with Deerpoint.  Defendants' actions nonetheless continued.

119.    Upon information and belief, Mahoney and/or Kwong breached their respective Secrecy Agreements by, without authorization, accessing, copying, using, and/or disclosing to Agrigenix, Mahoney, and/or other third parties confidential, proprietary, and trade secret information

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

31
COMPLAINT

1    protected by the Secrecy Agreement, as alleged herein.

2       120.    Moreover, apart from disclosing Deerpoint's confidential, proprietary, and trade secret

3   information, Mahoney and Kwong further, and independently, breached the Secrecy Agreement by

4   failing to take those steps necessary to return any tangible or intangible property and/or information to

5   Deerpoint upon the conclusion of their employment with Deerpoint, as alleged herein.

6       121.    Each of Mahoney's and Kwong's breaches of their respective Secrecy Agreements has

7   directly and proximately caused, and will continue to cause, significant monetary, competitive, and

8   irreparable harm to Deerpoint. To date, Deerpoint has been damaged in a sum of at least $2.4 million

9   as a result of Mahoney and Kwong's breaches of their respective Secrecy Agreements. In addition,

10   Deerpoint continues to sustain damages as a proximate result of Mahoney and Kwong's breaches in an

11   amount according to proof.

12       122.    By contrast, Deerpoint has performed all conditions, covenants, and promises required

13   on its part to be performed in accordance with the terms and conditions of the Secrecy Agreement,

14   having employed Mahoney and Kwong as agreed, and paid them for their work for Deerpoint during

15   the time of their employment.

16                  **FIFTH CAUSE OF ACTION**

17       **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

18              **(Against Mahoney and Kwong)**

19       123.    For its fifth cause of action, Deerpoint incorporates by reference, as through fully stated

20   herein, paragraphs 1-122 above.

21       124.    On or about May 9, 2016, Deerpoint and Mahoney entered into a valid and enforceable

22   Secrecy Agreement, as alleged herein. On or about May 9, Deerpoint and Kwong entered into a valid

23   and enforceable Secrecy Agreement, as alleged herein. As in every contract or agreement, under

24   California law, there was an implied covenant of good faith and fair dealing.

25       125.    Deerpoint has performed all conditions, covenants, and promises required on its part to

26   be performed in accordance with the terms and conditions of the Secrecy Agreement, having

27   employed Mahoney and Kwong as agreed, and having paid each of them for their work for Deerpoint

28   during the time of their employment.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

32

COMPLAINT

126.    Mahoney and/or Kwong unfairly interfered with Deerpoint's right to receive the benefit of the Secrecy Agreement, namely, the expectation that its employees would uphold the confidentiality and trade secret protection of Deerpoint's confidential, proprietary, and trade secret information.

127.    Deerpoint suffered significant monetary, competitive, and irreparable harm as a result of Mahoney and/or Kwong's conduct, as alleged herein.  As a direct and proximate result of Mahoney and Kwong's breaches of the covenant of good faith and fair dealing implied in their respective Secrecy Agreements, Deerpoint continues to sustain damages in an amount according to proof.

## SIXTH CAUSE OF ACTION

### (Breach of Settlement Agreement)

### (Against Mahoney)

128.    For its sixth cause of action, Deerpoint incorporates by reference, as through fully stated herein, paragraphs 1-127 above.

129.    On or about January 8, 2018, Deerpoint and Mahoney entered into a valid and enforceable Settlement Agreement, as alleged herein.  Under the Settlement Agreement, Mahoney understood and agreed that he held a position of trust as a fiduciary to Deerpoint with respect to any confidential, proprietary, and trade secret information belonging to Deerpoint that he had or has in his possession.  Mahoney further understood and agreed that he must return any of Deerpoint's tangible and/or intangible property to Deerpoint, and that he must refrain from publicly disparaging Deerpoint, as alleged herein.

130.    In line with those promises to Deerpoint under the Settlement Agreement, Mahoney understood that he had occasion to access, acquire, and generate knowledge and information related to Deerpoint's business and technology, which Deerpoint maintains as confidential or proprietary in order to maintain its competitive value.  Mahoney further understood that such information comprised trade secret information including, without limitation, technical or nontechnical data, formulas, patterns, processes, machines, compounds and compositions, automated equipment, automated information reporting to customers, compilations, programs, laboratory or technical notebooks, financial data, financial plans, business plans, product or service plans, and lists of actual or potential

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

33
COMPLAINT

customers or suppliers which (a) derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) are the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

131.     Also under the Settlement Agreement, Mahoney agreed that examples of such trade secret information belonging to Deerpoint include: (1) Deerpoint macro and micro fertilizer formulations, whether applied via fertigation, foliar, or by ground; (2) Deerpoint water treatment formulations; (3) All chemical delivery equipment, systems and methods for Deerpoint fertilizer and water treatment products; (4) Commodity fertilizers delivered via Deerpoint proprietary equipment, systems, or methods and (5) Modifications thereof which would be considered obvious iterations of Deerpoint's patented inventions.

132.     In line with those recognitions, Mahoney agreed that he shall not divulge, communicate, use to the detriment of Deerpoint or for the benefit of any other person or entity, or misuse in any way, any confidential, proprietary, or trade secret information belonging to Deerpoint.

133.     On or about January 29, 2018, Mr. Dave McNamara, counsel for Deerpoint, requested via email to Mahoney's counsel that Mahoney abide by his obligations under his Settlement Agreement with Deerpoint.  Defendants' actions nonetheless continued.

134.     Upon information and belief, Mahoney breached the Settlement Agreement by, without authorization, accessing, copying, using, and/or disclosing to Agrigenix and/or other third parties confidential, proprietary, and trade secret information protected by the Settlement Agreement, as alleged herein.

135.     Moreover, upon information and belief, apart from disclosing Deerpoint's confidential, proprietary, and trade secret information, Mahoney further, and independently, breached the Settlement Agreement by failing to take the necessary steps to hold in confidence, protect, and not sue, misappropriate, disseminate or otherwise disclose, directly or indirectly, any confidential, proprietary, or trade secret information belonging to Deerpoint without Deerpoint's prior written consent, as alleged herein.

136.     Lastly, upon information and belief, Mahoney has publicly disparaged and/or caused

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

34
COMPLAINT

1   the public disparagement of Deerpoint in violation of the Settlement Agreement.

2   137.   Each of Mahoney's breaches of the Settlement Agreement has directly and proximately

3   caused, and will continue to cause, significant monetary, competitive, and irreparable harm to

4   Deerpoint.  To date, Deerpoint has been damaged in a sum of at least $2.4 million as a result of

5   Mahoney's breaches of the Settlement Agreement.  In addition, Deerpoint continues to sustain

6   damages as a proximate result of Mahoney's breaches in an amount according to proof.

7   138.   By contrast, Deerpoint has performed all conditions, covenants, and promises required

8   on its part to be performed in accordance with the terms and conditions of the Settlement Agreement,

9   having paid the agreed sum to Mahoney in exchange for his agreement to be bound by the covenants

10   and promises expressed therein.

11   ## SEVENTH CAUSE OF ACTION

12   ### (Breach of Implied Covenant of Good Faith and Fair Dealing)

13   ### (Against Mahoney)

14   139.   For its seventh cause of action, Deerpoint incorporates by reference, as through fully

15   stated herein, paragraphs 1-138 above.

16   140.   On or about January 8, 2018, Deerpoint and Mahoney entered into a valid and

17   enforceable Settlement Agreement, as alleged herein.  As in every contract or agreement, under

18   California law, there was an implied covenant of good faith and fair dealing.

19   141.   Deerpoint has performed all conditions, covenants, and promises required on its part to

20   be performed in accordance with the terms and conditions of the Settlement Agreement, having paid

21   the agreed sum to Mahoney in exchange for his agreement to be bound by the covenants and promises

22   expressed therein.

23   142.   Mahoney unfairly interfered with Deerpoint's right to receive the benefits of the

24   Settlement Agreement, namely, the expectation that he would uphold the confidentiality and trade

25   secret protection of Deerpoint's confidential, proprietary, and trade secret information; the expectation

26   that he would return any tangible and/or intangible property belonging to Deerpoint; and that he would

27   not publicly disparage and/or cause the disparagement of Deerpoint.

28   143.   Deerpoint suffered significant monetary, competitive, and irreparable harm as a result

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

35
COMPLAINT

1    of Mahoney's conduct, as alleged herein. As a direct and proximate result of Mahoney's breaches of

2    the covenant of good faith and fair dealing implied in the Settlement Agreement, Deerpoint continues

3    to sustain damages in an amount according to proof.

4                        **EIGHTH CAUSE OF ACTION**

5         **(Intentional Interference with Prospective Economic Advantage)**

6                        **(Against All Defendants)**

7       144.    For its eighth cause of action, Deerpoint incorporates by reference, as through fully

8    stated herein, paragraphs 1-143 above.

9       145.    An economic relationship in the form of various customer relationships between

10   Deerpoint and its customers Agriglobe, Inc., Anderson Farms LLC, and Dalena Farms, Inc. existed,

11   which would have continued and provided Deerpoint with a future benefit but for Defendants'

12   interference.

13       146.    The Defendants, and each of them, knew of the existence of these economic

14   relationships because of Mahoney's and Kwong's job responsibilities and long-terms of employment

15   with Deerpoint put them in a position to know the needs and service requirements of each of

16   Deerpoint's customers. For example, consistent with each of their job responsibilities, Mahoney and

17   Kwong had access to confidential, proprietary, and trade secret information belonging to Deerpoint,

18   including information related to the formulations and pricing of its fertilizer and foliar products, as

19   well as Deerpoint's White Box technology. Upon information and belief, Mahoney and/or Kwong

20   conveyed their knowledge of Deerpoint's economic relationships with Agriglobe, Inc., Anderson

21   Farms LLC, and Dalena Farms, Inc. to Agrigenix.

22       147.    Aided by the confidential, proprietary, and trade secret information misappropriated

23   from Deerpoint, Defendants, and each of them, intentionally, wrongfully, and unlawfully induced

24   customers of Deerpoint to end their economic and/or contractual relationship with Deerpoint, and

25   subsequently converted such customers to be customers of Agrigenix, all to the economic

26   disadvantage of Deerpoint. Defendants' interference was thus independently wrongful because it

27   violated federal and/or state laws against trade secret misappropriation, and/or was dependent upon

28   Mahoney and/or Kwong's breaches of their Secrecy Agreement with Deerpoint and the covenant of

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

36

COMPLAINT

1  good faith and fair dealing implied therein, and/or was dependent upon Mahoney's breaches of his

2  Settlement Agreement with Deerpoint and the covenant of good faith and fair dealing implied therein.

3  148.   The Defendants intentionally acted in a manner and engaged in the conduct described

4  within the Complaint, by design, to interfere with and/or disrupt the economic benefit that Deerpoint

5  was intending to receive through the terms of various customer agreements and relationships.

6  Defendants' conduct was wrongful, independent of any interference with the agreement or

7  relationship that existed between Deerpoint and its customers, because such interference was

8  facilitated by Defendants' independent misappropriation of Deerpoint's confidential, proprietary, and

9  trade secret information, and thus falls outside the bounds of fair competition.

10  149.   As a proximate result of the designed and intentional acts of the Defendants, as

11  described throughout this Complaint, Deerpoint has suffered damages, in an amount in excess of the

12  jurisdictional minimum of this Court, said amount to be determined at trial.  Deerpoint seeks all

13  monetary damages caused by the Defendants' actions, including punitive damages.

14  ### NINTH CAUSE OF ACTION

15  **(Unfair Competition Under Cal. Bus. Prof. Code §§ 17200 *et seq.*)**

16  **(Against All Defendants)**

17  150.   For its ninth cause of action, Deerpoint incorporates by reference, as through fully

18  stated herein, paragraphs 1-149 above.

19  151.   California Business and Professions Code section 17200, *et seq.*, prohibits acts of

20  unfair competition, including any and all "unlawful, unfair or fraudulent business act or practice."

21  152.   Deerpoint is informed and believes, and on that basis alleges, that Defendants' conduct

22  as alleged herein constitutes "unlawful," "unfair," and/or "fraudulent" business practices in violation

23  of the unfair competition provisions of California Business & Professions Code §§ 17200, *et seq.*, in

24  that the alleged conduct by Defendants, and each of them, was a concerted plan directly intended to

25  deprive Deerpoint of customer relationships that Deerpoint expected would continue, in quick

26  succession, in order to disrupt Deerpoint's business for the benefit of Agrigenix.

27  153.   Defendants, and each of them, knew that by stealing and using Deerpoint's

28  confidential, proprietary, and trade secret information without Deerpoint's express permission for

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

37
COMPLAINT

Agrigenix's benefit, they engaged in unfair business practices by acting in violation of Cal. Civ. Code. §§ 3426, *et seq.* and 18 U.S.C. §§ 1836, *et seq.* In the performance of their former responsibilities at Deerpoint, Mahoney and Kwong have used, and continue to use, Deerpoint's confidential, proprietary, and trade secret information unlawfully, plainly in violation of Deerpoint's Secrecy Agreements with them, Mahoney's Settlement Agreement with Deerpoint, Deerpoint's Employee Handbook, Deerpoint's computer use policies, and basic principles of professional decency.

154. Deerpoint has been harmed and has lost money and property as a result of Defendants' conduct, including, but not limited to, lost productivity costs, lost profits as a result of the disruption of Deerpoint's business, and increased costs in identifying, obtaining, and preserving customers.

155. Deerpoint requests an order of restitution against Defendants.

156. Defendants' conduct described herein constitutes an unfair and unlawful business practice that should be restrained. As such, Deerpoint seeks an order from the Court enjoining Defendants, including their agents, principals, servants, representatives, joint-venturers, partners (of any kind), and/or alter egos, from contacting Deerpoint's customers and otherwise inducing or attempting to induce Deerpoint's customers to take their business from Deerpoint.

## PRAYER FOR RELIEF

Based on the foregoing, Deerpoint hereby demands a trial by jury for all issues so triable, and prays for judgment against Defendants Agrigenix, Mahoney, and Kwong as follows:

1. For a judgment against Defendants for direct and consequential damages in an amount according to proof;

2. For pre-judgment interest on all damages;

3. For punitive and exemplary damages in an amount appropriate to punish or set an example of Agrigenix, Mahoney, and Kwong, to be determined at trial;

4. Preliminary and permanent injunctive relief to prevent the Defendants, and each of them, from using Deerpoint's confidential, proprietary, and trade secret information in any way, including in designing, manufacturing, or marketing Agrigenix products and services; from continuing to possess Deerpoint's tangible and/or intangible property; and from publicly disparaging Deerpoint.

5. Attorneys' fees, witness fees, and the costs of litigation incurred by Deerpoint, as

1   applicable;

2        6.     For costs of suit incurred herein; and

3        7.     For such other and further relief the Court may deem just and proper.

4

5   Dated:  April 18, 2018                     McCORMICK, BARSTOW, SHEPPARD,
                                        WAYTE & CARRUTH LLP

6

7

8                               By: _____

9                                     David R. McNamara

10                                    Shane G. Smith
                                  Vanessa M. Cohn
                                *Attorneys for Plaintiff,*

11                        *DEERPOINT GROUP, INC., an Illinois*
                                    *corporation*

12  17916-00007 5052051.5

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

# EXHIBIT "1"

## DEERPOINT GROUP, INC.
## EMPLOYEES INVENTION AND SECRECY AGREEMENT

I, _Sean P. Mahoney_ understand that as an employee of Deerpoint Group, Inc., (hereinafter referred to as "Company"), I may be given access to or acquire information confidential to Company and may conceive and make inventions, discoveries, improvements, and or designs that relate to the business of Company. Accordingly, to obviate any misunderstanding at some future date regarding Company's rights to such matters, I accept the following obligations as incident to and in consideration of my employment (or continuation of employment as the case may be) with Company:

1). I agree to disclose promptly and in writing to Company all inventions, discoveries, improvements, or designs (a) which are conceived or made by me during the term of my employment with Company and which relate to Company's existing fields of operation or a reasonable expansion thereof and (b) which are conceived or made by me within three (3) years following termination of my employment with Company and which are based upon work done by me or assigned to me or upon information to which I had access as a result of my employment with Company. I agree that such inventions, discoveries, improvements, or designs shall be the exclusive property of Company, whether or not patent applications are filed thereon and I hereby assign to Company all rights, title, and interest to such inventions, discoveries, improvements, and designs. It is understood that in the event I feel an invention, discovery, improvement, or design made or conceived by me does not fall within either of categories (a) or (b) above, I have the right to request a statement in writing from Company of Company's disclaimer of any rights thereto. It further is understood that if such a request discloses a difference of opinion, the issue shall be submitted at Company's expense to a patent attorney mutually acceptable to the parties and the ultimate decision of that attorney shall be final. Failure on my part to request such a disclaimer from Company within six (6) months of the conception of me of any inventions, discovery, improvement, or design falls within either category (a) or (b) above.

2). I agree to perform any acts and execute at Company's request and at no expense to me, any and all papers and instruments Company considers reasonably necessary to perfect and protect Company's rights, title, and interest in any and to inventions, discoveries, improvements, and designs covered by paragraph 1 above, and any U.S. and/or foreign patent applications or extensions thereof embodying same. I further agree that this obligation shall continue after the termination of my employment with Company.

3). I agree that unless I have received authorization from Company to do so I shall not either during or after my employment with Company (a) disclose to any third party, (b) use, or (c) publish any information which is secret and confidential to Company. Such information, it is understood, may include, but is not limited to, knowledge and data relating to processes, machines, compounds and compositions, formulas, business plans, and marketing and sales information originated, owned, controlled or possessed by Company and which give Company an opportunity to obtain an advantage over its competitors. I further understand that as a guide I am to consider information originated, owned, controlled, or possessed by Company which is not

1

disclosed in printed publications stated to be available for distribution outside Company as being secret and Confidential to Company. In instances wherein doubt exists in my mind as to whether information is secret and Confidential to Company, I will request an opinion, in writing, from Company.

4). I agree that items (including but not limited to, products, equipment, data sheets, reports, memoranda, notes, records, plots, sketches, plans and other tangible items) which I possess or to which I am given access to as a direct result of my employment with Company shall at all times be recognized as the exclusive property of Company. I further agree that at no time, without express authorization from Company, shall I make such items available to third parties and that I shall upon leaving the employ of Company, deliver promptly to Company any such items (including copies thereof) which I have in my possession.

5). I agree that Company may make reasonable use of my name, portrait or photograph for advertising and trade purposes.

6). I agree that employment by and the compensation routinely received therefore from Company, and such other compensation as Company may from time to time provide, shall be full consideration and compensation for services performed by me and for inventions, discoveries, improvements, and designs assigned by me to Company hereunder. I further understand that the amount and/or nature of compensation routinely received by me from Company may be changed from time to time without affecting any provision of this agreement.

7). I further understand that the term "Company" as employed herein shall be taken to include Deerpoint Group, Inc. ("DPG") and any and all corporations, which are owned directly through the owners of DPG, including but not limited to Deerpoint Industries, Inc. and J.C. Miller and Associates, Inc. Therefore, for example, the phrase "fields of operation of Company" as employed herein shall include the fields of operation of such related corporations as well as DPG. This agreement, when executed by me, shall inure to the benefit of said corporations and shall continue to be in full force and effect as long as I continue employment with Company.

8). I agree that I may terminate my employment with the Company at any time, with or without reason or notice. The Company may also terminate my employment at any time with or without reason or notice.

9). This agreement is divisible and separable so that, if any provision or provisions hereof shall be held to be invalid, such holding shall not impair the remaining provisions hereof. If any provision hereof is construed to be too broad to be enforced, such provision shall be construed to create only an obligation to the full extent allowable by law.

10). This agreement shall bind me and my heirs, executors, administrators, and personal representatives and the successors and assigns of Company.

11). This agreement shall be construed according to the laws of the state of California.

12). This agreement supercedes all prior agreements, if any, between Company and myself with respect to the matters set forth.

In evidence of my assent to and understanding of the above terms I have signed this agreement, this _9th_ day of ____May____ , _2016_ .

_____
Employee Signature

_Sean P. Mahoney_
Employee Name

By _____
DPG Executive

_HR Director_
Title

_5/9/16._
Date

Deerpoint Group, Inc.

3

# EXHIBIT "2"

# DEERPOINT GROUP, INC.
## EMPLOYEES INVENTION AND SECRECY AGREEMENT

I, _Eva Kwong_____ understand that as an employee of Deerpoint Group, Inc., (hereinafter referred to as "Company"), I may be given access to or acquire information confidential to Company and may conceive and make inventions, discoveries, improvements, and or designs that relate to the business of Company. Accordingly, to obviate any misunderstanding at some future date regarding Company's rights to such matters, I accept the following obligations as incident to and in consideration of my employment (or continuation of employment as the case may be) with Company:

1). I agree to disclose promptly and in writing to Company all inventions, discoveries, improvements, or designs (a) which are conceived or made by me during the term of my employment with Company and which relate to Company's existing fields of operation or a reasonable expansion thereof and (b) which are conceived or made by me within three (3) years following termination of my employment with Company and which are based upon work done by me or assigned to me or upon information to which I had access as a result of my employment with Company. I agree that such inventions, discoveries, improvements, or designs shall be the exclusive property of Company, whether or not patent applications are filed thereon and I hereby assign to Company all rights, title, and interest to such inventions, discoveries, improvements, and designs. It is understood that in the event I feel an invention, discovery, improvement, or design made or conceived by me does not fall within either of categories (a) or (b) above, I have the right to request a statement in writing from Company of Company's disclaimer of any rights thereto. It further is understood that if such a request discloses a difference of opinion, the issue shall be submitted at Company's expense to a patent attorney mutually acceptable to the parties and the ultimate decision of that attorney shall be final. Failure on my part to request such a disclaimer from Company within six (6) months of the conception of me of any inventions, discovery, improvement, or design falls within either category (a) or (b) above.

2). I agree to perform any acts and execute at Company's request and at no expense to me, any and all papers and instruments Company considers reasonably necessary to perfect and protect Company's rights, title, and interest in any and to inventions, discoveries, improvements, and designs covered by paragraph 1 above, and any U.S. and/or foreign patent applications or extensions thereof embodying same. I further agree that this obligation shall continue after the termination of my employment with Company.

3). I agree that unless I have received authorization from Company to do so I shall not either during or after my employment with Company (a) disclose to any third party, (b) use, or (c) publish any information which is secret and confidential to Company. Such information, it is understood, may include, but is not limited to, knowledge and data relating to processes, machines, compounds and compositions, formulas, business plans, and marketing and sales information originated, owned, controlled or possessed by Company and which give Company an opportunity to obtain an advantage over its competitors. I further understand that as a guide I am to consider information originated, owned, controlled, or possessed by Company which is not

1

disclosed in printed publications stated to be available for distribution outside Company as being secret and Confidential to Company. In instances wherein doubt exists in my mind as to whether information is secret and Confidential to Company, I will request an opinion, in writing, from Company.

4). I agree that items (including but not limited to, products, equipment, data sheets, reports, memoranda, notes, records, plots, sketches, plans and other tangible items) which I possess or to which I am given access to as a direct result of my employment with Company shall at all times be recognized as the exclusive property of Company. I further agree that at no time, without express authorization from Company, shall I make such items available to third parties and that I shall upon leaving the employ of Company, deliver promptly to Company any such items (including copies thereof) which I have in my possession.

5). I agree that Company may make reasonable use of my name, portrait or photograph for advertising and trade purposes.

6). I agree that employment by and the compensation routinely received therefore from Company, and such other compensation as Company may from time to time provide, shall be full consideration and compensation for services performed by me and for inventions, discoveries, improvements, and designs assigned by me to Company hereunder. I further understand that the amount and/or nature of compensation routinely received by me from Company may be changed from time to time without affecting any provision of this agreement.

7). I further understand that the term "Company" as employed herein shall be taken to include Deerpoint Group, Inc. ("DPG") and any and all corporations, which are owned directly through the owners of DPG, including but not limited to Deerpoint Industries, Inc. and J.C. Miller and Associates, Inc. Therefore, for example, the phrase "fields of operation of Company" as employed herein shall include the fields of operation of such related corporations as well as DPG. This agreement, when executed by me, shall inure to the benefit of said corporations and shall continue to be in full force and effect as long as I continue employment with Company.

8). I agree that I may terminate my employment with the Company at any time, with or without reason or notice. The Company may also terminate my employment at any time with or without reason or notice.

9). This agreement is divisible and separable so that, if any provision or provisions hereof shall be held to be invalid, such holding shall not impair the remaining provisions hereof. If any provision hereof is construed to be too broad to be enforced, such provision shall be construed to create only an obligation to the full extent allowable by law.

10). This agreement shall bind me and my heirs, executors, administrators, and personal representatives and the successors and assigns of Company.

11). This agreement shall be construed according to the laws of the state of California.

2

12). This agreement supercedes all prior agreements, if any, between Company and myself with respect to the matters set forth.

In evidence of my assent to and understanding of the above terms I have signed this agreement, this _____9_____ day of _____May_____, _____2016_____.

_Eva Kwong_
Employee Signature

_Eva Kwong_
Employee Name

By _____
DPG Executive

_HR Director_
Title

_5/9/16_
Date

Deerpoint Group, Inc.