# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **DEERPOINT GROUP, INC.,** | **CASE NO. 1:18-CV-0536 AWI BAM** |
| **Plaintiff** | |
| **v.** | **ORDER ON DEFENDANTS' MOTION TO DISMISS** |
| **AGRIGENIX, LLC and SEAN MAHONEY,** | |
| **Defendants** | (Doc. No. 10) |

This is a business dispute involving intellectual property and trade secrets between Plaintiff Deerpoint Group, Inc. ("Deerpoint") and Defendants Agrigenix, LLC ("Agrigenix") and Sean Mahoney ("Mahoney").[1] Deerpoint brings federal claims for violations of 15 U.S.C. § 1125 (False Advertising) and 18 U.S.C. § 1836 (Defend Trade Secrets Act ("DTSA")), state law statutory claims for violations of Cal. Civ. Code § 3426.1 (California Uniform Trade Secrets Act ("CUTSA")), Cal. Bus. & Prof. Code § 17200 (Unfair Competition ("UCL")), two claims for breach of contract (two different contracts) and two related claims for breach of the covenant of good faith and fair dealing, and intentional interference with prospective economic advantage ("IIPEA"). Currently before the Court is Defendants' Rule 12(b)(6) motion to dismiss. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

---

[1] Defendant Eva Kwong was dismissed from this lawsuit without prejudice through a Rule 41(a)(1)(A)(i) dismissal on November 1, 2018. <u>See</u> Doc. No. 22.

## **RULE 12(b)(6) FRAMEWORK**

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. See Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015). In reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Kwan v. SanMedica, Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017). However, complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013). To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678; Mollett, 795 F.3d at 1065. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "Plausibility" means "more than a sheer possibility," but less than a probability, and facts that are "merely consistent" with liability fall short of "plausibility." Iqbal, 556 U.S. at 678; Somers, 729 F.3d at 960. The Ninth Circuit has distilled the following principles for Rule 12(b)(6) motions: (1) to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively; (2) the factual allegations that are taken as true must plausibly suggest entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. Levitt v. Yelp! Inc.,

765 F.3d 1123, 1135 (9th Cir. 2014).  In assessing a motion to dismiss, courts may consider

documents attached to the complaint, documents incorporated by reference in the complaint, or

matters subject to judicial notice.  In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1051 (9th Cir.

2014).  If a motion to dismiss is granted, "[the] district court should grant leave to amend even if

no request to amend the pleading was made . . . ."  Ebner v. Fresh, Inc., 838 F.3d 958, 962 (9th

Cir. 2016).  However, leave to amend need not be granted if amendment would be futile or the

plaintiff has failed to cure deficiencies despite repeated opportunities.  Garmon v. County of L.A.,

828 F.3d 837, 842 (9th Cir. 2016).

## BACKGROUND FACTS

From the Complaint, Deerpoint is in the business of chemical water treatment solutions for

agriculture irrigation.  Over the past decade, Deerpoint has enjoyed explosive demand for its

precision-fed patented fertilizers at custom irrigation sites.  Deerpoint custom builds each

chemical feed system for each site.  Deerpoint sells its products and services within California and

Arizona.  Deerpoint utilizes integrated systems of fertilizers, which are custom-blended through

proprietary methods, and applied to crops through data-controlled mechanical delivery systems.

Proprietary blends of fertilizers and foliar products[2] are the backbone of Deerpoint's product line.

Deerpoint's fertilizers are tailored to a variety of crops and conditions.  Further, at the heart of

Deerpoint's fertigation[3] program is patented precision feeding equipment, which has been

nicknamed the "White Box" by Deerpoint's customers.  Deerpoint has invested millions of dollars

customizing its fertilizers, foliar products, and equipment to a wide range of crops and

environments, and archives its products and services for the growers that use its services.  The

confidential, proprietary, and trade secret nature of Deerpoint's fertilizer and foliar blends is

essential to Deerpoint's business, and is the source of much business goodwill.

Deerpoint puts a premium on its employees to maintain strict confidentiality over its

---

[2] "Foliar feeding" is the application of nutrients to crops by spraying liquid fertilizer directly on to the leaves.

[3] "Fertigation" refers to a fertilization process whereby fertilizers are added to the water being used to irrigate crops, and reflects a combination of irrigation and fertilization.

proprietary formulations, practices, methods, insights, intellectual property, and other information. Since Deerpoint's founding in 1993, it has required its employees and executives to execute a detailed confidentiality agreement, the Employees Invention and Secrecy Agreement (the "EIS"). Deerpoint steadfastly enforces the EIS. Since at least 2000, every employee signs the EIS. Deerpoint's employee handbook also contains policies relating to confidentiality, and in 2016, Deerpoint implemented a new-hire training program that highlighted its policies, including the confidentiality policies. Deerpoint also regulates the access and exchange of information within the company, restricts access to certain information, and ensures that its confidential information is confined to company-owned computers.

Until October 4, 2017, Mahoney was the Chief Executive Officer of Deerpoint. Mahoney signed the EIS and an updated EIS in 2016. Despite the EIS, Mahoney acted to gain access to, and download from, a central computer Deerpoint's confidential, proprietary, and trade secret information. Further, prior to his departure, Mahoney was seen removing files and documents relating to formulation manufacturers, vendors, and suppliers. Mahoney and Deerpoint mutually agreed to terminate his employment on October 4, 2017.

On October 3, 2017, Mahoney filed a lawsuit in the Fresno County Superior Court against Deerpoint ("the Lawsuit"). On October 7, 2017, Mahoney filed an administrative complaint with the California Department of Fair Housing and Employment against Deerpoint. These matters were stayed pending settlement negotiations.

Sometime in October 2017, Mahoney launched a direct competitor to Deerpoint, Agrigenix. Mahoney is the president and chief executive officer of Agrigenix. Agrigenix promotes itself as an alternative to Deerpoint by feeding crops the precise nutrients need, in exactly the right amounts, at the right time for optimum growth. Agrigenix states that it provides a full line of nutrients and fertilizer blends formulated with proprietary chemistries. However, the blends are pirated from Deerpoint. Agrigenix also has foliar blends that mimic Deerpoint. Mahoney and Agrigenix possessed Deerpoint's confidential, proprietary, and trade secret information, and Mahoney founded Agrigenix on trade secrets misappropriated from Deerpoint. Agrigenix has told Deerpoint's customers that it is "the same as Deerpoint with a twist." Four

4

large clients of Deerpoint have switched to Agrigenix.  Further, circumstances suggest that Agrigenix/Mahoney may have taken steps to steal and copy Deerpoint's White Box technology.

On January 8, 2018, Mahoney and Deerpoint signed a Settlement Agreement ("the Settlement").  The Settlement resolved the Lawsuit and all other claims that the Mahoney and Deerpoint had against each other.  The Settlement included a provision that Paragraph 3 of the EIS remained in full force, a provision in which Mahoney acknowledged the confidential and proprietary nature of Deerpoint's trade secret information, a provision in which Mahoney agreed not to divulge or use Deerpoint's trade secrets and to take steps to protect such information from disclosure, and to return Deerpoint's property that was in Mahoney's possession.  Around March 2018, Agrigenix installed at least four devices that approximate Deerpoint's White Boxes.

## DEFENDANTS' MOTION TO DISMISS

### 1. SETTLEMENT BAR – 1st, 2nd, 5th, 7th, 8th, and 9th Causes of Action

*Defendants' Argument*

Defendants argue that the Settlement bars all claims based on conduct that occurred up to and including January 8, 2018.  The language of the Settlement is broad and settles all claims between Deerpoint and Defendants, regardless of whether the claims were known or unknown, that existed before and at the time the settlement was executed.  Although Agrigenix was not a signatory to the settlement, its conduct is encompassed by the Settlement as a third-party beneficiary because it was a person acting under, by, through, or in concert with Mahoney.

In reply, Defendants argue that Deerpoint has judicially admitted through the allegations in the complaint that Agrigenix acted together and in concert with Mahoney.  That judicial admission shows that Deerpoint's claims against Agrigenix were covered by the Settlement.  Defendants also argue that a claim under CUTSA arises against a given defendant only once, at the time of the initial misappropriation, and that all other wrongful uses of the particular trade secret augments the single claim.  Since the Settlement resolved Deerpoint's trade secret cause of action, and there is only one misappropriation claim possible against any one person, Deerpoint's trade secret misappropriation claims that are based on post-Settlement conduct are barred.

1    *Plaintiff's Opposition*

Deerpoint argues that the Settlement does not bar claims that accrued after the Settlement was signed, and that the Complaint contains many such claims. For example, the Settlement reaffirmed the confidential relationship between Mahoney and Deerpoint with respect to its trade secrets and obligated Mahoney to return Deerpoint's property/confidential information. These provisions preserved the ability of Deerpoint to bring a post-Settlement CUTSA claim.

With respect to claims that accrued pre-Settlement, the Settlement does not bar such claims as to Agrigenix. First, Defendants' argument is based on the inferential facts that Deerpoint knew that Agrigenix was up and running by January 8, 2018, and that the Settlement's release included any pre-existing-yet-unknown claims it had against Agrigenix. This logic leads to the absurd result that Deerpoint released each and every former employee who went to work at Agrigenix simply because Deerpoint knew of the new employment on January 8, 2018. Second, Agrigenix has not shown that the signatories intended for it to be a third-party beneficiary. Agrigenix does not provide an ordinary interpretation of the isolated term "acting in concert," nor does it account for other portions of the settlement agreement. For example, the Settlement defines its scope by reference to the lawsuit brought by Mahoney and the potential cross claims that could have been brought by Deerpoint, but Agrigenix was not a party to that lawsuit. The Settlement's release defines the subject matter released in the same way. At best, there is ambiguity in the Settlement, and that ambiguity is a question of fact that cannot be resolved in this motion.

*Relevant Contractual Provisions*

Under the "Recitals" portion of the Settlement, the Settlement explains that Mahoney filed an administrative complaint with the California Department of Fair Employment and Housing, on October 6, 2017. See Settlement ¶ B. A lawsuit was filed by Mahoney in the Fresno County Superior Court on October 3, 2017, known as "the Lawsuit," which included the October 6 DFEH complaint. Id. at ¶ C. Deerpoint indicated an intent to file a cross-complaint against Mahoney, or remove the Lawsuit and then file various counterclaims against Mahoney, which would include claims for "breach of fiduciary duty, misappropriation of trade secrets, unfair competition, and violation of secrecy agreements." Id. at ¶ D. However, the parties "settled, fully and finally, all

claims the Parties might have against each other up to and including the date of execution of this [Settlement] including, but not limited to, those claims which have been or could have been made in the Lawsuit." Id. at E.

The "Complete General Release" reads:

> Except as stated herein, in consideration for the promises set forth in this Agreement, each Party does hereby for themselves and for their heirs, representatives, attorneys, executors, administrators, successors, and assigns, release, acquit, remise, and forever discharge the other Party, including each of their respective affiliates, subsidiaries, parent companies, related companies, partners, officers, directors, managers, servants, agents, employees, former employees, representatives, insurance carriers, and attorneys, past or present, and all persons acting under, by, through, or in concert with any of them (collectively, the "Releasees"), from any and all actions, causes of action, obligations, costs, expenses, damages, losses, claims, liabilities, suits, debts, demands, and benefits (including attorneys' fees and costs), of whatever character, in law or in equity, known or unknown, suspected or unsuspected, matured or unmatured, of any kind or nature whatsoever, based on any act, omission, event, occurrence, or nonoccurrence from the beginning of time to the date of execution hereof, including but not limited to any claims or causes of action arising out of or in any way relating to Plaintiff's employment, his alleged contract claims, or which have been or could have been made in the Lawsuit (collectively "the claims") as well as any threatened claims in any cross-complaint or counterclaims. Exception: Nothing in this Agreement shall release any of the Parties from any of their rights or obligations under the terms of this Agreement.

Id. at ¶ 7.

The "General Release of Unknown Claims" section reads:

> For the purpose of implementing a full and complete release, the Parties expressly acknowledge that this release is intended to include in its effect, without limitation, claims that the Parties did not know or suspect to exist at the time of execution hereof, regardless of whether the knowledge of such claims, or the facts upon which they might be based, would materially have affected the settlement of this matter, and the consideration given under this Agreement is also for the release of those claims and contemplates the extinguishment of any such unknown claims. In furtherance of this settlement, the Parties waive any rights they may have under California Civil Code § 1542 (and other similar statutes and regulations). . . .[4]

Id. at ¶ 10.

Section 14 of the Agreement contains subparagraphs and is entitled "Agreement Not to Infringe or Misappropriate [Deerpoint's] Intellectual Property." Paragraph 14.3, entitled "Acknowledgment of [Deerpoint's] Confidential, Proprietary, and Trade Secret Information," and

---

[4] Cal. Civ. Code § 1542 reads: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

Paragraph 14.4, entitled "Non-Disclosure," read:

> Plaintiff acknowledges that he had occasion to access, acquire, and generate knowledge and information related to DPG's business and technology, which DPG maintains as confidential or proprietary in order to maintain its competitive value. Plaintiff further acknowledges that DPG considers this information proprietary within the meaning of Paragraph 3 of Plaintiff's EIS Agreement with DPG attached as Exhibit "3" hereto, and which remains in full force and effect notwithstanding Paragraph 7 of this Agreement. Plaintiff further acknowledges that the confidential and proprietary information belonging to DPG comprises Trade Secret information ("Trade Secrets") belonging to DPG in that such information includes, without limitation, technical or nontechnical data, formulas, patterns, processes, machines, compounds and compositions, automated equipment, automated information reporting to customers, compilations, programs, laboratory or technical notebooks, financial data, financial plans, business plans, product or service plans, and lists of actual or potential customers or suppliers which (a) derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) are the subject of efforts that are reasonable under the circumstances to maintain its secrecy. By way of examples only, and not limitation, Plaintiff agrees that confidential, proprietary, and Trade Secret information belonging to DPG that is subject to this Agreement includes: (1) DPG macro and micro fertilizer formulations, whether applied via fertigation, foliar, or by ground; (2) DPG water treatment formulations; (3) All chemical delivery equipment, systems and methods for DPG fertilizer and water treatment products; (4) Commodity fertilizers delivered via DPG proprietary equipment, systems, or methods and (5) Or modifications thereof which would be considered obvious iterations of DPG IP.

Id. at ¶ 14.3.

> Plaintiff shall not divulge, communicate, use to the detriment of DPG or for the benefit of any other person or entity, or misuse in any way, any confidential, proprietary, or Trade Secret information belonging to DPG (collectively "DPG Information") identified in Paragraph 14.3 above. Any DPG Information now known or hereafter acquired by Plaintiff shall be deemed a valuable, special, and unique asset of DPG that is received by Plaintiff in confidence and as a fiduciary of DPG, and such Plaintiff shall remain a fiduciary to DPG with respect to all of such DPG Information. In addition, Plaintiff (1) will receive and hold all DPG Information in trust and in strictest confidence, (2) will take reasonable steps to protect the DPG Information from disclosure and will, in no event, take any action causing, or fail to take any action reasonably necessary to prevent, any DPG Information from losing its character as DPG Information, and (3) except as required by law, will not, directly or indirectly, use, misappropriate, disseminate or otherwise disclose any DPG Information to any third party without the prior written consent of DPG, which may be withheld in DPG's absolute and sole discretion.

Id. at ¶ 14.4.

Paragraph 14.5, entitled "Return of Tangible and Intangible Property Belonging to [Deerpoint]," required Mahoney to return any Deerpoint property, prohibited Mahoney from duplicating Deerpoint property, required Mahoney to destroy any electronic formats containing

Deerpoint property, and acknowledged that Paragraph 4 of the EIS remained in force, notwithstanding the Settlement's release provision.

Finally, the "EIS Agreement" referenced is the May 9, 2016 EIS, which Deerpoint required all its employees to sign. <u>See</u> <u>id.</u> at ¶ 14.2. Paragraph 4 of the EIS acknowledged that certain items provided to Mahoney or to which he had access were Deerpoint's property, and that Mahoney would not provide such property to third parties. <u>See</u> Complaint at Ex. 1 at ¶ 4. Paragraph 3 of the EIS addresses Deerpoint's confidential, proprietary, and trade secret information. <u>See</u> Complaint ¶ 65 & Ex. 1 at ¶ 3. Paragraph 3 of the EIS reads in relevant part:

> I agree that . . . I shall not either during or after my employment with [Deerpoint] (a) disclose to any third party, (b) use, or (c) publish any information which is secret and confidential to [Deerpoint]. Such information, it is understood, may include, but is not limited to, knowledge and data relating to processes, machines, compounds and compositions, formulas, business plans, and marketing and sales information originated, owned, controlled or possessed by [Deerpoint] and which give [Deerpoint] an opportunity to obtain an advantage over it competitors. I further understand that as a guide I am to consider information originated, owned, controlled, or possessed by [Deerpoint] which is not disclosed in printed publications stated to be available for distribution outside [Deerpoint] as being secret and Confidential to [Deerpoint]. In instances wherein doubt exists in my mind as to whether information is secret and Confidential to [Deerpoint], I will request an opinion, in writing, from [Deerpoint].

Complaint Ex. 1 at ¶ 3.

### *Discussion*

1.     Mahoney

      a.     Pre-Settlement Claims

There is actually no dispute that the Settlement is broad and releases all claims that Deerpoint and Mahoney had against each other, whether known or unknown, that existed on or before January 8, 2018. Therefore, for the sake of clarity, to the extent that the Complaint may be read to include any claims by Deerpoint against Mahoney that existed on or before January 8, 2018, those claims will be dismissed without leave to amend.

      b.     Post-Settlement Claims

      (1)     CUTSA

The California Supreme Court in *Cadence Design Systems, Inc. v. Avant! Corp.*, 29 Cal.4th 215, 217 (2002) addressed the following question: "Under the [CUTSA], when does a claim for

trade secret infringement arise: only once, when the initial misappropriation occurs, or with each subsequent misuse of the trade secret?" Immediately after identifying the question, the California Supreme Court revealed its answer: "We conclude that in a plaintiff's action against the same defendant, the continued improper use or disclosure of a trade secret after defendant's initial misappropriation is viewed under the [CUTSA] as part of a single claim of 'continuing misappropriation' accruing at the time of the initial misappropriation." Id. The California Supreme Court explained:

> From our examination of the above statutes, a distinction between a 'misappropriation' and a 'claim' emerges. A misappropriation within the meaning of the [CUTSA] occurs not only at the time of the initial acquisition of the trade secret by wrongful means, but also with each misuse or wrongful disclosure of the secret. But a claim for misappropriation of a trade secret arises for a given plaintiff against a given defendant only once, at the time of the initial misappropriation, subject to the discovery rule provided in § 3426.6. Each new misuse or wrongful disclosure is viewed as augmenting a single claim of continuing misappropriation *rather than as giving rise to a separate claim.*

Id. at 223 (emphasis added); see also id. at 227; Cypress Semiconductor Corp. v. Superior Ct., 167 Cal.App.4th 575, 583-84 (2008).

Here, the Settlement's release is broad and essentially covers all claims or causes of action that Mahoney and Deerpoint had against each other, be they known or unknown, as of January 8, 2018. The Settlement's release would include CUTSA misappropriation claims that Deerpoint had against Mahoney. Further, at the time of Settlement, Deerpoint was clearly aware that Mahoney had "misappropriated" trade secrets for purposes of CUTSA. The Settlement's "Recitals" state that Deerpoint was threatening cross-claims and counterclaims in the Lawsuit for *inter alia* misappropriation of trade secrets. See Settlement ¶ C. Under the reasoning of *Cadence Design*, when Deerpoint and Mahoney executed the Settlement, they resolved the one and only CUTSA claim that Deerpoint could bring against Mahoney.[5] See Cadence Design, 29 Cal.4th at 217, 223, 227; Cypress Semiconductor, 167 Cal.App.4th at 583-84. Although Mahoney may have continued to misappropriate the trade secrets by disclosing them to Agrigenix or using them to

---

[5] There is no argument by Deerpoint that Mahoney misappropriated different trade secrets after the Settlement was signed. Therefore, the Court will view the Complaint as alleging that the trade secrets that Mahoney misappropriated pre-Settlement are the same trade secrets that were allegedly misappropriated post-Settlement.

make competing products, those subsequent acts of misappropriation are not separate claims, they merely augment the single claim that Deerpoint could have brought against Mahoney. See id. Because Deerpoint can only have one trade secret misappropriation claim against Mahoney, and that claim was settled on January 8, 2018, the Settlement appears to bar Deerpoint's attempt to bring a CUTSA claim for post-Settlement acts of misappropriation of the same trade secrets. See id.

Deerpoint relies largely on *Junction Solutions, LLC v. MBS Dev., Inc.*, 2007 U.S. Dist. LEXIS 86958 (N.D. Ill. Nov. 21, 2007) to argue that its post-Settlement CUTSA claims are not barred.[6] In *Junction Solutions*, Junction filed suit against MBS (and others) for *inter alia* violation of the Illinois Trade Secrets Act, based on the alleged improper acquisition and use of Junction's trade secret software. See id. at *4-*5. That lawsuit settled. See id. The settlement agreement released all claims, known or unknown or accrued or unaccrued, that the parties had against each other. See id. at *18-*19. The settlement excluded actions to enforce the settlement agreement itself, and any other matter that arose after the settlement's effective date. See id. at *19. Over a year after the settlement was executed, Junction brought a second lawsuit against MBS for *inter alia* MBS's use of the same trade secret software that was the subject of the first lawsuit. See id. at *6-*7, *21. In declining to grant MBS's Rule 12(c) motion based on the settlement, the district court explained:

> Junction's current lawsuit is clearly "related to" matters which occurred prior to the Settlement Agreement. That is, Junction is suing defendants for inappropriately using and/or disclosing its trade secrets--the very same trade secrets that were at issue in Junction's first suit. . . . Were this to be the only relevant provision of the Settlement Agreement, the court's inquiry would be over as the Settlement Agreement would bar Junction's current suit. However, a review of the remainder of the Agreement muddies the water; *it is not clear that Junction intended to release claims arising from defendants' future use of the trade secrets at issue.* For example, Paragraphs 6 and 7 of the Settlement Agreement require defendants to

---

[6] Deerpoint also cites *Tire Hanger Corp. v. Shinn Fu Co. of Am.*, 2017 U.S. Dist. LEXIS 178833 (C.D. Cal. June 7, 2017) and *Management Action Programs, Inc. v. Global Leadership & Mgmt. Resources, Inc.*, 2005 U.S. Dist. LEXIS 45627 (C.D. Cal. May 18, 2005) for the proposition that parties to a release may sue for post-release conduct that is not covered by the release. The Court does not disagree with this proposition. However, that general principal is not at issue. What is at issue is whether the Settlement bars a CUTSA claim based on post-Settlement conduct and pre-Settlement misappropriated trade secrets. Neither *Tire Hanger* nor *Management Action* involved CUTSA claims, let alone the type of post-Settlement CUTSA claim alleged by Deerpoint. See Tire Hanger, 2017 U.S. Dist. LEXIS 178833 at *1, *12 (listing the claims in the case, without identifying a CUTSA claim); Management Action Programs, 2005 U.S. Dist. LEXIS 45627 at *12 (same).

return all of Junction's confidential information relating to the trade secrets at issue, renounce ownership of any of the work they did for Junction, reaffirm their confidentiality obligations under their employment agreements with Junction, and agree that the "Junction Developments and Axapta Developments . . . are the property of [Junction]."

Defendants insist that Junction is alleging one continuous claim rather than a new claim because a claim for misappropriation of a trade secret can arise only once, when the confidential relationship between the parties is initially breached. However, *the logical extension of this argument is that Junction agreed to grant defendants complete immunity from all claims relating to their use of Junction's trade secrets, a proposition that is contradicted by the aforementioned provisions. . . .* If Junction intended to release defendants from any claim arising out of defendants' future use of Junctions trade secrets, why would defendants have had to agree that those trade secrets are the property of Junction and reaffirm their confidentiality agreements with Junction beyond the Settlement Agreement?

Id. at *21-*23 (emphasis added).

Admittedly, the facts in *Junction Solutions* are very similar to the facts of this case. However, the Court is not persuaded by *Junction Solutions*.

First, as an unpublished district court case, *Junction Solutions* is persuasive authority, it is not binding precedent. Second, no other court has adopted the relevant reasoning of *Junction Solutions*. *Junction Solutions* has been cited by one other court, and only for a proposition involving the res judicata effect of a voluntary dismissal with prejudice pursuant to a settlement. See Fox v. Will Cnty., 2012 U.S. Dist. LEXIS 83122, *14-*15 (N.D. Ill. June 8, 2012). Third, as italicized above, the *Junction Solutions* court was not certain that the plaintiff intended to release claims arising from the defendants' future use of the trade secrets. This point depends on the ability for claims to arise against the defendants in the future for their use of the trade secrets at issue. However, as quoted above, *Cadence Design* has made it clear that there are no such "future" CUTSA claims for misappropriation. There is only one claim that arises for misappropriation under CUTSA, all "future claims," i.e. subsequent uses or disclosures, merely augment that one claim. Cadence Design, 29 Cal.4th at 217, 223, 227. Based on *Cadence Design*, for purposes of CUTSA, a separate future misappropriation claim against a single defendant and involving the same previously misappropriated trade secret is a legal impossibility. See id. Fourth, the Court cannot agree that a defendant like MBS (or Mahoney) would essentially obtain immunity for all future uses or disclosures of trade secrets. CUTSA does not preempt or displace breach of contract claims that are based on misappropriation of trade secrets. See Cal. Civ. Code §

3426.7(b)(1); Integral Dev. Corp. v. Tolat, 675 F. App'x 700, 704 (9th Cir. 2017); Angelica

Textile Servs., Inc. v. Park, 220 Cal.App.4th 495, 508 (2013).  It is possible for plaintiffs like

Deerpoint and Junction Solutions to obtain monetary damages and injunctive relief for the

subsequent use or disclosure of a trade secret as part of a breach of contract/settlement claim.  See

Cal. Civ. Code § 3422(3); Densmoore v. Manzarek, 2008 Cal.App.Unpub. LEXIS 4367, *142-

*143 (2008) (holding that an injunction would be proper in the context of a breach of contract in

order to prevent the artist-defendants from performing under some variation of The Doors,

because the artist-plaintiffs would have to file lawsuit after lawsuit to recover profits).

Deerpoint also argues that *Cadence Design* states that "parties to a release in a trade secret

dispute remain free to fashion the release as broadly or narrowly as they choose."  Cadence

Design, 29 Cal.4th at 226.  Deerpoint contends that the Settlement reaffirmed the confidential

relationship between the parties with respect to trade secrets and required Mahoney to return

"trade secret properties" to Deerpoint, thus preserving Deerpoint's right to future actions under

California law based on new misappropriations.  Deerpoint's argument is also a point made by

*Junction Solutions*.  See Junction Solutions, 2007 U.S. Dist. LEXIS 86958 at *23.

Deerpoint is correct that § 14 of the Settlement in part addresses and reaffirms

confidentiality/trade secret provisions of the EIS and requires Mahoney to return "trade secret

properties."  See id. at ¶¶ 14.3-14.5.  However, the Court is not convinced that these aspects of the

Settlement are sufficient to preserve/create post-Settlement CUTSA claims.  First, CUTSA does

not create any affirmative obligations to return trade secrets.[7]  That obligation is created by the

Settlement.[8]  A failure to return misappropriated trade secrets alone violates only the obligations

of the Settlement; it violates no provision of CUTSA.  Second, the Court is unaware of any place

in the Settlement that addresses either obligations or causes of action under CUTSA.  The

---

[7] To be clear, the Court is not holding that a successful CUTSA plaintiff could not obtain injunctive relief that required the misappropriator to return misappropriated trade secrets and destroy copies.  In fact, such relief would seem to be entirely reasonable, considering the nature of a trade secret.  The Court is merely noting that this is something that is not expressly part of CUTSA.

[8] The Court notes that Paragraph 4 of the EIS also obligates Mahoney to return Deerpoint's property upon his leaving the company.

Settlement reaffirms prior contractual obligations and provides for injunctive relief. However, there is no mention of CUTSA or an express attempt within the Settlement to resurrect or create a future CUTSA claim based on previously misappropriated trade secrets. It is unknown why a reaffirmation of a prior contractual obligation, without any reference to CUTSA, should be read as creating new CUTSA claims that would otherwise be contrary to CUTSA itself/*Cadence Design*'s recognition that there is only one misappropriation claim against a single defendant for misappropriation of a particular trade secret.[9] While the Court agrees that the Settlement does not prohibit future actions under "California law" regarding the misappropriated secrets, in the absence of any reference to CUTSA, that law would likely be the California law of contracts, not CUTSA. Under California law, as explained by *Cadence Design*, the parties have resolved Deerpoint's CUTSA claim. If the parties truly intended to create what would be a claim previously unknown to CUTSA through the Settlement, then language that deals with CUTSA specifically should have been used. As it stands, the Court sees future contract related claims implicated by the Settlement, but not CUTSA claims for previously misappropriated trade secrets. Third, while *Cadence Design* held that parties to a release could make it as broad or as narrow as they like, no explanations or examples were given as to what the California Supreme Court envisioned. It seems to the Court that a release may exclude CUTSA claims, or expressly incorporate CUTSA remedies for a breach of the release, or estop a party from raising certain defenses to a CUTSA claim based on the further use of a previously misappropriated trade secret. Such provisions would affect the breadth of the release, prevent the misappropriator from obtaining a *de facto* license, and, at least with respect to the first and third examples, may give an indication that parties intended for a CUTSA claim to persist. However, *Cadence Design* did not hold that merely reaffirming a prior existing contractual obligation in a release would have the effect of creating a new CUTSA cause of action where none would otherwise exist. The Court is unaware of any California case that has interpreted the relevant language of *Cadence Design*

---

[9] Because Mahoney's misappropriation of trade secrets is clearly a material breach of the EIS, Deerpoint technically had the option to terminate the contract. See Multani v. Knight, 23 Cal.App.5t h 837, 852 (2018) ("[W]hen one party to a contract breaches a material term of the contract, the other party has the option to terminate the contract for cause."). Reaffirmance of the relevant portions of the EIS indicates that the various obligations of the EIS remain in effect, irrespective of any contrary argument that might have otherwise been possible from the Settlement.

consistent with Deerpoint's position, and Deerpoint has cited none. Therefore, the Court cannot conclude that the mere fact that prior contractual obligations were reaffirmed, or that Mahoney was obligated to return or destroy Deerpoint property, would create a totally new and heretofore legally unrecognized CUTSA claim.

In sum, pursuant to *Cadence Design*, dismissal of Deerpoint's post-Settlement based CUTSA claims without leave to amend is appropriate.[10]

### (2) DTSA

The DTSA is largely modelled after the Uniform Trade Secrets Act ("UTSA"). See Great Am. Opportunities, Inc. v. Kent, 2018 U.S. Dist. LEXIS 180741, *29-*30 (D. Colo. Oct. 22, 2018); Brand Energy & Infrastructure Servs. v. Irex Contracting Grp., 2017 U.S. Dist. LEXIS 43497, *16 (E.D. Pa. Mar. 23, 2017). California adopted the UTSA without significant change through enactment of CUTSA. See Cadence Design, 29 Cal.4th at 221. States that have adopted the UTSA, like California, "consistently apply a single claim theory to misappropriations of trade secrets." Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., 805 F.3d 701, 705 (6th Cir. 2015). Further, the CUTSA provisions relied upon and examined by *Cadence Design* are materially the same as the corresponding sections of the DTSA. Cf. Cadence Designs, 29 Cal.4th at 221-23 (examining Cal. Code Civ. P. §§ 3426.1(a) (definition of "improper means"), 3426.1(b) (definition of "misappropriation"), 3426.1(d) (definition of "trade secret"), 3426.6 ("Limitations period; accrual of action") with 18 U.S.C. §§ 1836(d) ("Period of limitations"), 1839(3) (definition of "trade secret"), 1839(5) (definition of "misappropriate"), 1839(6) (definition of "improper means"). Of note, both the DTSA and CUTSA provide a three-year limitations period for misappropriation and explain that "a continuing misappropriation constitutes a single claim of misappropriation." 18 U.S.C. § 1836(d); Cal. Code Civ. P. 3426.6. Deerpoint has cited no cases that indicate the DTSA should be construed differently from the CUTSA, as interpreted by *Cadence Design*.

---

[10] Again, the Court emphasizes that Deerpoint has not identified any trade secrets that were misappropriated by Mahoney post-Settlement. Therefore, the only trade secrets that are at issue are trade secrets that were misappropriated by Mahoney pre-Settlement.

In the absence of contrary authority, and given the similarity between the DTSA and CUTSA, the Court will interpret Deerpoint's DTSA claims consistently with its CUTSA claims. Therefore, for the same reasons that the Settlement bars Deerpoint's alleged post-Settlement CUTSA claims, the Court concludes that Deerpoint's post-Settlement DTSA claims are also barred by the Settlement. Dismissal without leave to amend of Deerpoint's DTSA claims against Mahoney is appropriate.

  2.  <u>Agrigenix</u>[11]

  "A third-party beneficiary is someone who may enforce a contract because the contract is made expressly for his benefit." <u>Matthau v. Superior Ct.</u>, 151 Cal.App.4th 593, 602 (2007). "A putative third party's rights under a contract are predicated upon the contracting parties' intent to benefit it." <u>Hess v. Ford Motor Co.</u>, 27 Cal.4th 516, 524 (2002) (quoting <u>Garcia v. Truck Ins. Exchange</u>, 36 Cal.3d 4246, 436 (1984)); <u>see also</u> <u>Rodriguez v. Oto</u>, 212 Cal.App.4th 1020, 128 (2013). That is, the "test for determining whether a contract was made for the benefit of a third party is whether an intent to benefit a third person appears from the terms of the contract." <u>Cargill, Inc. v. Souza</u>, 201 Cal.App.4th 962, 967 (2011); <u>Prouty v. Gores Tech. Grp.</u>, 121 Cal.App.4th 1225, 1232 (2004). "Ascertaining this intent is a question of ordinary contract interpretation." <u>Hess</u>, 27 Cal.4th at 524; <u>Garcia</u>, 36 Cal.3d at 436. A contract is to be interpreted to give effect to the mutual intention of the parties at the time the contract was made. <u>See</u> Cal. Civ. Code § 1636; <u>Hess</u>, 27 Cal.4th at 524; <u>Rodriguez</u>, 212 Cal.App.4th at 1028. The intent of the parties is "to be ascertained from the writing alone, if possible . . . ." Cal. Civ. Code § 1639; <u>Hess</u>, 27 Cal.4th at 524; <u>Rodriguez</u>, 212 Cal.App.4th at 1028. A contract's words are to be understood in their "ordinary and popular sense," unless "used by the parties in a technical sense, or unless a special meaning is given them by usage . . . ." Cal. Civ. Code § 1644; <u>Ameron International Corp. v. Insurance Co. of State of Pa.</u>, 50 Cal.4t h at 1370, 1378 (2010). "Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous." <u>Wind Dancer Prod. Grp. v. Walt Disney Pictures</u>, 10 Cal.App.5th 56, 69 (2017). A contractual term will be

---

[11] The parties' arguments with respect to Agrigenix and the Settlement relate to the CUTSA and DTSA claims. Therefore, the Court's analysis is limited to Deerpoint's trade secret claims against Agrigenix.

"ambiguous" where, in the context of the whole contract and under the circumstances, the term is capable of two or more reasonable constructions. TRB Investments, Inc. v. Fireman's Fund Ins. Co., 40 Cal.4th 19, 27 (2006). A "contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." Cal. Civ. Code § 1647; Hess, 27 Cal.4th at 524. "The character of a contract is not to be determined by isolating any single clause or group of clauses," rather a contract "is to be construed as a whole, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Iqbal v. Ziadeh, 10 Cal.App.5th 1, 10 (2017). A third-party beneficiary "need not be named in the contract where the agreement reflects the intent of the contracting parties to benefit the unnamed party." Cargill, 201 Cal.App.4th at 967. However, a "third party who is only incidentally benefitted by performance of a contract is not entitled to enforce it." Prouty, 121 Cal.App.4th at 1233. "[T]he circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle [the third party] to demand enforcement [of the contract]." Hess, 27 Cal.4th at 524 (quoting Neverkovec v. Fredericks, 74 Cal.App.4th 337, 348 (1999)). Generally, whether a third party is an intended beneficiary under a contract is a question of fact, but if the issue "can be answered by interpreting the contract as a whole and doing so in light of the uncontradicted evidence of the circumstances and negotiations of the parties making the contract, the issue becomes one of law . . . ." Souza v. Westlands Water Dist., 135 Cal.App.4th 879, 891 (2006).

Despite the above principles of third party beneficiary contract law, there is tension in California courts regarding the proof necessary to establish standing as a third-party beneficiary. See Iqbal, 10 Cal.App.5th at 13 n.2. By describing the arguments before it, the *Iqbal* court explained the two different approaches taken by California courts:

> Plaintiff relies on [*Neverkovec*] which held a third party could not rely solely on a literal interpretation of the contractual language to prove he was an intended third-party beneficiary. Defendant relies on [*Rodriguez*], which held if the requisite intent to make someone a third-party beneficiary appears unambiguously from the face of the contract, the third party makes a prima facie showing of entitlement merely by proving the contract where the opposing party introduces no evidence to establish the contract is ambiguous.

Id. The *Iqbal* court noted that it had addressed the competing approaches in an earlier case, *Cline v. Homuth*, 235 Cal.App.4th 699 (2015), but in neither case did it take a side. See id.

The Court finds a passage from *Cline* to be particularly instructive in this case. *Cline* arose in the context of bench trial. *Cline* examined and analyzed a number of third party beneficiary cases: *Hess*, *Neverkovec*, *Rodriguez*, *General Motors Corp. v. Superior Ct.*, 12 Cal.App.4th 435 (1993), *Lama v. Comcast Cablevision*, 14 Cal.App.4th 59 (1993), and *Appleton v. Waessil*, 27 Cal.App.4th 551 (1994). After describing these cases, *Cline* concluded:

> [T]he cases vary as to their approach in determining the scope of a general release and what evidence is necessary to obtain or defeat summary judgment on the basis that the general release bars a claim against another tortfeasor. It is consistently clear, however, that the law permits a plaintiff who opposes enforcement of a general release by a third party to offer extrinsic evidence as to the circumstances surrounding negotiation and signing of the release to attempt to show that releasing "any other person," meaning everyone, does not comport with the parties' intent. Such evidence was lacking in *General Motors*, *Lama*, and *Rodriguez*. Such evidence was present in *Appleton*, *Neverkovec* (where the language of the release was ambiguous as well), and *Hess*. The issue here is once Homuth presented evidence to show she was an intended beneficiary of the release, whether Cline offered competent evidence of the parties' intent and, if so, whether this evidence was sufficient to show the parties to the release did not intend to benefit Homuth, but rather to exclude her from the protection of the release, despite its plain language which extended to the "world."

Cline, 235 Cal.App.4th at 709-10.

Here, there is a reasonable argument that Agrigenix is a third-party beneficiary to the contract. The plain language of the release is not limited to claims by or against Mahoney or Agrigenix, nor is limited to claims that arise from Mahoney's employment or to claims that relate to the Lawsuit. The release applies to every possible claim the parties could have against each other, and it identifies numerous other persons and entities as being "released" from those possible claims, including "employees," "agents," and "subsidiaries." If the release were intended to only cover Agrigenix and Mahoney, listing the numerous "third parties" would be unnecessary. Based on the plain language of the release, Agrigenix is arguably an "affiliate" or a "related company" because it was founded and run by Mahoney, or a "person acting under, by, through, or in concert with [Mahoney]," because it used the trade secrets acquired by Mahoney. Settlement ¶ 7. Through any one of these categories, Agrigenix would be a third-party beneficiary and, as discussed above with respect to Mahoney, all CUTSA claims against it would be barred.

On the other hand, while Deerpoint does not provide alternative interpretations with respect to creating ambiguous meanings, Deerpoint does address the context of the Settlement,

which is consistent with the "Recitals" section of the Settlement, and argues that Agrigenix's arguments depend on Deerpoint knowing that Agrigenix was up and running on January 8, 2018. The Court takes the latter argument as indicating that Deerpoint did not know of Agrigenix's existence.  As indicated above, the Recitals explain that Mahoney is a former employee of Deerpoint who filed administrative complaints and the Lawsuit, the Lawsuit was stayed for settlement negotiations, Deerpoint threatened cross-complaints and counterclaims regarding trade secrets, and that the parties "settled, fully and finally, all claims the Parties [i.e. Mahoney and Deerpoint] might have against each other up to and including the date of execution of this Agreement including, but not limited to, those claims which have been or could have been made in the Lawsuit."  Settlement at ¶¶ A-E.  The context of the Settlement therefore centers around the Lawsuit and the claims that could have been made as part of the Lawsuit, even if the Lawsuit was removed to federal court.  The Lawsuit involved claims by and against Deerpoint and Mahoney only, it would not involve claims against Agrigenix.  Although the language of the Settlement and its release are broader than the Lawsuit, the Lawsuit was nevertheless the impetus of the Settlement.  It is not clear that Mahoney and Deerpoint would resolve the Lawsuit as well as potential claims against Agrigenix that would not be at issue during the Lawsuit.  Further, Agrigenix is not named in the Settlement, nor do there appear to be any obligations under the Settlement that would clearly apply to Agrigenix.  The Court understands that Mahoney and Agrigenix are separate entities.  Given the zealousness with which Deerpoint appears to protect its trade secrets, it seems unlikely that Deerpoint would fail to mention Agrigenix or fail to include any provisions that would expressly prohibit Agrigenix from using or disclosing Deerpoint's trade secrets.[12]  Cf. Hess, 27 Cal.4th at 527 (finding that the small amount of the settlement, along with

---

[12] Paragraph 14.6 in relevant part states that Mahoney recognizes and acknowledges that Deerpoint "shall be entitled to an injunction from any court of competent jurisdiction enjoining and restraining any breach or violation of any or all of the covenants set forth in Paragraphs 14.1 to 14.5 [which includes trade secret confidentiality] by [Mahoney] or any company with which he is affiliated or in which he holds an ownership interest . . . .  Nothing contained in this Paragraph 14.6 shall be construed to prevent [Deerpoint] from seeking and receiving from [Mahoney], or from any company with which he is affiliated or in which he holds an ownership interest, damages sustained by [Deerpoint] . . . ."  Id. at ¶ 14.6.  This paragraph clearly addresses companies that Mahoney may work for or have some connection or ownership interest in, which would include Agrigenix.  However, Paragraph 14.6 is an acknowledgement by Mahoney that Deerpoint can seek relief against such a company, it creates no actual obligations on, or penalties against, such a company, nor does it guarantee injunctive relief will issue against such a company.  Paragraph 14.6 is relevant to the parties' intentions, but it does not definitively show that Agrigenix is or is not an intended third-party beneficiary.

the failure to mention a third party company despite counsel for both signatories knowing of the plaintiff's claims against the third party company, indicated a lack of intent to bestow a benefit upon the third party company). Finally, if Deerpoint did not know of Agrigenix's existence, it is debatable whether the parties intended to bestow a benefit on Agrigenix.

The discussion in *Cline* illustrates that third-party beneficiary cases are usually decided after the submission of evidence regarding the parties' intent, including evidence about the negotiations and circumstances of the contract. Indeed, *Cline* distilled the legal principle that "the law permits a plaintiff who opposes enforcement of a general release by a third party to offer extrinsic evidence as to the circumstances surrounding negotiation and signing of the release to attempt to show that releasing 'any other person,' meaning everyone, does not comport with the parties' intent." Cline, 235 Cal.App.4th at 709. This principle has generally been followed either through a bench trial or summary judgment. The Court does not have the benefit of such evidence in this case, nor could it in the procedural context of a Rule 12(b)(6) motion.[13] See Fed. R. Civ. P. 12(d) (explaining that if matters outside the pleadings are considered, the motion is converted to a Rule 56 motion for summary judgment); In re NVIDIA, 768 F.3d at 1051 (identifying the matters that may be considered in resolving a Rule 12(b)(6) motion). Given the procedural posture of the case, as well as the arguments of the parties and the Settlement itself, Deerpoint should be given the opportunity to submit evidence regarding the parties' intent, including the negotiations and the circumstances of the Settlement. See Cline, 235 Cal.App.4th at 709.

Agrigenix's reply memorandum correctly points out that the Complaint alleges that Agrigenix acted in concert with Mahoney. Agrigenix contends that this is a judicial admission. "Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988). Factual assertions in a complaint, unless amended, are conclusively binding judicial admissions. Id.

---

[13] The Court could order the parties to present evidence, which would convert the Rule 12(b)(6) motion into a motion for summary judgment. Fed. R. Civ. P. 12(d). However, no party has requested conversion of the Rule 12(b)(6) motion, and it is highly likely that necessary discovery has not yet occurred. Cf. Fed. R. Civ. P. 56(d) (addressing denials of summary judgment when inadequate discovery has occurred). Therefore, the Court will not order the parties to submit evidence and convert this motion to a Rule 56 motion for summary judgment.

Here, the Court cannot hold that Deerpoint has made binding judicial admissions. First, Agrigenix's invocation of a judicial admission was made for the first time in its reply, and thus, Deerpoint has not had an opportunity to respond. Second, the relevant allegations were made by Deerpoint on "information and belief." Courts appear to be reluctant to construe allegations expressly made on "information and belief" as binding judicial admissions. See Corinth Inv'rs Holdings v. Evanston Ins. Co., 2014 U.S. Dist. LEXIS 118008, *6 n.1 (E.D. Tex. Aug. 24, 2014); Carl E. Woodward, LLC v. Acceptance Indem. Co., 2011 U.S. Dist. LEXIS 3121, *11 (S.D. Miss. Jan. 12, 2011); Diarama Trading Co. v. J. Walter Thompson U.S.A., Inc., 2005 U.S. Dist. LEXIS 19496, *30 (S.D. N.Y. Sep. 6, 2005). Third, even if Agrigenix acted in concert with Mahoney, and thus fits the literal language of the release, that does not necessarily establish that the parties intended for Agrigenix to be a third-party beneficiary. Cf. Hess, 27 Cal.4th at 525-27 (finding that the extrinsic evidence and other aspects of the settlement established that the contracting parties did not intend to release a company from liability, despite the company falling within the literal language of the release). Therefore, the Court will not hold that the relevant allegations made under "information and belief" constitute binding judicial admissions.

In sum, because the Court cannot hold on this record that Agrigenix is a third-party beneficiary, dismissal of the trade secret claims against Agrigenix on the basis of a settlement bar is inappropriate. See Cline, 235 Cal.App.4th at 709.

## 2. CONVERSION OF CONTRACT TO CLAIMS TO TORTS – 1st, 2nd, 5th, 7th, 8th, and 9th Causes of Action

*Defendants' Arguments*

Deerpoint argues that contract and tort law are different branches of law and serve different functions, contract law enforces binding agreements between parties and tort law vindicates social policy. Tort damages are not to be judicially extended in order to fashion a remedy for breach of a contractual provision. The Complaint improperly attempts to bring tort claims that are based on breaches of the duties imposed by the EIS and Settlement. Because these six claims represent an attempt to convert contract claims into tort claims, they should be dismissed.

1  *Plaintiff's Opposition*

2  Deerpoint argues that the two cases relied upon by Defendants are distinguishable.  Neither

3  case supports the notion that tort claims that are exempt from a settlement agreement are somehow

4  per se barred if brought alongside a claim for breach of that agreement.  The arguments are merely

5  an attempt to lay the ground work for a petition to compel arbitration and should be rejected.

6  *Discussion*

7  Defendants' arguments are based largely on citations to two California cases:  *Foley v.*

8  *Interactive Data Corp.*, 47 Cal.3d 654 (1988) and *Lazar v. Superior Ct.*, 12 Cal.4th 631, 646

9  (1996).  In *Foley*, the California Supreme Court declined to permit the recovery of tort remedies

10  for the breach of the covenant of good faith and fair dealing.  See *Foley*, 47 Cal.3d at 700.  As part

11  of its analysis, *Foley* recognized the distinction between tort and contract law - contract law

12  enforces the intentions of the individual contracting parties, but tort law vindicates a society's

13  "social policy."  Id. at 683.  *Lazar* addressed the circumstances in which a plaintiff may pursue a

14  claim of fraudulent inducement of an employment contract.  *Lazar*, 12 Cal.4th at 635.  *Lazar* cited

15  *Foley* for the proposition that tort damages should not be judicially extended in order to fashion

16  remedies for the breach of a contract.  *Lazar*, 12 Cal.4th at 646.

17  Consistent with *Foley* and *Lazar*, a litigant "may not ordinarily recover in tort for the

18  breach of duties that merely restate contractual obligations."  Aas v. Superior Ct., 24 Cal.4th 627,

19  643 (2000).[14]  However, it is possible for the same conduct to "constitute both a breach of contract

20  and an invasion of an interest protected by the law of torts."  Erlich v. Menezes, 21 Cal.4th 543,

21  551 (1999).  That is, "[c]ourts will generally enforce the breach of a contractual promise through

22  contract law, except when the actions that constitute the breach violate a social policy that merits

23  the imposition of tort remedies."  Aas, 24 Cal.4th at 643; Erlich, 21 Cal.4th at 551.  "[C]onduct

24  amounting to a breach of contract becomes tortious only when it also violates a duty independent

25  of the contract arising from principles of tort law."  Aas, 24 Cal.4th at 643; Erlich, 21 Cal.4th at

26  551.  "An omission to perform a contract obligation is never a tort, unless that omission is also an

27

28  [14] Superseded by statute on other grounds as explained in Rosen v. State Farm Gen. Life Ins. Co., 30 Cal.4th 1070, 1079-80 (2003).

omission of a legal duty." Erlich, 21 Cal.4th at 551; Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal.4th 503, 515 (1994).

### a. First Cause of Action

The first cause of action is for a violation of federal law, the DTSA (18 U.S.C. § 1836). As applied to the DTSA, Defendants' arguments essentially amount to an attempt to impose a state law defense on a federal cause of action. Such an attempt is improper and unavailing. See Wallis v. Spencer, 202 F.3d 1126, 1144 (9th Cir. 1999); see also Haywood v. Drown, 556 U.S. 729, 763 (2009) (Thomas, J., dissenting) ("Second, Florida's sovereign immunity rule violated the Supremacy Clause by operating as a state-law defense to a federal law."); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 263 (1985) (Brennan, J., dissenting) (". . . because state law defenses would not of their own force be applicable to federal causes of action.").

### b. Second Cause of Action

The second cause of action is for violation of CUTSA. As discussed above, there are no viable CUTSA claims alleged against Mahoney. Further, although CUTSA claims remain against Agrigenix, Agrigenix was not a signatory to either the EIS or the Settlement, and Deerpoint alleges no breach of contract claims against Agrigenix. Without a contractual duty owed by Agrigenix to Deerpoint, Agrigenix's arguments have no possible application to the remaining CUTSA claims.

### c. Fifth & Seventh Causes of Action

The fifth and seventh causes of action are alleged against Mahoney for breaches of the covenant of good faith and fair dealing. There is no indication that Deerpoint is attempting to obtain tort damages for these claims. Further, there is nothing improper about Deerpoint alleging breach of contract claims as well as separately alleging related claims for breaches of the covenant of good faith and fair dealing. "*Although breach of the implied covenant often is pleaded as a separate count*, a breach of the implied covenant is necessarily a breach of contract." Digerati Holdings, LLC v. Young Money Entm't, LLC, 194 Cal.App.4th 873, 885 (2011) (emphasis added) (citing Careau & Co. v. Security Pac. Bus. Credit, Inc., 222 Cal.App.3d 1371, 1393-94 (1991)). As an example, *Foley* involved separately alleged claims for breach of contract and breach of the

23

covenant of good faith and fair dealing. See Foley, 47 Cal.3d at 662, 671, 678. Because

Deerpoint's claims for breach of the covenant of good faith and fair dealing are contract claims,

there is no improper expansion of tort remedies as prohibited by *Foley*. Dismissal of the fifth and

seventh causes of action is not appropriate.

### d. Eighth Cause of Action - IIPEA

One of the elements of an IIPEA claim is that the defendant engaged in an independently

wrongful act, that is, an act that is "wrongful by some legal measure other than the fact of

interference." Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal.4th 376, 393 (1995). An

act is "independently wrongful" if it is "proscribed by some constitutional, statutory, regulatory,

common law, or other determinable legal standard." Korea Supply Co. v. Lockheed Martin Corp.,

29 Cal.4th 1134, 1139 (2003).

Deerpoint alleges that Mahoney's conduct was independent of the interference because "it

violated federal and/or state laws against trade secret misappropriation, and/or was dependent

upon [Mahoney's] breaches of [the EIS] with Deerpoint and the covenant good faith and fair

dealing implied therein, and/or was dependent upon Mahoney's breaches of his Settlement

Agreement with Deerpoint and the covenant of good faith and fair dealing. . . . Defendants'

conduct was wrongful, independent of any interference with the agreement or relationship that

existed between Deerpoint and its customers, because such interference was facilitated by

Defendants' independent misappropriation of Deerpoint's confidential, proprietary, and trade

secret information, and thus falls outside the bounds of fair competition." Complaint ¶¶ 147, 148.

From these allegations, Deerpoint's Complaint identifies essentially two types of wrongful acts:

breaches of contract and trade secret misappropriation.[15]

---

[15] In a separate portion of Deerpoint's opposition, it references Paragraphs 81, which alleges disparaging comments by Defendants against Deerpoint to third-parties who decided to hire Agrigenix. However, the IIPEA claim expressly identifies the wrongful acts at issue in Paragraphs 147 and 148. "Disparagement" is conspicuously absent from Paragraphs 147 and 148. It is true that Paragraph 144 incorporates by reference Paragraphs 1 to 143. However, incorporating literally all 143 preceding paragraphs, without specific reference to either disparagement or Paragraph 81, does not give Defendants (or the Court) fair notice of the factual bases of the IIPEA claim. See Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1321-23 (11th Cir. 2015) (describing four different types of improper pleadings that fail to give a defendant fair notice, including "the mortal sin of re-alleging all preceding counts"); JN Grp. Holdings, Inc. v. Ryan, 2018 U.S. Dist. LEXIS 9215, *7 (D. Haw. Jan. 19, 2018); Salcido v. Vericrest Fin. & Summit Mgmt. Co., LLC, 2013 U.S. Dist. LEXIS 158640, *22 (N.D. Cal. Nov. 5, 2013). The Court will not read the IIPEA claim as being based to any degree on "disparagement." See Weiland, 795 F.3d at 1321-23.

1   With respect to breaches of contract, including breaches of the covenant of good faith and

2   fair dealing, see Digerati Holdings, 194 Cal.App.4th at 885, this conduct does not form the basis

3   of a valid interference with prospective economic advantage claim.  Under California law, a

4   breach of contract cannot constitute the "wrongful" conduct required for the tort of interference

5   with prospective economic advantage.  Youngevity Int'l v. Smith, 2018 U.S. Dist. LEXIS 168286,

6   *19 (S.D. Cal. Sept. 28, 2018); Vigdor v. Super Lucky Casino, Inc., 2017 U.S. Dist. LEXIS

7   97681, *22 (N.D. Cal. June 23, 2017); JRS Products, Inc. v. Matsushita Elec. Corp. of Am., 115

8   Cal.App.4t h 168, 181-82 (2004); Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co., 47

9   Cal.App.4th 464, 479 (1996).  Therefore, dismissal of the eighth cause of action to the extent that

10  it relies on a breach of contract as a "wrongful act" is appropriate.

11  With respect to trade secret misappropriation, i.e. CUTSA, this statutory claim exists

12  separate and apart from any contract.  The duties imposed by CUTSA do not depend upon any

13  contractual relationship.  Because the duties of CUTSA are statutory and independent of contracts,

14  the IIPEA claim does not improperly attempt to obtain tort remedies for breaches of contract.  See

15  Aas, 24 Cal.4th at 643; Erlich, 21 Cal.4th at 551.  Therefore, dismissal based on an improper

16  attempt to expand tort remedies to contract claims is not appropriate.

17              e.      Ninth Cause of Action

18  The ninth cause of action is a statutory UCL claim.  Deerpoint's statutory UCL claim

19  exists separate and apart from any contract.  The duties imposed by the UCL do not depend upon

20  any contractual relationship.  Because the duties of the UCL are statutory and independent of

21  contracts, this claim does not improperly attempt to obtain tort remedies for breaches of contract.

22  See Aas, 24 Cal.4th at 643; Erlich, 21 Cal.4th at 551.  Therefore, dismissal of the UCL claim

23  based on an improper attempt to expand tort remedies to contract claims is not appropriate.

24

25  **3.**      **CUTSA PREEMPTION – 5th, 7th, 8th, and 9th Causes of Action**

26          *Defendants' Arguments*

27  Defendants argue that four the Complaint's claims are preempted by CUTSA.  CUTSA is a

28  comprehensive statute that is intended to occupy the field of common law trade secret

25

misappropriation law. To that end, CUTSA will preempt civil, non-contractual claims that if there is no material distinction between the wrongdoing alleged under CUTSA and wrongdoing alleged under the civil claim. The fifth, seventh, eighth, and ninth causes of action all arise from the nucleus of operative facts as Deerpoint's CUTSA claim. Therefore, these claims are preempted and should be dismissed.

*Plaintiff's Opposition*

Deerpoint argues that there are no preemption problems. The fifth and seventh causes of action (breaches of the covenant of good faith and fair dealing) are contract based, and CUTSA expressly does not preempt contractual claims. The eighth cause of action (IIPEA) is based on Defendants' disparagement of Deerpoint to four former Deerpoint clients. Since disparagement is conduct that is different from the acts supporting the CUTSA claim, the eighth cause of action is not preempted. Further, the ninth claim (UCL) is properly pled and has a nucleus of fact that is separate from the CUTSA claims. Therefore, it also represents "wrongful conduct" that supports the IIPEA claim. Finally, the ninth cause of action (UCL) includes allegations that track the IIPEA claim, namely that Defendants disparaged Deerpoint. Because the UCL is grounded on disparagement, it has a nucleus of operative fact that is separate from the CUTSA claims.

*Legal Standard*

CUTSA enjoys a comprehensive structure and breadth. Angelica Textile, 220 Cal.App.4th at 505; K.C. Multimdedia, Inc. v. Bank of Am. Tech. & Operations, Inc., 171 Cal.App.4th 939, 957 (2009). CUTSA has a specific provision that addresses preemption. See Cal. Civ. Code § 3426.7; Angelica Textile, 220 Cal.App.4th at 505. CUTSA does not preempt or supersede any statute relating to misappropriation of trade secrets or any statute that otherwise regulates trade secrets. See Cal. Civ. Code § 3426.7(a). Importantly, CUTSA "does not affect (1) contractual remedies, whether or not based upon misappropriation of a trade secret, (2) other civil remedies that are not based upon a misappropriation of a trade secret, or (3) criminal remedies." Cal. Civ. Code § 3426.7(b). Therefore, § 3426.7 "expressly allows contractual and criminal remedies, whether or not based on trade secret misappropriation," but "implicitly preempts alternative civil remedies based on trade secret misappropriation." Angelica Textile, 220 Cal.App.4th at 505.

CUTSA provides the "exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies based upon misappropriation of a trade secret." Silvaco Data Systems v. Intel Corp., 184 Cal.App.4th 210, 236 (2010).[16] "[T]he determination of whether a claim is based on trade secret misappropriation is largely factual." Angelica Textile, 220 Cal.App.4th at 505. CUTSA preempts/supersedes civil, non-contract claims "based on the same nucleus of facts as trade secret misappropriation." Silvaco Data, 184 Cal.App.4th at 232; K.C., 171 Cal.App.4th at 962; see also Angelica Textiles, 220 Cal.App.4th at 506.

*Discussion*

a.    5th & 7th Causes of Action – Good Faith & Fair Dealing

Contract claims are expressly outside of CUTSA's preemptive scope. See Cal. Civ. Code § 3426.7(b)(1); Angelica Textile, 220 Cal.App.4th at 505; K.C., 171 Cal.App.4th at 954. Because a claim for breach of the covenant of good faith and fair dealing is a contract claim, see Digerati Holdings, 194 Cal.App.4th at 885, it is expressly not preempted/superseded by CUTSA. See Cal. Civ. Code § 3426.7(b)(1); Angelica Textile, 220 Cal.App.4th at 505; K.C., 171 Cal.App.4th at 954.

b.    8th Cause of Action – IIPEA

The elements of a claim for IIPEA are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's actions. Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc., 2 Cal.5th 505, 512 (2017); Redfearn v. Trader Joes Co., Inc., 20 Cal.App.5th 989, 1005 (2018). Courts have recognized that, if an interference with prospective economic advantage claim is based on the same nucleus of facts as a CUTSA trade secret misappropriation claim, then the IIPEA tort is preempted by CUTSA. See Switchboard, Inc. v. Panama jack, Inc., 2014 U.S. Dist. LEXIS 197849, *15-*17 (C.D. Cal. Dec. 15, 2014); Farmers Ins. Exch. v. Steele Ins. Agency, Inc., 2013 U.S. Dist. LEXIS 104606, *25-*27 (E.D. Cal. July 23, 2013); RSPE Audio Sols., Inc. v. Vintage

---

[16] Disapproved on other grounds by Kwikset Corp. v. Superior Ct., 51 Cal.4th 310, 337 (2011).

King Audio, Inc., 2013 U.S. Dist. LEXIS 2909, *5-*7 (C.D. Cal. Jan. 7, 2013).

As explained above, the Court dismissed the IIPEA claim to the extent that it is based on breaches of contract. Therefore, the allegations in the Complaint show that the remaining basis of the IIPEA claim is trade secret misappropriation in violation of CUTSA. It goes without saying that wholesale reliance on a violation of CUTSA necessarily means that the IIPEA and CUTSA misappropriation claims share a common nucleus of operative facts. Therefore, CUTSA preempts Deerpoint's IIPEA claim to the extent it is based on the misappropriation of trade secrets. Dismissal of the IIPEA claim is appropriate.[17]

    c.       Ninth Cause of Action – UCL[18]

The UCL broadly proscribes the use of any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code. § 17200; Beaver v. Tarsadia Hotels, 816 F.3d 1170, 1177 (9th Cir. 2016). "The UCL operates as a three-pronged statute: 'Each of these three adjectives [unlawful, unfair, or fraudulent] captures a 'separate and distinct theory of liability.'" Beaver, 816 F.3d at 1177 (quoting Rubio v. Capital One Bank, 613 F.3d 1195, 1203 (9th Cir. 2010)).

In relevant part, the Complaint alleges that Defendants' conduct "constitutes 'unlawful,' 'unfair,' and/or 'fraudulent' business practices in violation of the unfair competition provisions of the [UCL], in that the alleged conduct by Defendants, and each of them, was a concerted plan directly intended to deprive Deerpoint of customer relationships that Deerpoint expected would continue, in quick succession, in order to disrupt Deerpoint's business for the benefit of Agrigenix." Complaint ¶ 152. Further, Defendants "knew that by stealing and using Deerpoint's confidential, proprietary, and trade secret information . . . they engaged in unfair business practices by acting in violation of Cal. Civ. Code § 3426 and 18 U.S.C. § 1836. . . . [Mahoney used, and continues to use], Deerpoint's confidential, proprietary, and trade secret information

---

[17] As discussed in Footnote 15, supra, the IIPEA allegations do not provide fair notice that the claim is based on "disparagement." Therefore, the Court does not consider arguments based on "disparagement." See Weiland, 795 F.3d at 1321-23. Further, the Complaint does not indicate that a UCL claim also forms a basis for the IIPEA claim.

[18] Deerpoint's opposition defends its UCL claim by arguing it is based on IIPEA and disparagement. The allegations under the UCL do not reference disparagement. The UCL claim suffers from the improper shotgun tactic of incorporating by reference every single paragraph that preceded it. Therefore, just as with the IIPEA claim, the Court will not consider any arguments in support of the UCL claim that are based on disparagement. See Weiland, 795 F.3d at 1321-23; Footnotes 15 & 17, supra.

unlawfully, plainly in violation of [the EIS], [the Settlement], . . . and basic principles of professional decency."  Id. at ¶ 153.  From these allegations, the Court gleans three basic acts that constitute either unfair or unlawful conduct by Defendants:  (1) breaches of contract; (2) trade secret misappropriation; and (3) committing IIPEA.

<u>(1)</u>      <u>IIPEA</u>

The Court has found that no plausible IIPEA claim is stated.  To the extent that Deerpoint relies on an actionable IIPEA claim to support a UCL claim, the UCL claim fails and dismissal is appropriate.  <u>Krantz v. BT Visual Images, L.L.C.</u>, 89 Cal.App.4th 164, 178 (2001) (holding that a UCL claim will "rise or fall depending on the state of the antecedent substantive causes of action."); <u>see</u> <u>Fresno Motors, Ltd. Liab. Co. v. Mercedes Benz USA, Ltd. Liab. Co.</u>, 771 F.3d 1119, 1135 (9th Cir. 2014) (same); <u>Vargas v. JP Morgan Chase Bank, N.A.</u>, 30 F.Supp.3d 945, 953 (C.D. Cal. 2014) (same); <u>Shalaby v. Bernzomatic</u>, 281 F.R.D. 565, 576 (S.D. Cal. 2012) (same); <u>Johnson v. Hewlett-Packard Co.</u>, 809 F.Supp.2d 1114, 1139 (N.D. Cal. 2011) (same).

<u>(2)</u>      <u>Trade Secrets</u>

With respect to violations of the trade secret laws, as noted above, CUTSA will not preempt non-trade secret related civil claims if the civil claims do not share a common nucleus of operative facts with the CUTSA misappropriation claim.  <u>See</u> Cal. Civ. Code § 3426.7(b)(2); <u>Silvaco Data</u>, 184 Cal.App.4th at 232; <u>K.C.</u>, 171 Cal.App.4th at 962.  Here, because the Complaint's UCL claim identifies the trade secret statutes and then alleges trade secret misappropriation through use and disclosure, the Complaint's UCL claim is clearly based on the same nucleus of operative facts as the CUTSA claim.  Therefore, to the extent that Deerpoint's UCL claim relies on trade secret misappropriation, CUTSA preempts the UCL claim and dismissal is appropriate.  <u>See</u> <u>K.C.</u>, 171 Cal.App.4th at 961-62 (finding that a UCL claim that was based on the same nucleus of operative facts as a CUTSA claim was preempted); <u>see also</u> <u>Waymo, LLC v. Uber Techs., Inc.</u>, 256 F.Supp.3d 1059, 1064 (N.D. Cal. 2017) (same); <u>Norsat Int'l v. B.I.P. Corp.</u>, 2014 U.S. Dist. LEXIS 74953, *33-*34 (S.D. Cal. May 30, 2014) (same); <u>RSPE Audio Sols., Inc. v. Vintage King Audio, Inc.</u>, 2013 U.S. Dist. LEXIS 2909, *5-*7 (C.D. Cal. Jan. 7, 2013) (same).

### (3)    Breach of Contract[19]

California courts hold that a breach of contract claim will not support a UCL claim unless the conduct that constitutes a breach of conduct is also "unfair, unlawful, or fraudulent," as those terms are understood under the UCL.[20]  See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1152 (9th Cir. 2008); Arce v. Kaiser Found. Health Plan, Inc., 181 Cal.App.4th 471, 489 (2010); Puentes v. Wells Fargo Home Mortgage, Inc., 160 Cal.App.4th 638, 645 (2008).

Here, the allegations under the UCL claim do not identify "fraudulent" conduct,[21] and they do not explain how any conduct, let alone breaching conduct, fits the "unfair" prong.[22]  Rather, the conduct identified as breaching contracts relates to obtaining, disclosing, and using trade secrets, i.e. misappropriation.  See Complaint ¶ 153; Doc. No. 14 at 23:27-28 ("Deerpoint acknowledges that [¶ 153] highlights Defendants' alleged trade secret misappropriation.").  This breaching conduct implicates CUTSA, and thus the "unlawful" prong of the UCL.  See In re Vaccine Cases, 134 Cal.App.4th 438, 457 (2005) (noting that an allegation of a statutory violation is an allegation of "unlawful" conduct, rather than "unfair" or deceptive conduct).  However, a violation of

---

[19] There is no contractual relationship between Deerpoint and Agrigenix.  Therefore, a breach of contract based UCL claim is only possible against Mahoney.

[20] The terms "unlawful," "unfair," and "fraudulent" are terms of art under the UCL.  "A business practice is 'fraudulent' under the UCL if members of the public are likely to be deceived."  Davis v. HSBC Bank, 691 F.3d 1152, 1169 (9th Cir. 2012) (citing Puentes, 160 Cal.App.4th at 645).  The UCL's "unlawful" prong "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL," and that "virtually any law or regulation – federal or state, statutory or common law – can serve as a predicate . . . ." Candelore v. Tinder, Inc., 19 Cal.App.5th 1138, 1155 (2018).  California law with respect to "unfair" conduct is currently "in flux."  Hodsdon v. Mars, Inc., 891 F.3d 857, 866 (9th Cir. 2018).  Conduct is "unfair" either when it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition," or when it "'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Id.

[21] UCL claims that are based on "fraudulent" conduct must meet Rule 9(b)'s heightened pleading standard, meaning that the "who, what, when, where, and how" of the fraudulent conduct, as well as what conduct/statement is misleading and why it is false, must be expressly alleged.  Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 964 (9th Cir. 2018).  Although the allegations under the UCL indicate that Defendants engaged in fraudulent conduct, the allegations do not meet Rule 9(b)'s pleading standards.  Indeed, the allegations under the UCL do not attempt to identify any "fraudulent" conduct.  Although other paragraphs in the Complaint may indicate "fraudulent" conduct, the shotgun incorporation by reference of literally every prior allegation that preceded the UCL claim is improper and does not meet Rule 8 standards, let alone Rule 9 standards.  See Weiland, 795 F.3d at 1321-23.

[22] Again, other allegations in the Complaint may indicate "unfair" conduct.  However, Deerpoint's shotgun incorporation by reference of every prior allegation that preceded the UCL claim is improper and does not meet Rule 8 standards.  See Weiland, 795 F.3d at 1321-23; Footnotes 15, 17, & 18, supra.

CUTSA cannot form the basis of a UCL claim because of CUTSA's preemptive scope.  See Waymo, 256 F.Supp.3d at 1064; K.C., 171 Cal. App. at 961-62.  As Deerpoint does not explain how any breach of contract by Mahoney constituted "unlawful," "unfair," or "fraudulent" conduct, the breaches of contract cannot form the basis of a UCL claim.

In sum, dismissal of the UCL claim is appropriate.  See Sybersound Records, 517 F.3d at 1152; Arce, 181 Cal.App.4th at 489; Puentes, 160 Cal.App.4th at 645.

**4.      SUPERFLUOUS CLAIMS – 5th and 7th Causes of Action**

*Defendants' Arguments*

Mahoney argues that the fifth and seventh causes of action are nothing more than a straightforward breach of contract claim.  Because Deerpoint has already alleged the same breaches as part of its breach of contract claim, the fifth and seventh causes of action should be dismissed as superfluous.

*Plaintiff's Opposition*

Deerpoint argues that it has properly alleged two implied covenant claims.  First, with respect to the fifth cause of action, the Complaint alleges that Mahoney unfairly interfered with its expectation that its employees would uphold the confidentiality and secrecy of its trade secrets.  This expectation flows from Deerpoint's corporate culture.  Mahoney breached the covenant/expectation by disclosing protected materials to Agrigenix and by failing to take steps as an Agrigenix executive from publishing portions of Deerpoint's trade secrets.  Second, with respect to the seventh cause of action, the Complaint alleges that Mahoney unfairly interfered with its expectation that he would uphold the confidentiality and secrecy of its trade secrets.  Mahoney breached that expectation by disclosing trade secrets to Agrigenix and by failing to take steps as an Agrigenix executive to prevent Agrigenix from publishing portions of Deerpoint's trade secrets.  Deerpoint argues that, although both the fifth and the seventh causes of actions have facts that overlap with the fourth and sixth causes of action (for breach of contract), two claims can be distinguished, one for breach of contract and one for breach of the implied covenant of good faith and fair dealing.

*Legal Standard*

2        "The covenant of good faith and fair dealing, implied by law in every contract, exists

3    merely to prevent one contracting party from unfairly frustrating the other party's right to receive

4    the benefits of the agreement actually made."  Guz v. Bechtel Nat'l, Inc., 24 Cal.4th 317, 349

5    (2000); see also Digerati Holdings, 194 Cal.App.4th at 885.  "[T]he scope of conduct prohibited

6    by the covenant of good faith is circumscribed by the purposes and express terms of the contract."

7    Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., 2 Cal.4th 342, 373

8    (1992); see Digerati Holdings, 194 Cal.App.4th at 885.  "Although breach of the implied covenant

9    often is pleaded as a separate count, a breach of the implied covenant is necessarily a breach of

10   contract."  Digerati Holdings, 194 Cal.App.4th at 885; see Careau & Co., 222 Cal.App.3d at 1393-

11   94.  However, if the plaintiff's allegations of breach of the covenant of good faith "do not go

12   beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek

13   the same damages or other relief already claimed in a companion contract cause of action, they

14   may be disregarded as superfluous as no additional claim is actually stated."  Bionghi v. Metro.

15   Water Dist., 70 Cal.App.4th 1358, 1370 (1999); Careau & Co., 222 Cal.App.3d at 1395.  That is,

16   "where breach of an actual [contract] term is alleged, a separate implied covenant claim, based on

17   the same breach, is superfluous."  Guz, 24 Cal.4th at 327; see also id. at 352.

18       *Discussion*[23]

19       1.       Fifth Cause of Action

20        The fifth cause of action is based on the EIS.  See Complaint ¶ 124.  In relevant part, the

21   fifth cause of action alleges:  "Mahoney . . . unfairly interfered with Deerpoint's right to receive

22   the benefit of the [EIS], namely, the expectation that its employees would uphold the

23 _____

24   [23] Deerpoint's opposition cites Paragraphs 72, 75, and 77 in support of its assertion that Mahoney did not stop
     Agrigenix from publishing certain aspects of Deerpoint's trade secrets.  See Doc. No. 14 at p.20.  As detailed below,
     neither the substance of Paragraphs 72, 75, and 77 nor an express reference to those paragraphs are found under the
25   fifth and seventh causes of action.  Like all of the other causes of action, the fifth and seventh causes of action
     incorporate by reference literally every prior allegation that preceded them.  See Complaint ¶¶ 123, 139.  Again, this
26   form of shotgun pleading is improper and does not provide sufficient notice that Deerpoint is relying on conduct by
     Mahoney as an Agrigenix executive to prevent publication of trade secrets by Agrigenix.  See Weiland, 795 F.3d at
27   1321-23.  Therefore, the Court's analysis will not consider or discuss any argument based on the incorporation of
     Paragraphs 72, 75, or 77 of the Complaint.  See id.; Footnotes 14 and 16, *supra*.

28

confidentiality and trade secret protection of Deerpoint's confidential, proprietary, and trade secret information." <u>Id.</u> at ¶ 126.

Relatedly, the fourth cause of action is for breach of the EIS. The Complaint alleges that, through the EIS, Mahoney "understood that [his] employment at Deerpoint may give him access to Deerpoint's confidential information, and that [he] was not to disclose, use, or publish any confidential information belonging to Deerpoint, either during or after employment with the Company." Complaint ¶ 115. Also under the EIS, Mahoney had access to a variety of tangible "items" that remained Deerpoint's property, would not be made available to third parties, and were to be returned to Deerpoint if the property was in Mahoney's possession. <u>Id.</u> at ¶ 116. Mahoney allegedly breached the EIS by (1) accessing, copying, using, and/or disclosing to Agrigenix Deerpoint's confidential, proprietary, and trade secret information, and (2) failing to take steps to return Deerpoint's "property." <u>See id.</u> at ¶¶ 117, 118.

From the above allegations, the conduct that allegedly breached the covenant of good faith and fair dealing is the same conduct that breached other provisions of the EIS. Both claims are premised on failing to return property and not using, misappropriating, or divulging Deerpoint's confidential trade secrets. The "expectation" that trade secret information would stay secret is clearly encompassed within the third and fourth paragraphs of the EIS. That expectation is nothing more than the assumption that Mahoney (and all other employees) would follow the contract and not commit a breach of an express contractual term. Because the fifth cause of action does not contain any conduct that is different or separate from the breaches alleged in the fourth cause of action, the fifth cause of action is redundant and will be dismissed. <u>See</u> <u>Trombley Enters., LLC v. Sauer, Inc.</u>, 2018 U.S. Dist. LEXIS 159410, *9-*11 (N.D. Cal. Sep. 17, 2018) (relying on *Careau & Co.* and dismissing redundant implied covenant claim); <u>Dedicato Treatment Ctr. v. Cigna Health & Life Ins. Co.</u>, 2017 U.S. Dist. LEXIS 220004, *12-*14 (C.D. Cal. Aug. 24, 2017) (same); <u>R Power Biofuels, LLC v. Chemex LLC</u>, 2016 U.S. Dist. LEXIS 156727, *55-*56 (N.D. Cal. Nov. 11, 2016) (same); <u>Guz</u>, 24 Cal.4th at 327, 352; <u>Bionghi</u>, 70 Cal.App.4th at 1370; <u>Careau & Co.</u>, 222 Cal.App.3d at 1395.

2.      Seventh Cause of Action

The seventh cause of action is based on the Settlement. See id. at ¶ 140. In relevant part, the seventh cause of action alleges: "Mahoney . . . unfairly interfered with Deerpoint's right to receive the benefit of the [Settlement], namely, the expectation that he would uphold the confidentiality and trade secret protection of Deerpoint's confidential, proprietary, and trade secret information; the expectation that he would return any tangible and/or intangible property belonging to Deerpoint; and that he would not publicly disparage and/or case the disparagement of Deerpoint." Id. at ¶ 142.

Relatedly, the sixth cause of action is for breach of the Settlement. The Complaint alleges the Settlement obligated Mahoney to: (1) act as a fiduciary to Deerpoint with respect to Deerpoint's confidential, proprietary, and trade secret information, (2) return Deerpoint's "property," (3) not publicly disparage Deerpoint, and (4) not divulge to third parties or use to Deerpoint's detriment any of Deerpoint's confidential, proprietary, and trade secret information. See id. at ¶¶ 129-133. Mahoney allegedly breached the Settlement by: (1) accessing, copying, using, and/or disclosing to Agrigenix or third parties Deerpoint's confidential, proprietary, and trade secret information, (2) failing to take necessary steps to hold in confidence and protect, and not use or disclose, Deerpoint's confidential, proprietary, and trade secret information, and (3) publicly disparaging Deerpoint. Id. at ¶¶ 134-136.

The seventh cause of action suffers from the same flaw as the fifth cause of action. The conduct that allegedly breached the covenant of good faith and fair dealing is the same conduct that breached other express provisions of the Settlement. Both the sixth and seventh causes of action are premised on failing to return property, not using, misappropriating, or divulging Deerpoint's confidential trade secrets, and not disparaging Deerpoint. The "expectations" that trade secret information would stay secret, that property would be returned, and that no disparagement would occur, are clearly encompassed within Paragraphs 14 and 15 of the Settlement. Those expectations are nothing more than the assumption that Mahoney would follow the Settlement and not commit a breach of an express contractual term. Because the seventh cause of action does not contain any conduct that is different or separate from the conduct alleged under

the sixth cause of action, the seventh cause of action is redundant and will be dismissed.  <u>See</u>

<u>Trombley Enters.</u>, 2018 U.S. Dist. LEXIS 159410 at *9-*11; <u>Dedicato Treatment</u>, 2017 U.S. Dist.

LEXIS 220004 at *12-*14; <u>R Power Biofuels</u>, 2016 U.S. Dist. LEXIS 156727 at *55-*56;

<u>Bionghi</u>, 70 Cal.App.4th at 1370; <u>Guz</u>, 24 Cal.4th at 327, 352; <u>Careau & Co.</u>, 222 Cal.App.3d at

1395.

### **5.**  **LEAVE TO AMEND**

With respect to Mahoney, the Court has dismissed the first, second, fifth, seventh, eighth,

and ninth causes of action.  Due to application of the settlement bar, amendment will not cure the

defects of the first and second causes of action, nor will any claim be permitted to proceed against

Mahoney that arose prior to the Settlement.  Therefore, dismissal of those causes of action will be

without leave to amend.  Similarly, by operation of CUTSA preemption, amendment is futile and

will not be permitted with respect to the IIPEA and UCL claims based on CUTSA/trade secret

misappropriation.  Because the Court cannot hold at this time that Deerpoint cannot allege non-

CUTSA based IIPEA and UCL claims, dismissal of the eighth and ninth causes of action will be

with leave to amend.  Finally, the fifth and seventh causes of action are dismissed as superfluous

of the fourth and sixth causes of action.  Although the Court harbors doubts whether Deerpoint

may allege conduct that is not superfluous to its breach of contract claims, it is not clear that

amendment would be futile.  Therefore, the dismissal of fifth and seventh causes of action will be

with leave to amend.

With respect to Agrigenix, the Court has dismissed the eighth and ninth causes of action.

Again, to the extent that Deerpoint attempts to base these claims on CUTSA/trade secret

misappropriation, amendment is futile.  However, because it is not clear that Deerpoint cannot

allege non-CUTSA based IIPEA and UCL claims, dismissal will be with leave to amend.

//

//

//

//

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.    Defendants' motion to dismiss (Doc. No. 10) is GRANTED as follows:

      a.    The first and second causes of action against Mahoney are DISMISSED without leave to amend;

      b.    The fifth and sixth causes of action are DISMISSED with leave to amend;

      c.    The eighth and ninth causes of action are DISMISSED with leave to amend to allege non-CUTSA based claims;

2.    Defendants' motion to dismiss is otherwise DENIED;

3.    Plaintiff may file an amended complaint, that is consistent with the analysis of this order, within twenty-one (21) days of service of this order;

4.    If Plaintiff files an amended complaint, Defendants shall file an answer or other appropriate response to the amended complaint within twenty-one (21) days of service of the amended complaint; and

5.    If Plaintiff fails to file a timely amended complaint, then leave to amend shall automatically be withdrawn and, within twenty-one (21) of service of this order, Defendants shall file an answer to the Complaint in light of the analysis of this order.

IT IS SO ORDERED.

Dated:   December 4, 2018                                      

SENIOR  DISTRICT  JUDGE