**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DEERPOINT GROUP, INC.,** | **CASE NO. 1:18-CV-0536 AWI BAM** |
| **Plaintiff** | |
| | **ORDER ON DEFENDANTS' MOTION** |
| v. | **TO DISMISS** |
| **AGRIGENIX, LLC and SEAN MAHONEY,** | (Doc. No. 30) |
| **Defendants** | |

This is a business dispute involving intellectual property and trade secrets between Plaintiff Deerpoint Group, Inc. ("Deerpoint") and Defendants Agrigenix, LLC ("Agrigenix") and Sean Mahoney ("Mahoney"). Deerpoint brings federal claims for violations of 15 U.S.C. § 1125 (False Advertising) and 18 U.S.C. § 1836 (Defend Trade Secrets Act ("DTSA")), state law statutory claims for violations of Cal. Civ. Code § 3426.1 (California Uniform Trade Secrets Act ("CUTSA")), Cal. Bus. & Prof. Code § 17200 (Unfair Competition ("UCL")), two claims for breach of contract (two different contracts) and two related claims for breach of the implied covenant of good faith and fair dealing, and an intentional interference with prospective economic advantage ("IIPEA") claim. Currently before the Court is Defendants' second Rule 12(b)(6) motion to dismiss. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

## **RULE 12(b)(6) FRAMEWORK**

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A

dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. See Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015). In reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Kwan v. SanMedica, Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017). However, complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013). To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678; Mollett, 795 F.3d at 1065. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "Plausibility" means "more than a sheer possibility," but less than a probability, and facts that are "merely consistent" with liability fall short of "plausibility." Iqbal, 556 U.S. at 678; Somers, 729 F.3d at 960. The Ninth Circuit has distilled the following principles for Rule 12(b)(6) motions: (1) to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively; (2) the factual allegations that are taken as true must plausibly suggest entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014). In assessing a motion to dismiss, courts may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters subject to judicial notice. In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1051 (9th Cir.

2014).  If a motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made . . . ."  Ebner v. Fresh, Inc., 838 F.3d 958, 962 (9th Cir. 2016).  However, leave to amend need not be granted if amendment would be futile or the plaintiff has failed to cure deficiencies despite repeated opportunities.  Garmon v. County of L.A., 828 F.3d 837, 842 (9th Cir. 2016).

**BACKGROUND FACTS**

From the First Amended Complaint ("FAC"), Deerpoint is in the business of chemical water treatment solutions for agriculture irrigation.  Over the past decade, Deerpoint has enjoyed explosive demand for its precision-fed patented fertilizers at custom irrigation sites.  Deerpoint utilizes integrated systems of fertilizers, which are custom-blended through proprietary methods, and applied to crops through data-controlled mechanical delivery systems.  Deerpoint's fertilizers are tailored to a variety of crops and conditions.  Further, at the heart of Deerpoint's fertigation[1] program is patented precision feeding equipment, which has been nicknamed the "White Box" by Deerpoint's customers.  Deerpoint has invested millions of dollars customizing its fertilizers, foliar products, and equipment to a wide range of crops and environments, and archives its products and services for the growers that use its services.

Deerpoint puts a premium on its employees to maintain strict confidentiality over its proprietary formulations, practices, methods, insights, intellectual property, and other information. Since Deerpoint's founding in 1993, it has required its employees and executives to execute a detailed confidentiality agreement, the Employees Invention and Secrecy Agreement (the "EIS"). Deerpoint steadfastly enforces the EIS.  Since at least 2000, every employee has signed the EIS. Deerpoint's employee handbook also contains policies relating to confidentiality, and in 2016, Deerpoint implemented a new-hire training program that highlighted its policies, including the confidentiality policies.  Deerpoint also regulates the access and exchange of information within the company, restricts access to certain information, and ensures that its confidential information

[1] "Fertigation" refers to a fertilization process whereby fertilizers are added to the water being used to irrigate crops, and reflects a combination of irrigation and fertilization.

is confined to company-owned computers.  Deerpoint also requires its vendors and suppliers to sign a secrecy agreement that protects Deerpoint's confidential, proprietary, and trade secret information before a business relationship is created.

Until October 4, 2017, Mahoney was the Chief Executive Officer of Deerpoint.  Mahoney signed the EIS and an updated EIS in 2016.  Despite the EIS, Mahoney acted to gain access to, and download from, a central computer Deerpoint's confidential, proprietary, and trade secret information.  Further, prior to his departure, Mahoney was seen removing files and documents relating to formulation manufacturers, vendors, and suppliers.  Mahoney and Deerpoint mutually agreed to terminate his employment on October 4, 2017.

On October 3, 2017, Mahoney filed a lawsuit in the Fresno County Superior Court against Deerpoint ("the Lawsuit").  On October 7, 2017, Mahoney filed an administrative complaint with the California Department of Fair Housing and Employment against Deerpoint.  These matters were stayed pending settlement negotiations.

Sometime in October 2017, Mahoney launched a direct competitor to Deerpoint, Agrigenix.  Mahoney is the president and chief executive officer of Agrigenix.  Agrigenix promotes itself as an alternative to Deerpoint by feeding crops the precise nutrients needed, in exactly the right amounts, at the right time for optimum growth.  Agrigenix states that it provides a full line of nutrients and fertilizer blends formulated with proprietary chemistries.  However, the blends are pirated from Deerpoint.  Agrigenix also has foliar blends that mimic Deerpoint.  Mahoney and Agrigenix possessed Deerpoint's confidential, proprietary, and trade secret information, and Mahoney founded Agrigenix on trade secrets misappropriated from Deerpoint.  It also appears that Agrigenix/Mahoney have taken steps to steal and copy Deerpoint's White Box technology.  Agrigenix has told Deerpoint's customers that it is "the same as Deerpoint with a twist," but in reality, Agrigenix is blatantly copying Deerpoint's products.  Mahoney has told Deerpoint clients that he has no secrecy obligations to Deerpoint.  Four large clients of Deerpoint, representing $2.4 million in revenues, have switched to Agrigenix.

On January 8, 2018, Mahoney and Deerpoint signed a Settlement Agreement ("the Settlement").  The Settlement resolved the Lawsuit and all other claims that the Mahoney and

Deerpoint had against each other.  The Settlement included a provision that Paragraph 3 of the EIS remained in full force, a provision in which Mahoney acknowledged the confidential and proprietary nature of Deerpoint's trade secret information, a provision in which Mahoney agreed not to divulge or use Deerpoint's trade secrets and to take steps to protect such information from disclosure, and a provision to return Deerpoint's property that was in Mahoney's possession.

Around March 2018, Agrigenix installed at least four devices that approximate Deerpoint's White Boxes.


**DEFENDANTS' MOTION TO DISMISS**

**1.**     **First Cause of Action – CUTSA[2]**

*Defendants' Argument*

Agrigenix argues that in order for it to be liable for trade secret misappropriation under CUTSA, it must have acquired the trade secrets from someone other than Deerpoint.  However, the FAC alleges that Mahoney took Deerpoint's trade secrets and then used them to start and operate Agrigenix.  Deerpoint acknowledges that Mahoney is Agrigenix's President and CEO.  As such, Mahoney is the agent of Agrigenix.  Agrigenix and its employees/officers function as a single unit and are the same for purposes of various tort, agency, and jurisdictional principles. Because Mahoney and Agrigenix are one and the same, the allegations essentially show that Agrigenix obtained the trade secrets from itself.  Further, because Mahoney was released from all CUTSA liability, and because Agrigenix and Mahoney are one in the same, the release released Agrigenix and Mahoney.  Additionally, the FAC alleges that Kwong is an officer of Agrigenix who obtained trade secret information from Deerpoint and acted in concert with Mahoney to start Agrigenix.  Agrigenix then argues that Kwong's position as an officer of Agrigenix means that Kwong's acts were Agrigenix's acts (just like Mahoney) Because Kwong acted in concert and in partnership with Mahoney, the Settlement's release covers Kwong and, because Agrigenix and Kwong are the same for tort principles, the release covers Agrigenix.

---

[2] The first cause of action is alleged against Agrigenix only.

*Plaintiff's Opposition*

Deerpoint argues that Agrigenix is inviting the Court to decide the entire trade secrets claim without discovery or trial on the basis of third party beneficiary status. However, the Court has already held that dismissal on the basis of third party beneficiary status was appropriate because Deerpoint had not been given the opportunity to present evidence regarding the parties' intent behind the Settlement. Further, Deerpoint argues that Agrigenix's argument that Mahoney and Agrigenix are one in the same has no support in law or fact. Finally, Deerpoint argues that Agrigenix's arguments regarding Kwong fail for the same reasons as their arguments regarding Mahoney.

*Relevant Contractual Provisions*

Under the "Recitals" portion of the Settlement, the Settlement explains that Mahoney filed an administrative complaint with the California Department of Fair Employment and Housing, on October 6, 2017. See Settlement ¶ B. A lawsuit was filed by Mahoney in the Fresno County Superior Court on October 3, 2017, known as "the Lawsuit," which included the October 6 DFEH complaint. Id. at ¶ C. Deerpoint indicated an intent to file a cross-complaint against Mahoney, or remove the Lawsuit and then file various counterclaims against Mahoney, which would include claims for "breach of fiduciary duty, misappropriation of trade secrets, unfair competition, and violation of secrecy agreements." Id. at ¶ D. However, the parties "settled, fully and finally, all claims the Parties might have against each other up to and including the date of execution of this [Settlement] including, but not limited to, those claims which have been or could have been made in the Lawsuit." Id. at E.

The "Complete General Release" reads:

> Except as stated herein, in consideration for the promises set forth in this Agreement, each Party does hereby for themselves and for their heirs, representatives, attorneys, executors, administrators, successors, and assigns, release, acquit, remise, and forever discharge the other Party, including each of their respective affiliates, subsidiaries, parent companies, related companies, partners, officers, directors, managers, servants, agents, employees, former employees, representatives, insurance carriers, and attorneys, past or present, and all persons acting under, by, through, or in concert with any of them (collectively, the "Releasees"), from any and all actions, causes of action, obligations, costs, expenses, damages, losses, claims, liabilities, suits, debts, demands, and benefits (including attorneys' fees and costs), of whatever character, in law or in equity,

known or unknown, suspected or unsuspected, matured or unmatured, of any kind or nature whatsoever, based on any act, omission, event, occurrence, or nonoccurrence from the beginning of time to the date of execution hereof, including but not limited to any claims or causes of action arising out of or in any way relating to Plaintiff's employment, his alleged contract claims, or which have been or could have been made in the Lawsuit (collectively "the claims") as well as any threatened claims in any cross-complaint or counterclaims. Exception: Nothing in this Agreement shall release any of the Parties from any of their rights or obligations under the terms of this Agreement.

Id. at ¶ 7.

*Discussion*

a.    Relation of Mahoney to Agrigenix

Agrigenix's reply explains that it is not attempting to obtain dismissal based on its possible third-party beneficiary status under the Settlement. The Court will accept this representation and focus its discussion instead on Agrigenix's agency-based arguments. With this understanding of Agrigenix's position, for at least two reasons the Court cannot agree with Agrigenix that dismissal is appropriate at this time.

First, it is undoubtedly true that an officer of a corporation is an agent of the corporation, see Frances T. v. Village Green Owners Assn., 42 Cal.3d 490, 505 (1986), and it is beyond dispute that an agent's acts within the scope of his authority will bind his principal. See Corbit v. Kimball, 107 Cal. 665, 667 (1895). Agrigenix desires the Court to infer that every act constituting trade secret misappropriation that is alleged in the FAC was committed by Mahoney at a time when Mahoney was acting within his authority as the CEO (and therefore agent) of Agrigenix. However, there are no allegations in the FAC that allege that Mahoney acted in his capacity and under his authority as the CEO of Agrigenix. It is unclear why the Court should read the FAC in such a way as to make Mahoney's actions Agrigenix's actions in the absence of an agency or employment allegation, especially since many (if not all) acts of trade secret misappropriation by Mahoney may have occurred prior to Agrigenix's creation. The Court must view the FAC in the light most favorable to Deerpoint. See Kwan, 854 F.3d at 1096. Therefore, in the absence of an express allegation, the Court will not read the FAC as alleging that Mahoney acted as Agrigenix's CEO during acts of misappropriation.

Second, the Court understands Agrigenix's argument as collapsing Mahoney and

7

Agrigenix into a single entity.  However, officers and directors of a corporation are "liable to third persons injured by their own tortious conduct regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable."  <u>Frances T.</u>, 42 Cal.3d at 504. Therefore, even if Mahoney was acting as the CEO of Agrigenix when he misappropriated Deerpoint's trade secrets, both Mahoney and Agrigenix could be held liable for trade secret misappropriation.  <u>See</u> <u>PMC, Inc. v. Kadisha</u>, 78 Cal.App.4th 1368, 1381-82 (2000) (noting that an officer may be held liable for an intentional tort he committed on behalf of the corporation even though the corporation is also liable, and noting that trade secret misappropriation is an intentional tort).  Collapsing Mahoney and Agrigenix into a single entity based only on Mahoney's position as the CEO is inconsistent with an agent's liability for his own intentional torts, such as trade misappropriation.

Accordingly, dismissal of the CUTSA cause of action based on Mahoney's status as an officer of Agrigenix is inappropriate at this time.

        b.      <u>Relation of Kwong to Mahoney and Agrigenix</u>

Agrigenix argues that Kwong is an agent of Agrigenix based on her position within Agrigenix.  However, the above analysis with respect to Mahoney also applies to Kwong.  There are no allegations in the FAC that Kwong acted as an officer of Agrigenix when she allegedly misappropriated trade secrets, and both she and Agrigenix could be held personally liable for any trade secret misappropriation that she committed in her capacity as an officer of Agrigenix.

Agrigenix also argues that Kwong and Mahoney acted in concert and in a partnership for purposes of the Settlement's release.  However, Kwong is not expressly identified in the Settlement.  Therefore, Agrigenix's argument relies on Kwong being a third party beneficiary to the Settlement.  In the prior motion to dismiss, the Court adopted the following principle from <u>Cline v. Homuth</u>, 235 Cal.App.4th 699 (2015): "the law permits a plaintiff who opposes enforcement of a general release by a third party to offer extrinsic evidence as to the circumstances surrounding negotiation and signing of the release to attempt to show that releasing 'any other person,' meaning everyone, does not comport with the parties' intent."  <u>Cline</u>, 235 Cal.App.4th at 709.  As it did during the prior motion to dismiss, the Court will continue to hold that Deerpoint

will be given the opportunity to submit evidence regarding the parties' intent, including the negotiations and the circumstances of the Settlement, with respect to the assertion that any person or party is a third-party beneficiary of the Settlement. See Cline, 235 Cal.App.4th at 709.

Accordingly, dismissal of the first cause of action based on Kwong's status as an officer of Agrigenix or her relationship with Mahoney is inappropriate. See id.

**2.      Second Cause of Action – DTSA[3]**

_Defendants' Argument_

Defendants argue that dismissal of the second cause of action is appropriate because the Court has interpreted the DTSA and CUTSA consistently. For the same reasons that the CUTSA claim fails, so too fails the DTSA claim.

_Plaintiff's Opposition_

Deerpoint argues that because the CUTSA claim is viable, there is no basis to dismiss the DTSA claim. Deerpoint also contends that the DTSA and CUTSA are different in that DTSA misappropriation claims can arise separately from an initial misappropriation. Deerpoint points to a textual difference between the DTSA's and the CUTSA's respective limitations periods. The relevant DTSA provision begins, "For purposes of this *subsection*," 18 U.S.C. § 1836(d) (emphasis added), while the relevant CUTSA provision begins, "For purposes of this *section.*" Cal. Civ. Code § 3426.6 (emphasis added). Deerpoint also cites to district court cases that uphold misappropriation claims premised on the unauthorized use of a trade secret after the DTSA's effective date, even though the secret was improperly acquired prior to the effective date. See Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc., 2017 U.S. Dist. LEXIS 62109 (N.D. Cal. Apr. 24, 2017); Agilysis, Inc. v. Hall, 258 F.Supp.3d 1331 (N.D. Ga. 2017); Adams Arms, LLC v. Unified Weapon Sys., 2016 U.S. Dist. LEXIS 132201 (M.D. Fla. Sept. 27, 2016).

_Discussion_

Initially, the basis for dismissing the DTSA claim as argued by Defendants is invalid. The Court is not dismissing the CUTSA claims, so the Court also will not dismiss the DTSA claims. That being said, there is clearly a dispute between the parties regarding the interpretation of the

---

[3] The second cause of action is alleged against Agrigenix only.

DTSA. In the order on Defendants' prior motion to dismiss, the Court interpreted the DTSA and CUTSA "consistently," which meant applying the same rationale to the two trade secrets causes of action against Mahoney and dismissing both claims with prejudice. See Deerpoint Grp., Inc. v. Agrigenix, LLC, 345 F.Supp.3d 1207, 1227-18 (E.D. Cal. 2018). The parties' dispute has been briefed. Because of the importance of the issue, the Court will address the issue. After consideration, the Court will continue to interpret the DTSA and the CUTSA consistently.

First, the difference between "subsection" and "section" appears to occur because of the different textual structure of the two statutory schemes. Section 3426.6 is a stand-alone provision that sets the limitations period for a CUTSA claim. Section § 1836(d) is a subsection of a multi-section provision that sets the limitations period for a civil DTSA claim. The language of the two sections appear to be materially the same. Section 1836(d) in relevant part reads: "A civil action under subsection (b) may not be commenced later than 3 years after the date on which [the misappropriation was discovered or reasonably should have been discovered]. For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation." 18 U.S.C. § 1836(d).[4] As can be seen, the DTSA's "continuing misappropriation" language expressly applies to Subsection (d), but subsection (d) expressly applies to subsection (b). Section 1836(b) is the DTSA's civil enforcement section. Therefore, the "continuing misappropriation" language will affect subsection (b). As a result, both § 3426.6 and § 1836(d) apply the same limitations periods to their respective civil enforcement provisions. The difference in the use of the term "section" verses "subsection" does not appear to be significant.

Second, the cases cited by Deerpoint (as acknowledged by Deerpoint) involve situations in which acts of misappropriation occurred both prior to and after May 11, 2016, the date the DTSA became effective.[5] That factual scenario does not appear to be the situation here. The FAC alleges that Agrigenix was started by Mahoney the month he was terminated from Deerpoint,

---

[4] Cal. Civ. Code § 3426.6 reads: "An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim."

[5] The DTSA covers acts occurring "on or after the date of the enactment of this Act," May 11, 2016. Defend Trade Secrets Act of 2016, PL 114-145, May 11, 2016, 130 Stat. 376; Human Longevity, inc. v. J. Crag Vener Inst., Inc., 2018 U.S. Dist. LEXIS 213912, *10 n.2 (S.D. Cal. Dec. 18, 2018).

October 2017.  See FAC ¶ 72.  Even if Agrigenix was formed by Mahoney several months prior to

his October 2017 termination, that would still mean that Agrigenix was created in 2017, well after

May 11, 2016.  Any acts of misappropriation by Agrigenix could not have occurred prior to May

11, 2016.  Unless Agrigenix was founded prior to May 11, 2016, this case would involve a

straightforward application § 1836(d) to Agrigenix.  Although Deerpoint seeks to rely on *Cave

Consulting*, *Agilysis*, and *Adams Arms* by analogy, Deerpoint does not explain why an analogy to

cases with materially different factual scenarios and that answer an inapplicable legal question

should govern over cases like *Cadence Design*, that apply the same "continuing misappropriation"

language to the same key factual scenario – acts of misappropriation that occurred after the

enactment of the trade secret law.  Cf. Allied Erecting & Dismantling Co. v. Genesis Equip. &

Mfg., 805 F.3d 701, 705 (6th Cir. 2015) (holding that states that have adopted the UTSA, like

California, "consistently apply a single claim theory to misappropriations of trade secrets.");

Brand Energy, 2017 U.S. Dist. LEXIS 43497 at *17 ("Congress intended the DTSA to apply in

substantially the same way as the states' trade secrets laws, but with a much broader geographic

and jurisdictional reach.").

   Therefore, at this time, the Court will continue to apply the DTSA and the CUTSA

consistently.[6]  See Deerpoint Grp., 345 F.Supp.3d at 1227-18.  Dismissal of the second cause of

action is inappropriate.

###    **3.**   **Fifth & Seventh Causes of Action – Implied Covenant of Good Faith**

   *Defendants' Argument*

   Defendants argues that the implied covenant claims remain no different from the express

breach of contract claims.  The implied covenant claims do allege that if the terms of the EIS or

the Settlement cannot be construed to require Mahoney to control others in order to maintain the

secrecy of Deerpoint's information, or prevent others from disparaging Deerpoint, then that

requirement should be implied through the covenant of good faith and Mahoney's relationship

---

[6] The Court recognizes that the DTSA is a relatively new law and the federal jurisprudence on it is developing. Further, although the parties did brief the issue of DTSA interpretation, the briefing was not as in-depth as it could have been.  Therefore, if Deerpoint can make a good faith and well supported argument that a different conclusion is clearly warranted, the Court will entertain a motion for reconsideration.

1    with Agrigenix.  However, if Mahony was not associated with Agrigenix, the covenant of good

2    faith would not imply a term in the two agreements that would require him to control Agrigenix's

3    use of the secrets.  This is because the act of disclosure would itself be a breach of an express

4    term, and nothing in the EIS or the Settlement suggests that the parties contemplated any sort of

5    continuing obligation on the part of Mahoney to attempt to control the conduct of those to whom

6    an unauthorized disclosure was made.  "This makes sense because, in such a situation, plaintiff

7    Deerpoint would have a claim for indirect trade secret misappropriation against the one to whom

8    the unauthorized disclosure was made . . . ."  With respect to disparagement, the Settlement

9    prohibits disparagement by Mahoney only.  Nothing indicates that the Settlement contemplated

10   imposing a duty on Mahoney to monitor and censor the statements of Agrigenix's employees or

11   agents.  Defendants argue that the only way the Settlement can be construed to impose an

12   obligation on Mahoney to control the speech of Agrigenix employees is if the employees act as

13   Mahoney's agents and at his instruction.  However, in such a situation, the disparaging statements

14   would be viewed by the law as Mahoney's statements.

15           _Plaintiff's Opposition_

16           Deerpoint argues that its implied covenant claims are "fallbacks" to the breach of contract

17   claims.  The claims are made in the alternative and "to the extent" that the Settlement or the EIS is

18   not construed as requiring Mahoney to stop others' unauthorized use and/or disparagements made

19   possible by Mahoney's initial breaches.  If the hypothetical comes to pass, Mahoney still breached

20   the implied covenant by having interfered with Deerpoint's right to receive the benefits of the EIS

21   and the Settlement.  That is, if the EIS and the Settlement are "interpreted as requiring Mahony to

22   prevent others from misappropriating Deerpoint's trade secrets following his initial unauthorized

23   disclosures, then his subsequent bad faith failure to act frustrated Deerpoint's expectations in

24   executing those contracts that its trade secret information would not be used by others."  This

25   position is in line with _Guz v. Bechtel Nat'l, Inc._, 24 Cal.4th 317, 349 (2000) and _Celador Int'l,

26   Ltd v. Walt Disney Co._, 347 F.Supp.2d 846 (C.D. Cal. 2004).  Further, if the Court agrees that the

27   neither the EIS nor the Settlement contemplates any continuing obligation on the part of Mahoney

28   to attempt to control the conduct of those to whom an unauthorized disclosure was made,

Deerpoint's contract damages may be cut-off at the moment Mahoney disparaged Deerpoint or disclosed the trade secrets to Mahoney. This possibility is why Deerpoint alleges that, "to the extent that" the EIS or Settlement are interpreted in a certain way, the implied covenant was nevertheless breached. Such alternative or hypothetical pleading is appropriate.

*Relevant Allegations*

In relevant part, the FAC alleges under the fifth cause of action:

> After execution of the [Settlement], Mahoney breached the terms of [the EIS] when disclosing Deerpoint's protected information and materials to Agrigenix and by failing to return materials taken from Deerpoint, as alleged herein. To the extent that the [EIS] is not construed as requiring Mahoney to stop Agrigenix's subsequent disclosures and/or uses of Deerpoint's protected information and materials, then Mahoney breached the covenant of good faith and fair dealing implied in the [EIS] when later failing to take steps as an Agrigenix executive to prevent Agrigenix's subsequent disclosure and/or use of those information and materials by, for example, publishing the components of fertilizer and foliar blends derived from Deerpoint's protected information in the months following execution of the [Settlement]. That inaction by Mahoney interfered with Deerpoint's right to receive the benefit of the [EIS], namely, the expectation that its employees (and former employees) would uphold the confidentiality and trade secret protection of Deerpoint's confidential, proprietary, and trade secret information.

> These breaches by Mahoney of the covenant of good faith and fair dealing implied into the [EIS], as alleged herein, were committed in bad faith. The bad faith nature of these breaches shows, for example, in the circumstance that Mahoney's failure to act occurred after Deerpoint's counsel . . . requested via email to Mahoney's counsel . . . that Mahoney abide by his obligations under the [EIS] with Deerpoint. Mahoney's actions nonetheless continued.

> Deerpoint suffered significant monetary, competitive, and irreparable harm as a result of Mahoney's conduct, as alleged herein. As a direct and proximate result of Mahoney's breaches of the covenant of good faith and fair dealing implied in the [EIS], Deerpoint continues to sustain damages in an amount according to proof.

FAC at ¶¶ 126-128.

The seventh cause of action contains materially similar allegations to the above quoted paragraphs, except the contract at issue is the Settlement, not the EIS. Accordingly, the seventh cause of action also alleges that Mahoney breached the duty of good faith by not taking steps to stop Agrigenix from using and disclosing trade secrets (to the extent that the Settlement did not require Mahoney to do so), Mahoney acted in bad faith, and Deerpoint suffered monetary, competitive, and irreparable harm. See id. at ¶¶ 143, 145, 146. In addition, the seventh cause of action alleges:

> Mahoney further breached the terms of the [Settlement] after its execution by publicly disparaging and/or causing the disparagement of Deerpoint, as alleged herein. To the extent that the [Settlement] is not construed as requiring Mahoney to also prevent Agrigenix's disparagement of Deerpoint, then Mahoney breached the covenant of good faith and fair dealing implied in [the Settlement] when later failing to take steps as an Agrigenix executive to prevent Agrigenix and/or its employees and/or its agents from publicly disparaging and/or causing the disparagement of Deerpoint by, for example, and on information and belief, telling existing Deerpoint customers that Agrigenix is "the same as Deerpoint with a twist," that Deerpoint is failing and will lose all of its customers to Agrigenix, and that Mahoney is not obligated to maintain the confidential and trade secret nature of Deerpoint's protected information. That inaction by Mahoney interfered with Deerpoint's right to receive the benefit of the Settlement Agreement.

Id. at ¶ 144.

### *Legal Standard*

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." Guz v. Bechtel Nat'l, Inc., 24 Cal.4th 317, 349 (2000); see also Digerati Holdings, LLC v. Young Money Entm't, LLC, 194 Cal.App.4th 873, 885 (2011). The covenant requires a party "to do everything that the contract presupposes that the [party] will do to accomplish its purposes." Thrifty Payless, Inc. v. The Americana Brand, LLC, 218 Cal.App.4th 1230, 1244 (2013); Pasadena Live v. City of Pasadena, 114 Cal.App.4th 1089, 1093 (2004). Thus, "the covenant prevents a party from acting in bad faith to frustrate the contract's actual benefits." Guz, 24 Cal.4th at 353 n.18. The covenant is "limited to assuring compliance with the express terms of the contract and cannot be extended to create obligations not contemplated by the contract." Golden Eagle Land Investment, LP v. Rancho Sant Fe Assn., 19 Cal.App.5th 399, 426 (2018); Pasadena Live, 114 Cal.App.4th at 1094. That is, "where an implied covenant claim alleges a breach of obligation beyond the agreement's actual terms, it is invalid." Guz, 24 Cal.4th at 326. The covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." Id. at 350. The covenant of good faith will not alter a party's specific and express obligations under a contract. See Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., 2 Cal.4th 342, 373 (1992); PMC, 65 Cal.App.4th at 890. "[T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract."

14

Carma Developers, 2 Cal.4th at 373; see Digerati Holdings, 194 Cal.App.4th at 885. If the plaintiff's allegations of breach of the covenant of good faith "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." Bionghi v. Metro. Water Dist., 70 Cal.App.4th 1358, 1370 (1999). That is, "where breach of an actual [contract] term is alleged, a separate implied covenant claim, based on the same breach, is superfluous." Guz, 24 Cal.4th at 327; see also id. at 352. "[I]n most cases, a claim for breach of the implied covenant can add nothing to a claim for breach of contract." Lamke v. Sunstate Equip. Co., 387 F.Supp.2d 1044, 1047 (N.D. Cal. 2004).

*Discussion*

Initially, the Court agrees with Deerpoint that it is permissible to allege the fifth and seventh causes of action as hypothetical or alternative causes of action to the express breach of contract claims. The Federal Rules of Civil Procedures permit parties to allege claims that are hypothetical, in the alternative, or even inconsistent. See Fed. R. Civ. P. 8(d)(2), (3); Molsbergen v. United States, 757 F.2d 1016, 1018-19 (9th Cir. 1985). There is nothing improper about Deerpoint framing its implied covenant claims as hypothetical or alternative claims. See id.

Further, as pled, the implied covenant claims give further meaning to the express breach of contract claims. The fourth and sixth causes of action do not allege that Mahoney breached either the EIS or the Settlement by failing to prevent Agrigenix from disparaging Deerpoint or using and disclosing Deerpoint's trade secrets. See FAC ¶¶ 113-122, 129-139. However, by alleging that the implied covenant claims arise "to the extent that" the Settlement and the EIS are interpreted to not require Mahoney to stop Agrigenix from using and disclosing trade secrets and disparaging Deerpoint, the implied covenant claims necessarily indicate that Deerpoint is contending that the EIS and the Settlement do impose such an obligation on Mahoney. Mahoney's failure to "control" Agrigenix regarding disparagement and trade secrets would breach the EIS and the Settlement. In the Court's view, two consequences flow from this reading of the express breach and implied covenant claims.

15

First, if the EIS and the Settlement do require Mahoney to stop Agrigenix from disparaging Deerpoint and from using and disclosing trade secrets, then the implied covenant claims merely duplicate part of the express breach of contract claims. The same conduct by Mahoney that allegedly breached the implied covenant claims would also breach an express contractual term, and the expectation of secrecy and non-disparagement would be captured by the express contractual term. Therefore, the implied covenant claims would be superfluous and subject to dismissal. See Guz, 24 Cal.4th at 327, 352; Bionghi, 70 Cal.App.4th at 1370; see also R Power Biofuels, LLC v. Chemex LLC, 2016 U.S. Dist. LEXIS 156727, *55-*56 (N.D. Cal. Nov. 11, 2016).

Second, if the terms of the EIS and the Settlement obligate Mahoney to return Deerpoint's property, to not use or disclose trade secrets, and to not disparage Deerpoint, but do not obligate Mahoney to stop Agrigenix or others from disparaging Deerpoint or using and disclosing trade secrets, then Deerpoint is attempting to imply a duty on Mahoney that is otherwise not a part of the EIS or the Settlement. That is, Deerpoint appears to be using the implied covenant claims to augment the terms of the EIS and the Settlement by creating a new duty/obligation. However, it is well established that the implied covenant of good faith and fair dealing "'is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." McKnight v. Torres, 563 F.3d 890, 893-94 (9th Cir. 2009) (quoting Spinks v. Equity Residential Briarwood Apartments, 171 Cal.App.4th 1004, 1033 (2009) and Pasadena Live, 114 Cal. App.4th 1089, 1094 (2004)); Golden Eagle, 19 Cal.App.5th at 426; see Guz, 24 Cal.4th at 349-50 ("[The implied covenant] cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of the agreement."). Using the implied covenant to create what amounts to a duty to control third parties runs afoul of this limitation on implied covenant claims. See Guz, 24 Cal.4th at 349-50

Deerpoint argues that its implied covenant claims are proper because, as recognized by *Celador*, there is an exception to the general rule that an implied covenant claim may not rest on the same facts as an express breach of contract when the defendant is alleged to have acted in bad

faith to frustrate the contract's benefits. Deerpoint's characterization of *Celador* is correct.[7] However, the Court is not convinced that *Celador* aids Deerpoint.

First, *Celador* was attempting to determine whether implied covenant claims and express contract claims were superfluous, *Celador* did not address the prohibition against using implied covenant claims to impose duties beyond the express/specific terms of an agreement. Although Defendants argued that the implied covenant claims were still superfluous, they also quoted the rule at issue, cited appropriate case law, and stated that the Deerpoint was improperly attempting to impose a duty to control third parties which was not part of the EIS or Settlement. See Doc. No. 31 at 10:23-11:7, 12:21-13:8. *Celador* does not address this argument.

Second, *Celador* involved a series of acts that allegedly breached both express contractual terms and the implied covenant of good faith and fair dealing. See Celador, 347 F.Supp.2d at 852-53. *Celador* in part held that, "Even if the fact finder concludes that the consensual terms of the contract did not impose such obligations on Defendants, the factfinder could conclude that the actions of Defendants frustrated a benefit of the contract – the benefit of receiving Contingent Compensation from the [television show]." Id. at 853. This holding identifies a benefit provided by the contract at issue that would be frustrated by the alleged conduct, which is consistent with the nature of an implied covenant. See Guz, 24 Cal.4th at 349 (holding that the implied covenant

---

[7] The Court is not bound by *Celador* and is not necessarily convinced that "bad faith" is an exception to the rule that an implied covenant claim is superfluous to a breach of contract claim when the same acts are alleged to breach both provisions. *Celador* relies on footnote 18 of the *Guz* opinion for finding a "bad faith" exception. Footnote 18 reads in part: "We do not suggest the [implied covenant] has no function whatever in the interpretation and enforcement of employment contracts. As indicated above, the covenant prevents a party from acting in bad faith to frustrate the contract's actual benefits. Thus, for example, the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned. We confront no such claim here." Guz, 24 Cal.4th at 353 n.18. The Court reads this hypothetical as indicating that, even if the termination was permissible under one portion of the contract (perhaps relating to the duration of employment), the termination nevertheless violated the implied covenant because it frustrated an obligation owed to, or the reasonable expectation of, the employee to receive a different contractual obligation or benefit (in the example, the right to receive compensation earned). Cf. Racine & Laramie, Ltd. v. Department of Parks & Recreation, 11 Cal.App.4th 1026, 1031-32 (1992) ("In essence, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which, while not technically transgressing the express covenants, frustrates the other party's rights to the benefits of the contract."). Footnote 18 identifies two separate acts by the employer at issue – not paying compensation earned and terminating employment to avoid paying compensation owed. That is, the *Guz* hypothetical does not deal with an identical act that is used to support claims for an express breach of contract and for a breach of implied covenant. Further, the *Guz* footnote did not say that it was creating an exception to the rule against superfluous implied covenant claims, and no California state court has cited to and adopted *Celador*'s characterization of *Guz*. However, because the Court need not adopt *Celador*'s discussion of a "bad faith" exception to superfluous implied covenant claims, it is enough for the Court to register its concerns.

prevents "one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made.").

In the case at bar, the Complaint alleges that Mahoney's failure to control Agrigenix deprived Deerpoint of the benefits of the EIS and the Settlement, "namely, the expectation that its employees (and former employees) would uphold the confidentiality and trade secret protection of Deerpoint's [trade secrets]." FAC at ¶¶ 126, 143. To be sure, it is reasonable to expect that Deerpoint's employees and former employees will honor their obligation to not steal and to keep Deerpoint's protected confidential information secret. However, the reasonable expectation is that the employee himself will not steal, use, or disclose.[8] That is, Deerpoint can reasonably expect employees or former employees to monitor and curb their own conduct in order to honor the confidentiality of Deerpoint's trade secrets. Attempting to affect or curb the conduct of a third party is a different matter altogether and would require employees or former employees to take entirely different actions other than merely returning property or not stealing. Moreover, what a third party does with stolen trade secrets does not affect the obligation of an employee to himself not steal, use, or disclose the trade secret. Therefore, as alleged in the FAC, there is not a plausible claim that Mahoney's failure to control (or attempt to control) the actions of third parties/Agrigenix frustrates the particular benefit of secrecy that was provided by the EIS and the Settlement. Because the FAC does not adequately allege that Mahoney's failure to affect the conduct of Agrigenix or Agrigenix employees frustrates a benefit that is actually provided by the express terms of the EIS and the Settlement,[9] *Celador* does not aid Deerpoint. See Guz, 24 Cal.4th at 349-50.

In sum, the FAC's implied covenant claims improperly attempt to impose a duty that is outside the duties and obligations of the Settlement and EIS. See id. Therefore, dismissal of the fifth and seventh causes of action is appropriate.

---

[8] This is because the implied covenant claim only applies "to the extent that" it is determined that the EIS and Settlement only imposed duties on Mahoney to curb his own behavior. See FAC ¶¶ 126, 143, 144.

[9] With respect to disparagement and the seventh cause of action, the FAC does not identify what particular benefit was frustrated by Mahoney's failure to control Agrigenix or Agirgenix employees. The FAC merely alleges that an unknown benefit was frustrated. See FAC ¶ 144.

18

1    <u>**4.**</u>        <u>**Eighth Causes of Action – Intentional Interference with Prospective Economic**</u>

2             <u>**Advantage (IIPEA)**</u>

3        *Defendants' Argument*

4        Agrigenix argues that the Court prohibited Deerpoint from pursing an IIPEA claim based

5    on a breach of contract.  However, even though the FAC's IIPEA relies on disparagement to

6    satisfy the wrongful conduct element, the disparagement is based on a breach of the Settlement by

7    Mahoney (both directly and through Agrigenix).  Therefore, the IIPEA continues to be improperly

8    based on a breach of contract.  Further, even if the disparagement was not based on a breach of the

9    Settlement, the statements identified as disparaging are not actionable because they are not false

10   statements of fact.  Instead, the statements are either puffery, opinions, too vague, or hyperbole

11   and invective from a competitor.[10]

12       *Plaintiff's Opposition*

13       Deerpoint argues that it has alleged a plausible IIPEA claim based on disparaging

14   comments that essentially rise to the level of trade libel, as well as statutory unfair competition.

15   Contrary to Agrigenix's argument, the IIPEA is not based on a breach of contract.  Paragraph 150,

16   relied upon by Agrigenix, prefaces certain factual allegations as occurring before or after

17   execution of the Settlement, but it does not tie the disparaging statements to a breach of contract.

18   Moreover, Paragraph 150 ties trade libel to Defendants in the alternative and apart from any

19   contract breach.  Further, Agrigenix ignores the allegations that Agrigenix and its employees made

20   disparaging statements separate and apart from Mahoney.  Deerpoint also argues that Agrigenix is

21   attempting to impose a standard that is more stringent than the applicable 12(b)(6) standard, and,

22   in any event, the four alleged exemplary disparaging statements are sufficient to support a

23   disparagement claim.

24       *Legal Standard*

25       The elements of a claim for IIPEA are:  (1) an economic relationship between the plaintiff

26   and some third party, with the probability of future economic benefit to the plaintiff; (2) the

---

[10] In reply, Defendants argue that "the FAC contains no claim for trade libel."  Doc. No. 36 at :7:11.  The Court takes
this as an argument that there is no separately pled cause of action for trade libel in the FAC.  However, the Court is
aware of no requirement that the wrongful act for an IIPEA claim be alleged as a separate companion cause of action.

defendant's knowledge of the relationship; (3) intentional wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's actions.  Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc., 2 Cal.5th 505, 512 (2017); Edwards v. Arthur Andersen LLP, 44 Cal.4t h 937, 944 (2008); Redfearn v. Trader Joes Co., Inc., 20 Cal.App.5th 989, 1005 (2018).   With respect to the third element, the "intentional wrongful act" must be independently wrongful.  See Edwards 44 Cal.4th at 944.  That is, the act must be "wrongful by some legal measure other than the fact of interference."  Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal.4th 376, 393 (1995).  An act is "independently wrongful" if it is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  Edwards, 44 Cal.4th at 944; Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1159 (2003); Redfearn, 20 Cal.App.5th at 1006.

### *Discussion*

The FAC relies on disparaging statements by Mahoney and/or Agrigenix as to satisfy the third element of an IIPEA claim.  Acts of defamation or disparagement are sufficiently independently wrongful to meet the third element of IIPEA.  Marsh v. Anesthesia Services Med. Grp., 200 Cal.App.4th 480, 505 (2011).  The FAC identifies the following statements as disparaging:  (1) Agrigenix is the same as Deerpoint with a twist; (2) Deerpoint is failing and will lose all of its customers to Agrigenix; (3) Mahoney is not obligated to maintain Deerpoint trade secrets; and (4) Agrigenix's products are 20% better than Deerpoint's while being 20% cheaper.  FAC ¶ 150.[11]  The FAC alleges that these and "other statements" by Agrigenix necessarily connote that "Agrigenix had superior products when, in reality, it only had copies of Deerpoint's proprietary products."  Id.

"'[C]ommercial disparagement,' 'injurious falsehood,' 'product disparagement,' 'trade libel,' 'disparagement of property,' and 'slander of goods,'" are names that have been given to the same tort by various courts over the years.  Hartford Cas. Ins. Co. v. Swift Distribution, Inc., 59 Cal. 4th 277, 289 (2014); see also Crum & Forster Specialty Ins. Co. v. Willowood USA, LLC,

---

[11] The FAC also alleges that these statements were untrue and were made to influence Deerpoint's customers to move to Agrigenix.  See FAC ¶ 151.

2013 U.S. Dist. LEXIS 105389, *18 n.7 (D. Or. Aug. 1, 2014).  "Disparagement" consists of "injurious falsehoods that interfere with business," and unlike the tort of defamation, is "not directed at the plaintiff's personal reputation, but rather at the goods a plaintiff sells or the character of his other business." Aetna Cas. & Sur. Co. v. Centennial Ins. Co., 838 F.2d 346, 351 (9th Cir. 1988); see Hartford, 59 Cal.4th at 289.  "Disparagement" is generally understood to mean "a knowingly false or misleading publication that derogates another's property or business and results in special damages."  Hartford, 59 Cal.4th at 289; see also ComputerXpress, Inc. v. Jackson, 93 Cal.App.4th 993, 1010 (2001) ("Disparagement" encompasses "all false statements concerning the quality of services or product of a business which are intended to cause that business financial harm and in fact do so.").  "[C]ourts have required that the defendant's false or misleading statement have a degree of specificity that distinguishes direct criticism of a competitor's product or business from other statements extolling the virtues or superiority of the defendant's product or business."  Hartford, 59 Cal.4th at 291.  Statements that consist of merely loose, figurative, or hyperbolic language, as well as statements that are mere puffery or the expression of opinion, will not constitute "disparagement."  See Aerosonic Corp. v. Trodyne Corp., 402 F.2d 223, 231 (5th Cir. 1968); Hanford, 59 Cal.4th at 299; ComputerExpress, 93 Cal.App.4th at 1010-11, 1014.  In general, whether a statement is a fact or opinion or puffery is a question of law that a court decides by placing itself in the shoes of an average listener or reader and determining the "natural and probable effect of the statement, considering both the language and the context."  ComputerExpress, 93 Cal.App.4th at 1011; see Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc., 911 F.2d 242, 245 (9th Cir. 1990) (holding that courts generally may determine whether a statement is puffery as part of Rule 12(b)(6) motion).

Here, viewing the allegations in the light most favorable to Deerpoint, the Court finds that the second statement, in which Mahoney and/or Agrigenix stated that Deerpoint is failing, is sufficient to constitute a disparaging statement.  Cf. New Box Solutions, LLC v. Davis, 2018 U.S. Dist. LEXIS 164510, *16 (C.D. Cal. Sept. 18, 2018) (holding that the statement that a company "is out of business or going out of business and does not do good work for its clients" was sufficient to allege a breach of an anti-disparagement clause); Liquid Manna, LLC v. GLN Global

Light Network, LLC , 2015 U.S. Dist. LEXIS 147143, *10 (W.D. Tex. Oct. 29, 2015) (finding the false statement that a company was "going out of business" was disparaging); Intelsat U.S. Sales Corp. v. Juch-Tech, Inc., 935 F.Supp.2d 101, 117 (D. D.C. 2013) (holding that statements that a company "was on the verge of bankruptcy or that [the company] would be shortly out of business" was disparaging); Specialty Labs. Inc. v. Accurate Diagnostic Labs, Inc., 2013 U.S. Dist. LEXIS 198460, *4, *8-*11 (C.D. Cal. Mar. 13, 2013) (declining to dismiss a disparagement claim that included the allegations that a business was in severe financial difficulty and would be going out of business); Barnett v. Fireman's Fund Ins. Co., 90 Cal.App.4th 500, 510 (2001) (finding that the statement that a company's "methods of doing business was flawed and would result in [the company's] failure," along with other unidentified disparaging statements, were sufficient to trigger insurance coverage for disparagement).  While some courts have held that statements about a company's future financial stability are non-actionable opinions, e.g. Oracle USA, Inc. v. Rimini St., Inc., 2010 U.S. Dist. LEXIS 116249, *8 (D. Nev. Oct. 29, 2010), the statement alleged in the FAC is alleged in current terms – Deerpoint *is* failing.  See FAC ¶ 150.  Moreover, given Mahoney's past connection with and knowledge of Deerpoint's operations, Deerpoint's customers may have been more likely to believe the statements were true and that Deerpoint was in fact failing.

Additionally, the Court finds that the first and fourth statements, when read together indicate disparagement.  By themselves, the first and fourth statements would be either opinion or puffery.   It is entirely unknown what "with a twist" means when comparing Agrigenix to Deerpoint, and there is no clear or obvious way that Agrigenix products are "20% better" than Deerpoint's.  See Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1145 (9th Cir. 1997) ("[P]roduct superiority claims that are vague or highly subjective often amount to nonactionable puffery . . . .").  Nevertheless, when read together, and viewed in the light most favorable to Deerpoint, the statements reasonably indicate that Agrigenix is representing that its products are superior to and *different* from Deerpoint's, when in fact (as alleged by the FAC) Agrigenix's products are the same as Deerpoint's.  The Fifth Circuit has upheld a "disparagement" claim based on this very kind of deception.  See Aerosonic Corp., 402 F.2d at 223 ("There can be no question

that the letters sent by Femina contained false and misleading statements in claiming that the defendants had a superior product, when in fact they had only a copy of Tordyne's Model 1202 device.").

Finally, with respect to the second statement, that Mahoney was not obligated to maintain trade secrets, it is unclear how this is disparaging. The statement deals with personal obligations that Mahoney may or may not owe to Deerpoint. The statement says nothing about Deerpoint's business, products, or services. By itself, the second statement is not disparaging and does not support a claim for "disparagement."[12]

In sum, because three of the four statements identified in the FAC, either separately or collectively, are sufficiently "disparaging," dismissal of the eighth cause of action against is inappropriate.[13]

### 5. Ninth Causes of Action – Unfair Competition Law (UCL)

*Defendants' Argument*

Agrigenix argues that Deerpoint is relying on an actionable IIPEA claim as the basis of its UCL claim. For the reasons discussed above, because the IIPEA claim fails, the UCL also fails.[14]

*Plaintiff's Opposition*

Deerpoint argues that because its IIPEA claim is viable, so too is its UCL claim. The disparaging statements fit the UCL definition of "unfair" and "unlawful" conduct. Additionally, Deerpoint argues that Agrigenix does not challenge a statement that satisfies the definition of "unlawful."

---

[12] The Court is not holding that the second statement has no possible relevance to this case, it is merely holding that the statement by itself is not sufficiently disparaging.

[13] Defendants' argument regarding a breach of contract improperly serving as the wrongful act for the third element of the IIPEA has no application to Agrigenix, as Agrigenix was not a signatory to either the EIS or the Settlement. Additionally, Defendants' reply did not respond to Deerpoint's argument that its disparagement allegations are pled in the alternative to any breach of contract claim. Cf. Doc. No. 35 at 18:13-18 with Doc. No. 36 at 7:9-8:13. As discussed above, a party may allege claims that are hypothetical, in the alternative, or inconsistent. See Fed. R. Civ. P. 8(d)(2), (3); Molsbergen, 757 F.2d at 1018-19. Therefore, the Court accepts that Deerpoint's disparagement allegations in the IIPEA cause of action are made in the alternative to any breach of contract based on disparagement.

[14] In reply, Defendants clarify that they are not challenging a UCL claim based on a violation of trademark laws. See Doc. No. 36 at 8:18-22. Therefore, Court confines its analysis to a UCL claim based on a viable IIPEA claim.

*Legal Standard*

The UCL broadly proscribes the use of any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code. § 17200; Beaver v. Tarsadia Hotels, 816 F.3d 1170, 1177 (9th Cir. 2016). "The UCL operates as a three-pronged statute: 'Each of these three adjectives [unlawful, unfair, or fraudulent] captures a 'separate and distinct theory of liability.'" Beaver, 816 F.3d at 1177 (quoting Rubio v. Capital One Bank, 613 F.3d 1195, 1203 (9th Cir. 2010)). The UCL's "unlawful" prong "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL," and that "virtually any law or regulation – federal or state, statutory or common law – can serve as a predicate . . . ." Candelore v. Tinder, Inc., 19 Cal.App.5th 1138, 1155 (2018). When the underlying legal claim that supports a UCL cause fails, "so too will the [the] derivative UCL claim." AMN Healthcare, Inc. v. Aya Healthcare Services, Inc., 28 Cal.App.5th 923, 950 (2018); see also Krantz v. BT Visual Images, L.L.C., 89 Cal.App.4th 164, 178 (2001)

*Discussion*

Here, the IIPEA claim has not been dismissed. Because Defendants' argument is based on the viability of Deerpoint's IIPEA claim, the dismissal of the UCL is claim is inappropriate. Cf. AMN Healhtcare, 28 Cal.App.5th at 950.

**6.** **Requested Dismissal of Mahoney**

Mahoney argues that because no federal causes of action are alleged against Mahoney, and because dismissal of any claims against Agrigenix is appropriate to the extent that those claims are based on Mahoney's conduct, the Court should decline to exercise pendent party jurisdiction over Mahoney. However, because the Court has not dismissed all claims against Agrigenix that are based on Mahoney's conduct, the basis for Mahoney's argument collapses. Therefore, Mahoney's request for dismissal will be denied without prejudice.

**7.** **Leave To Amend**

The Court has dismissed the fifth and seventh causes of action for breach of the implied covenant of good faith. The Court has concerns whether Deerpoint may allege viable claims that are not redundant or that do not improperly augment either the EIS of the Settlement.

Nevertheless, because it is not clear at this time that amendment would be futile, the Court will grant Deerpoint leave to file a complaint that amends the fifth and seventh causes of action. Additionally, as part of the Court's analysis of the implied covenant claims, the Court found that the allegations under the fourth and sixth causes of action were necessarily affected by the allegations under the implied covenant claims. Therefore, Deerpoint is also granted leave to amend to include such a claim under the fourth or sixth causes of action, or under both. No other amendment will be permitted.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion to dismiss is GRANTED with respect to the fifth and seventh causes of action and those claims are DISMISSED with leave to amend, consistent with this order;

2. Defendants' motion to dismiss is otherwise DENIED;

3. Within twenty-one days of service of this order, Plaintiff may file an amended complaint;

4. Within fourteen days of service of the amended complaint, Defendants shall file an appropriate response; and

5. If Plaintiff fails to file a timely amended complaint, leave to amend shall automatically be withdrawn and Defendants shall file an answer within twenty-eight days of service of this order.

IT IS SO ORDERED.

Dated:   June 17, 2019        _____

                             SENIOR  DISTRICT  JUDGE