1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

| | |
|---|---|
| DEERPOINT GROUP, INC., an Illinois corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>AGRIGENIX, LLC, a Delaware limited liability company; SEAN MAHONEY, an individual; and CUSTOM AG FORMULATORS, INC., a California Corporation,<br><br>    Defendants. | Case No.  1:18-cv-00536-AWI-BAM<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS**<br><br>(Doc. 168) |

19

20         On April 21, 2022, Plaintiff Deerpoint Group, Inc. ("Deerpoint") filed a motion for

21    sanctions against Defendants Agrigenix, LLC and Sean Mahoney ("Defendants") for failure to

22    preserve ESI ("Electronically Stored Information") in violation of Federal Rule of Civil

23    Procedure Rule 37(e). (Doc. 168.) On May 13, 2022, the Court stayed briefing on the motion for

24    sanctions pending resolution of Defendant Agrigenix's bankruptcy and the motion to withdraw

25    filed by Defendants' counsel. (Doc. 177.) On July 25, 2022, following the lifting of the stay and

26    the resolution of the motion to withdraw, the Court ordered Defendants to respond to the motion

27    for sanctions. (Doc. 197.) On August 12, 2022, new counsel for Defendants Agrigenix and Sean

28    Mahoney filed the opposition and objections to evidence in the motion for sanctions. (Docs. 200,

201.) On August 22, 2022, Plaintiff filed its reply and response to Defendants' objections. (Docs. 210, 211.) On August 30, 2022, Defendants filed objections to evidence provided in the reply. (Doc. 214.)

Having considered the moving papers, opposition papers, and the record in this action,[1] the motion for sanctions for failure to preserve ESI in violation of FRCP 37(e) is GRANTED.

## FACTUAL AND PROCEDURAL OVERVIEW[2]

This case is a trade secret misappropriation and patent infringement case filed on April 18, 2018, related to chemical water treatment solutions for agriculture irrigation.  In its Second Amended Complaint, Deerpoint seeks compensatory and punitive damages, and injunctive relief, arising out of the theft of Deerpoint's proprietary and trade secret information by Defendants Agrigenix and Mahoney for the benefit of a competing company, Agrigenix.  Plaintiff alleges that Agrigenix, through Mahoney, quickly launched copycat products and unfairly interfered with Deerpoint's customer relationships during and after Mahoney's employment with Deerpoint. Deerpoint also seeks similar damages for an alleged patent infringement of one its patents by Agrigenix and Mahoney, and also alleges patent infringement by Defendant Custom Ag Formulators, Inc.

Over the years that this case has been pending, the parties have engaged in extensive discovery.  The Court has been requested to resolve various discovery disputes, and the Scheduling Order was amended several times to accommodate the delay associated with obtaining discovery.

Then, on April 21, 2022, Deerpoint filed a Motion for Sanctions for Failure to Preserve Electronically Stored Information ("ESI") in Violation of FRCP 37(e) ("Motion for Sanctions"). (Doc. 168.)  Plaintiff's motion alleges that Defendants have intentionally spoliated ESI including: (1) emails from personal accounts, (2) content from missing computers, (3) content that has been

---

[1] In light of the extensive briefing on the motion for sanctions, the Court finds that oral argument would not be beneficial. To conserve the resources of the parties and the judiciary, the motion is submitted on the record.

[2] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

wiped or encrypted on laptops from employees, (4) files that were stored on a cloud service, and (5) substantial but unknown volumes of Agrigenix emails.

### A.    Summary of Plaintiff's Motion for Sanctions

Mahoney became CEO of Plaintiff Deerpoint in 2013.  When the relationship between Plaintiff and Mahoney deteriorated, Defendant Mahoney initiated a separate employment lawsuit against Plaintiff in October 2017. (Doc. 168 at 9.)[3] In January 2018, and as is relevant to this litigation, the parties reached a settlement where Defendant Mahoney represented that apart from a single email with attachments, he did not retain and would not use any of Plaintiff's confidential, proprietary, or trade secret information in the future. (*Id.*) Defendant Mahoney also agreed to return and then delete any such information he had in his possession. (*Id.*)

Thereafter, Plaintiff filed this trade secret misappropriation and patent infringement case on April 18, 2018. (*Id.*) On February 24, 2020, Plaintiff filed a Second Amended Complaint (now the operative complaint) alleging eight causes of action including: (1) trade secret misappropriation under 18 U.S.C. §§ 1836; (2) trade secret misappropriation under Cal. Civ. Code §§ 3426.1; (3) false advertising under 15 U.S.C. §1125; (4) breach of secrecy agreement; (5) breach of settlement agreement; (6) intentional interference with prospective economic advantage; (7) unfair competition under Cal. Bus. Prof. Code §§17200 *et seq.*; and (8) patent infringement. (Doc. 82.)

The parties began discovery in October 2019 when Plaintiff served its initial discovery requests on Defendants. (Doc. 168 at 10.) Defendants served responses, including commitments to produce documents, in November 2019. (*Id.*) Defendants began providing documents, mostly ESI, in December 2019. (*Id.*) After Defendants claimed the production was complete, Plaintiff determined that there were documents and information missing. (*Id.*) Plaintiff claims counsel requested additional information and production from Defendants, such as equipment design information, financial information, and sales efforts. (*Id.*) While Defendants provided some additional information, Defendants "repeatedly asserted they had provided everything within their

---

[3] Page numbers refer to the Court's CM/ECF pagination.

possession, custody, or control." (*Id.*)

Plaintiff points to previously undisclosed information which Plaintiff independently identified as evidence of Defendants' failure to comply with their discovery obligations.  The investigation of this information is background to the discovery of concealed or spoliated ESI.  Plaintiff's arguments are summarized below.

### 1.   Agriglobe

In June 2021, Plaintiff independently identified the location of a previously unknown site where an upgraded version of Defendants' fertigation equipment was being used. (Doc. 168 at 10.) The property was owned by Agriglobe, a third party. (*Id.* at 10-11.) After finding the new equipment, Plaintiff subpoenaed Agriglobe in August 2021, requesting inspection of the equipment and testimony along with business records. (*Id.* at 11.) In September 2021, Plaintiff inspected the equipment and in early October 2021, received 900 pages of documents from Agriglobe. (*Id.*) Plaintiff states that many of the documents produced by Agriglobe were not produced by Defendants but were responsive to multiple discovery requests. The documents produced contained information about a new version of Defendant Agrigenix's fertigation equipment ("Green Machine"), information about sales efforts and resulting revenues, and dealings with a previously undisclosed supplier, Hydrite Chemical ("Hydrite"). (*Id.*; *see* Doc. 168-1, "Michaelson Decl." ¶9 and Exh. 6.)  Mahoney and Agrigenix had not identified Hydrite as a significant vendor in their prior disclosures or production.

### 2.   Hydrite Chemical

After following up with Hydrite, Plaintiff received nearly 400 pages of ESI in October 2021 from Hydrite. (Doc. 168 at 11; *see* Michaelson Decl. ¶10.) Plaintiff claims the material produced by Hydrite was within the scope of multiple discovery requests, but not produced by Defendants, and revealed that Hydrite was a major supplier to Agrigenix. (Doc. 168 at 11; *see* Michaelson Decl. ¶10 ("the financial material produced previously by Agrigenix and Mahoney failed to reflect nearly all transactions involving Agrigenix and Hydrite.") Further, other documents produced by Hydrite, but not by Defendants, contained information relevant to Plaintiff's claims of trade secret misappropriation, and breach of contract, by using Deerpoint's

4

fertilizer formulas. (Doc. 168 at 11; *see* Michaelson Decl. ¶10 ("email to Hydrite admitting that a composition covered by claims 14 and 16 of the patent Deerpoint has asserted in this case could be made by blending potassium formate or by blending formic acid.").)

### 3. Depositions

Deerpoint then undertook efforts to substantiate the information that it had learned independently about the Green Machine. In October 2021, Plaintiff deposed Jason Chow. (Doc. 168 at 12.) Mr. Chow was a former Deerpoint employee who went to work for Agrigenix after leaving Deerpoint.[4] (*Id.* at 7-8.) Plaintiff alleges that Chow had access to "substantial amounts of confidential, propriety, and trade secret Deerpoint information" while employed at Deerpoint. (*Id.* at 7.) Plaintiff alleges that Mr. Chow falsely asserted that he had little to no knowledge of Defendant's fertigation equipment, and he also minimized his role at Deerpoint and knowledge of their trade secrets. (*Id.* at 12, n.2.) But Mr. Chow admitted that he had seen a schematic for an Agrigenix fertigation device, which prompted another request for full disclosure of previously requested information about the Green Machine. (*Id.* at 12.) It was not produced.

Plaintiff pursued information about Defendants' use of Plaintiff's pricing information, which is pricing Plaintiff holds in confidence. In December 2021, Plaintiff deposed Nolan Sorensen. (*Id.*) Mr. Sorensen worked in a sales position with Deerpoint before moving to Agrigenix. (*Id.*) In his sales position, Mr. Sorensen had access to confidential and proprietary information regarding Plaintiff's customers. (*Id.*) During his deposition, Mr. Sorensen testified that he had helped prepare a document that compared Agrigenix's pricings with that of Deerpoint's, and that he likely used his Agrigenix laptop when using or preparing the document. (*Id.* at 12; Doc. 200-1, "Bruckner Decl." Exh. 2 ("Sorenson Depo." pp. 47, 101–02).) Plaintiff had independently discovered that such a document existed, though it had not seen a physical copy. (Doc. 168 at 12.) Plaintiff alleges that Defendants did not respond to requests to produce the document. (*Id.*)

---

[4] As best the Court can determine, the major employees of Agrigenix consisted of Eva Kwong, Gail Walker, Nolan Sorensen, Jason Chow, Steven Wilson, Graham Towerton (a chemist), and Mahoney. (Michaelson Decl. ¶¶3–4.) These employees become important to this motion as they relate to the ESI in the employees' laptops, discussed *infra*. There may have been other employees, but they are not discussed in this motion.

By this point, Plaintiff was concerned with purposeful withholding and/or destruction of ESI. In December 2021, Plaintiff deposed Defendant Mahoney under Rule 30(b)(6) regarding document management systems and practices, document collection efforts, and document preservation efforts. (*Id.* at 13.) Defendant Mahoney testified that, "(1) all documents covered by Deerpoint document requests had been provided to defense counsel for production; (2) all Agrigenix documents continued to exist 'in the cloud' and could be obtained through the IT provider for Agrigenix, called Unity IT; (3) Agrigenix employees had used Agrigenix-owned laptop computers, but that all of those laptops had been sold or donated to charity in the first quarter of 2021 and were no longer available; and (4) Agrigenix had only experimented with a third-party industry-specific document management system called 'Montage for Ag' or more simply 'Montage.'" (*Id.*) Plaintiff asserts that all of the above testimony was false. (*Id.*)

### 4.   Unity IT

In an attempt to locate ESI following the deposition of Defendant Mahoney, on December 23, 2021, Plaintiff served a document subpoena on cloud storage provider Unity IT. (*Id.*) Based on the production of records, Plaintiff learned that Defendants had engaged Unity IT in August 2018 to service 12 employee email accounts and two service email accounts and to maintain cloud storage for financial data through Intuit and other data through Microsoft OneDrive. (*Id.*) Plaintiff claims that Agrigenix and Unity transferred all material from the previous infrastructure to OneDrive (all other business records, including e-mails, calendars, marketing materials, spreadsheets, research and design documents, etc.), some 2400 files. (*Id.*; Michaelson Decl. ¶14; Sorenson Depo. p. 41 (the Agrigenix company had an email system).) Plaintiff acknowledges that Defendants notified Unity from the onset of their dealings of the need to preserve all ESI. (Doc. 168 at 13.)

Plaintiff alleges that Defendants failed to consistently pay Unity. (*Id.* at 14.) Defendants were notified multiple times over a ten-month period that the material archived in the cloud storage could be lost. (*Id.*) On November 11, 2019, Unity deactivated Defendants' licenses. (*Id.*) In February 2020, Defendants began to reactivate some of their licenses with Unity. (*Id.*) Emails for seven users were restored on March 19, 2020. (*Id.*) However, by February 9, 2021,

Defendants were in arrears with Unity again. (*Id.*) In May 2021, Unity sent correspondence to Defendants concerning unpaid invoices, warning that failures to pay after May 2021 could result in another purge of ESI. (*Id.*) Mahoney and Agrigenix could have mitigated the effects of a purge by downloading from the cloud whatever existed there, but did not do so. (Doc. 168-39, "Beeson Decl." ¶3.)

### 5.   Fresno First Bank

On December 23, 2021, Plaintiff subpoenaed one of Agrigenix's banks, Fresno First Bank, because Agrigenix financial disclosures remained incomplete. (Doc. 168 at 15.) In mid-January, Fresno First Bank produced documents which included information not previously disclosed about transactions between Agrigenix and several third parties. (*Id.*) The third parties included GAR Bennet and Custom Ag, among other customers and suppliers not previously identified. (*Id.*) The documents revealed that Defendants had sufficient funds to cover the few hundred dollars or less per month of Unity IT's cloud services from November 2019 to May 2021. (*Id.*)

### 6.   Laptops

Around January 25, 2022, Mr. Hampton, who formerly represented Agrigenix with respect to the patent claim, disclosed that Towerton, a former employee, was still in possession of his company laptop and that another laptop might also be available. (*Id.*) As a result, Plaintiff's counsel asked Mr. Manock, former counsel for Defendants Mahoney and Agrigenix, to locate other laptops. (*Id.*) Plaintiff indicates that recently-recovered ESI revealed that Agrigenix had purchased six laptops and one desktop on November 30, 2017, and two more laptops in early 2018. (*Id.*; Michaelson Decl. at ¶19, Exh. 24.) By mid-February 2022, Defendants' former counsel located seven laptops used by employees of Agrigenix; other laptops were never located. (Doc. 168 at 15; Michaelson Decl. ¶19 ("There were probably others, because in August 2018 Agrigenix contracted with Unity to set up accounts for 10 Agrigenix computers.").)  Plaintiff does not know what ESI was contained on these laptops, but documents produced by Unity indicate that Mahoney used a desktop while at Agrigenix (or had a second desktop) and maintained files on it that were not stored in the cloud.  (Doc. 168 at 15.)  Plaintiff does not know where other

laptops and the "desktop" referred to in documents are located. (*Id.*)

       7.    <u>Retention of Forensic Expert</u>

On February 11, 2022, Plaintiff engaged Digital Mountain, a company which provides computer forensic services, to examine the newly located laptops. (Doc. 168-39, Beeson Decl. ¶¶1, 5.) Mr. Beeson opines that based on his review of the Unity licenses, Agrigenix could have downloaded the data stored in the cloud and archived it locally, on computers, external hard drives, or other storage devices that are in physical possession of Agrigenix.  (Beeson Decl. ¶3.)

On February 16, 2022, Mr. Beeson physically inspected five laptops belonging to Walker, Chow, Kwong, Wilson, and Mahoney's mother. (Beeson Decl. ¶5.) On February 25, 2022, Digital Mountain received a hard disk drive containing forensic images of two more laptops, belonging to Towerton and Dorn. (*Id.*) Mr. Beeson was able to access and examine six of the seven laptops. (*Id.*) Mr. Beeson was unable to access the Wilson hard drive because it was encrypted, and despite repeatedly asking for a password, no password was provided. (*Id.* ¶7.)

Forensic analysis revealed the following about each laptop:

- Wilson's laptop: The laptop was found to be encrypted. (Doc. 168 at 16; Beeson Decl. ¶7.) Plaintiff has been unable to access information on the disk drive. (Doc. 168 at 16.) Despite several requests for the password, no password has been provided. (Beeson Decl. ¶7.)

- Laptop given to Mahoney's mother: Though the laptop was purchased in 2017 or 2018, the laptop had an operating system that was installed in December 2019. (Doc. 168 at 16; Beeson Decl. ¶8.) The computer contained only one user account, for Defendant Mahoney's mother. (Beeson Decl. ¶8.) There were physical signs that the laptop case had been opened, which would allow for the hard drive to have been replaced. (*Id.*) The computer contains twelve empty files in a folder labelled Agrigenix, but does not contain any Agrigenix ESI. (*Id.*)

- Kwong's laptop: Forensics revealed that the laptop had a new hard drive installed in June 2021, coinciding with the time Kwong ceased working at Agrigenix. (Doc. 168 at 17; Beeson Decl. ¶9.) Kwong told Mr. Manock the original hard drive had crashed and

needed to be replaced. (Doc. 168 at 17.) Plaintiff requested the original hard drive be produced, but it has not been produced. (*Id.*) The laptop showed no signs of physical damage or misuse that might result in such a crash. (Beeson Decl. ¶9.)

- Chow's laptop: Evidence shows a first use of the laptop in 2018. Forensics revealed that there was some ESI on the laptop however, in February 2022, a program (CCleaner) was used repeatedly in the days before the laptop was turned over to wipe and delete files so that they cannot be recovered. (Doc. 168 at 17; Beeson Decl. ¶10.) This is about the time Chow was contacted about returning his laptop. (Doc. 168 at 17.) Plaintiff was able to find an incomplete volume of relevant files such as a number of image files (digital photographs) but only a handful of files with names or in folders. (Beeson Decl. ¶10.)

- Towerton laptop: Forensics found limited copies of some email files for other Agrigenix employees, including Mahoney, Dorn, Kwong, Walker, Chow, Sorensen, and Wilson. (Doc. 168 at 13; Beeson Decl. ¶12.) No correspondence after June 7, 2018 was found on Towerton's laptop. (Beeson Decl. ¶12.)

- Dorn, Chow, Towerton, and Walker's laptops: Forensics found some recoverable email archives and local copies of some of the ESI stored in the cloud. (Doc. 168 at 17; Beeson Decl. ¶11.) But much is missing: emails about the formation of Deerpoint and many emails from its early days are missing from the laptops, as are any business emails from between November 11, 2019 and March 19, 2020 and again after approximately May 2021 (when company employees could only use personal email). (Doc 168 at 17.)

From the forensic analysis, Plaintiff contends that for several laptops recently recovered and made available, there was a lack of preservation and even affirmative destruction of contents. Plaintiff identified some limitations in the ESI found on the laptops, including: emails not sent or received by the owner, emails sent when Unity IT's services were suspended, and full files stored in the cloud. At any point before licenses were suspended, Defendants could have downloaded the data stored in the cloud and stored it locally. (Beeson Decl. ¶3.) Further, several computers

were not retrieved.

### 8. GAR Bennett

In March 2022, Plaintiff obtained documents from GAR Bennett pursuant to a subpoena. (Doc. 168 at 18.) The documents contained invoices that showed Defendants had sold components of their fertigation equipment to GAR Bennett in the midst of this litigation. (*Id.*) The documents also included other invoices, one of which was not reflected in the documents received from Fresno First Bank or any QuickBooks files recovered. (*Id.*) No documents memorializing the sale transaction to GAR Bennett were ever produced by Mahoney or Agrigenix. (*Id.*)

### 9. Additional ESI Plaintiff identifies as missing

Plaintiff alleges that emails from personal accounts, presumably used when Unity IT services were suspended, were not preserved. (*Id.*) Plaintiff also alleges that documents that were contained in the "Montage" document management system were not preserved. (*Id.*) Documents that were recently recovered indicate that Montage was used by Agrigenix from January 2018 through at least August 2018. (*Id.*) Finally, Plaintiff found reference to an "F Drive" which documents reveal was used prior to the use of OneDrive, though no documents from an "F Drive" were produced. (*Id.*; Michaelson Decl. ¶23d.)

In summary, Plaintiff argues that ESI as to customer solicitations, Green Box design, product formulas, financial and other ESI disappeared upon "wiping" of the Chow laptop, the supposed "crash" of the Kwong device, encryption of the Wilson computer, disappearance of the Mahoney computer and other computers, and failure to maintain a backup of cloud ESI.

## B. Defendants' Opposition

### 1. Background

Defendant Mahoney joined Plaintiff as its CEO in Spring 2013. (Doc. 200 at 8.) Mahoney grew the fledgling fertigation business to $35 million in annual sales based upon his business relationships, employees, and expanding his customer base. After the business relationship with Plaintiff broke down, Defendant Mahoney left Deerpoint in fall of 2017 and claims he did not intentionally take proprietary, confidential, or trade secret materials when he left. (*Id.*)

Mahoney formed Agrigenix in October 2017 and many of Plaintiff's employees joined

10

Agrigenix. (*Id.* at 8-9.) Mahoney was not in need of any of Plaintiff's confidential or trade secrets because Agrigenix hired Custom AG Formulators to blend fertilizer formulas. (*Id.* at 9.) Agrigenix's boxes were less expensive and complex than Plaintiff's and Agrigenix's boxes were built with off-the-shelf pumps and tubes. (*Id.*) Based upon Mahoney's connections with local growers, who were friends and colleagues, and who were willing to share pricing information, Mahoney grew Agrigenix. (*Id.* at 9-10.)

When this litigation arose, Defendants retained Doerksen Taylor Stokes LLP to represent them. (*Id.* at 10.) However, due to the cost of the defense, Defendants were not able to afford their bills and counsel withdrew in March 2019. (*Id.*) Counsel from Doerksen sent Defendants a litigation hold letter on June 1, 2018, which informed Defendants of the need to preserve evidence relevant to this case. (*Id.*) The letter required some follow up with Defendants but there was no response from counsel from Doerksen regarding whether follow up took place. (*Id.*; Menshikova Decl. ¶2.) Prior counsel did not recall their firms sending out litigation hold letters. (Menshikova Decl. ¶¶ 3, 4.)

Defendants then retained Manock Law and Sierra Law, the latter to represent them with regards to the patent claims. (Doc. 200 at 10.) At some point Defendants were paying their legal fees directly until early 2021 when insurance began covering legal fees. (*Id.*) Insurance would not cover Sierra Law, so Defendants retained Hall Griffin LLP. (*Id.*) Due to financial woes, Agrigenix ceased operations in March 2021 and filed for bankruptcy on April 25, 2022. (*Id.* at 11.)

2.   Discovery

Defendants claim they have complied with all discovery requests and produced substantial ESI. (*Id.*) Defendants began their production on December 17, 2019. (*Id.*) Defendants claim they "went to great lengths" to respond to all of Plaintiff's requests.[5] (*Id.*) Defendants claim Plaintiff

---

[5] On October 9, 2019, Plaintiff propounded: 57 Requests for Production to Defendant Mahoney, 107 Requests for Production to Defendant Agrigenix, 7 Interrogatories to Defendant Mahoney, and 13 Interrogatories to Defendant Agrigenix. On April 17, 2020, Plaintiff propounded: 33 Requests for Production to Defendant Agrigenix, 10 Interrogatories to Defendant Agrigenix, and 4 Interrogatories to Defendant Mahoney. (Doc. 200 at 11.)  Defendants produced about 2,402 pages between January 29, 2019 and March 20, 2020. (*Id.* at 6–7.) An additional 11,173 pages were produced on February 10, 2022.  (*Id.* at 12.)

1    informed the Court on November 4, 2021, that document production was complete, well before

2    the issues in this motion were raised. (*Id.* at 13.)

3                    3.    <u>Laptops</u>

4          When Agrigenix ceased operations in March 2021, Defendants believed there was no

5    longer a need to maintain the laptops. (*Id.*; Doc. 200-3, "Mahoney Decl." ¶27.) Agrigenix allowed

6    employees to take their laptops with them. (Mahoney Decl. ¶20.) Defendants took no steps to

7    wipe the laptops before giving them away. (*Id.*) Defendants sincerely believed that the materials

8    on the laptops were stored in the cloud and that document production was essentially over. (*Id.*

9    ¶¶25, 27.) Defendants claim the following about specific laptops (those provided to Wilson,

10    Kwong, Chow, and Mr. Mahoney's mother):[6]

11        •    Wilson Laptop: The laptop was not encrypted by Defendants. (Doc. 200 at 14.)

12              Defense counsel has attempted to obtain the password to no avail. (*Id.*; Brucker Decl.

13              ¶8.)

14        •    Kwong Laptop: The original hard drive appears to have crashed and was replaced

15              while in Kwong's possession. (Doc. 200 at 14.) Defendants did not cause the crash or

16              cause the loss of the crashed drive. (*Id.*; Mahoney Decl. ¶22.)

17        •    Chow Laptop: To the extent that the laptop was cleaned in February 2022, Defendants

18              could not control the actions of a third party and did not request that Chow take such

19              actions. (Doc. 200 at 14.) Further, Chow only deleted personal materials unrelated to

20              the litigation. (*Id.*; Chow Decl. ¶8.) Moreso, the laptop was not "wiped" as suggested

21              by Plaintiff, but rather, Chow used a "performance optimizer" that routinely cleans

22              and speeds up computers. (Doc. 200 at 14.)

23        •    Laptop given to Mahoney's mother: Plaintiff admits after examining the laptop that

24              there was no ESI contained on the laptop. (*Id.*) Even if ESI existed, Defendants took

25              no steps to delete any content on the laptop before giving it away. (*Id.*) Plaintiff's

26              assumptions that the laptop was at some point Mahoney's and was cleaned or had data

27              removed is unsupported speculation. (*Id.* at 10.)

28

---

[6] Defendants assert that Plaintiff admits that the laptops provided to Walker, Dorn, and Towerton were recovered.

1          4.      Cloud Data

2          Defendants again state that they believed that the material on the laptops was stored in the

3  cloud. (*Id.*) In fact, not only did Defendants request Unity IT place a litigation hold on its records,

4  but Defendants also agreed to pay extra to Unity IT to place the litigation holds. (*Id.*) However,

5  due to business necessity and the failure to afford services, Defendants were forced to stop paying

6  Unity IT. (*Id.*) Defendants claim that Agrigenix employee Towerton even paid Unity IT

7  personally to maintain the services for some time. (*Id.*) Despite being told that services would be

8  suspended, Defendant Mahoney believed that he would lose access to the information on the

9  cloud, not that the information would be unrecoverable. (*Id.*; Mahoney Decl. ¶27 ("I understood

10  and sincerely believed that Agrigenix's ability to pay Unity IT for its services would only cause

11  termination of access to the information in the cloud . . . [and] that all of the information

12  maintained on the Unity IT servers would not be lost and would remain recoverable at a later

13  date.").) There is zero evidence that Defendants were warned that material archived in the cloud

14  could be lost. (Doc. 200 at 15-16.) Rather, Plaintiff omits the language of the warnings. (*Id.*)

15          Exhibits 7–22 of the declaration of Jon Michaelson clearly show: "(1) that Agrigenix

16  repeatedly requested that its data on the cloud be preserved over the course of several years,

17  including as recently as March 11, 2021; (2) Agrigenix paid for services when it could afford to

18  do so; and (3) Unity IT did not explain to Agrigenix before terminating its access to the cloud that

19  data would be permanently lost if payment was not made." (*Id.* at 16 (internal citations omitted).)

20  Specifically, Plaintiff misrepresents Exhibit 17 to Michaelson's declaration. Exhibit 17 involves

21  an email between Defendant Mahoney and Unity IT where Unity IT states, "I doubt your old mail

22  will be there." (*Id.*) This was in response to Defendant Mahoney's question as to whether data

23  that was stored in the cloud prior to the first suspension would still be in the cloud when services

24  were reactivated. (*Id.*) Plaintiff treats the statement as saying that the data was purged when

25  services were terminated. (*Id.*) Plaintiff also misrepresents an email from Unity IT (Michaelson

26  Decl., Exh. 20) which states that data prior to February 2020 may have been purged. (*Id.*)

27  Defendants claim that Plaintiff misleads the court by arguing that the Defendants were told that

28  the data had probably already been purged. (Doc. 200 at 16-17.)

Defendants claim that to this day they are unaware if the data is recoverable or not. (*Id.* at 17.) However, Defendants admit "Unity IT has reported that it does not currently believe that the data is still available online given the time that has passed." (*Id.*)

Defendants concede their duty to preserve ESI. (Doc. 200 at 18.) Defendants argue that Plaintiff has not shown the requisite culpable state of mind. Agrigenix was a small start-up company, and this litigation has dragged on with four sets of lawyers coming and going. There was no scheme to spoliate ESI. Any loss of ESI on the laptops was not caused or requested by Defendants. The data in the cloud was not intentionally spoliated, and Plaintiff merely speculates as to the data that has been lost. Agrigenix repeatedly requested that its data on the cloud be preserved and paid when it could to do so. Unity did not explain that the data would be lost. The issue of personal email is a red herring. Mahoney produced his personal email, and Plaintiff did not subpoena former employees' personal email. (*Id.* at 18-21.)

Defendants ask the Court to fashion a reasonable remedy under 37(e)(1) if the Court finds prejudice. Defendants argue that the Court could reopen discovery and continuing all dates would be an appropriate remedy. Defendants argue that Plaintiff's request for monetary damages is excessive and unsupported. Defendants ask the Court to deny the requested adverse factual findings as impermissible under Rule 37(e)(1). (Doc. 200 at 26.)

### C.    Plaintiff's Reply

Plaintiff argues that while Defendants admit that they did not take adequate steps to preserve ESI, they ignore the full nature and scope of the failure. (Doc. 210 at 4.) Defendants try to minimize their misdeeds.

Defendants discuss only four laptops. But ESI was spoliated from no fewer than five laptops, out of at least eight known laptops used by Agrigenix and at least one desktop. (*Id.*) Plaintiff believes that all computers used by Defendants were spoliated in one fashion or another. (*Id.*) Similarly, the timing of the "cleaning" of Chow's laptop and whatever program he used left the device with no ESI from the period where he was an Agrigenix employee. All of that data was spoliated. (*Id.* at 3-4.) Furthermore, Defendants have not addressed in any material respect three or more computers that were unaccounted for, including two computers Mahoney himself used.

(*Id.* at 12.) Defendants have not disclosed whether or not either of Mahoney's work computers remain in his possession or were disposed of. (*Id.*) Defendants also emphasize that they themselves did not wipe any laptops of ESI, however, allowing those devices out of their control is enough to find that they failed to preserve the laptops and their data. (*Id.* at 13.)

As to the data stored in the cloud, ESI in multiple remote locations was spoliated. (*Id.* at 5.) This includes all files maintained on OneDrive by Unity IT and all business-related content on personal email accounts including dates prior to the formation of Agrigenix and at later times when the Unity IT system was deactivated. (*Id.*) ESI from a few laptops does not rectify the loss of unknowable amounts of ESI. (*Id.*) ESI that still remains missing includes:

- ESI from Agrigenix computers that were never backed up to OneDrive, such as ESI from the Mahoney desktop and possibly others as well.
- ESI that was backed up to OneDrive, but that disappeared when the cloud data was lost because it was not downloaded to a non-spoliated computer.
- Material from personal email accounts not copied to Agrigenix email addresses during times when those were active, such as Mahoney communications with the multiple customers he claimed would elect to do business with Agrigenix.
- Contents of Montage program files, including customer communications.
- Contents of the Agrigenix "F Drive."

(*Id.* (internal citations omitted).)

The spoliation spans the entire Agrigenix organization and all of its activities prior to its formation through the close of discovery. (*Id.* at 6.) Defendants attempt to minimize the extent of the spoliation by claiming Plaintiff failed to demonstrate that the lost material was not duplicative of items that were produced. However, to prove that the documents would be duplicative would require Plaintiff to examine the spoliated ESI. (*Id.*)

Additionally, it is reasonable to reach conclusions as to what was spoliated based on the surrounding circumstances as follows. (*Id.*) Deerpoint devoted years to building its business and spent millions on the technology that made that business a success, yet only months after Agrigenix was formed and with very little spent on R&D, Defendants offered the same unique

15

products as Deerpoint. (*Id.* at 7.) Deerpoint timely requested discovery that should have been produced before Defendants' spoliation and was requested at the same time as the spoliation of the cloud storage. (*Id.* at 8.) No laptop contents from any Agrigenix employee responsible for sales was recovered, despite Mahoney bragging about 30 grower meetings, and thus any communications with actual or potential customers have been spoliated. (*Id.*) The development of the Green Machine and product formulas have been lost. The spoliation of ESI that contained relevant evidence of theft and use of confidential information and trade secrets has made it impossible for Deerpoint to prove its case. (*Id.* at 8-9.)

Defendants' spoliation was intentional. (*Id.* at 9.)  Defendants knew their obligations to preserve ESI.  Indeed, original counsel advised Defendants, in a comprehensive litigation hold letter, of the duty to preserve. (Mahoney Decl., Exh. 1 (litigation hold letter).) In late March 2021, Mahoney made a statement to Unity IT that ESI had to be preserved, indicating Mahoney knew his preservation obligations. (*See* Mahoney Decl. ¶¶ 16–18, 25–27.)  Mahoney is a sophisticated litigant who has been involved in prior lawsuits. Defendants were represented and advised by counsel at all times.

Spoliation began shortly after Defendants were served with discovery. Whether Mahoney believed that Unity IT ESI would not be spoliated does not relieve Defendants of their obligations. Defendants stopped paying for ESI licenses and were warned the services would be terminated.  Discontinuing services would result in termination of preservation and the loss of the data.  Defendants' lawyers advised them that discontinuing services would result in termination of preservation and the loss of the data.  (Mahoney Decl., Exh. 1.)

There are three or more computers, including two used by Mahoney (a laptop and a desktop), that are entirely unaccounted for by Defendants. Mahoney has not disclosed whether or not either of his own work computers remained in his possession for any particular length of time and what happened to the ESI contained on the computers.

Moreover, loss of ESI from computers given to Agrigenix employees is the responsibility of Defendants. Plaintiff's position is that when Defendants gave away the computers, allowing those computers to leave their control by giving them to departing employees over whom they no

16

1    longer had authority, Defendants affirmatively failed to preserve. (Doc. 210 at 13.)

2                                **EVIDENTIARY OBJECTIONS**

3         Both parties object to the other's evidence.  For instance, Defendants submit objections to

4    both the evidence in support of the motion for sanctions and the supplemental evidence filed with

5    Plaintiff's reply. (Docs. 201, 214.) Specifically, Defendants object to statements in the

6    declarations of Jon Michaelson, Christopher Beeson, and John Miller. Many of Defendants'

7    objections to Plaintiff's evidence are based on lack of foundation, lack of personal knowledge, or

8    hearsay. Defendants object to Mr. Beeson's declaration on the grounds that his declaration lacks

9    foundation, is speculative, is based on hearsay, and is inadmissible under Federal Rule of

10   Evidence 702. The Court disagrees. Mr. Beeson's testimony is based on his analysis of the

11   surrendered devices, and Mr. Beeson is qualified, for the purposes of this motion, to offer

12   opinions based on his analysis of the devices. (Doc. 168-39, ¶¶1–2.)

13        To the extent the Court has relied on evidence to which objections have been made, those

14   objections are OVERRULED; the Court OVERRULES AS MOOT the parties' remaining

15   evidentiary objections. "While the Federal Rules of Evidence do not necessarily apply in the

16   context of a motion for sanctions, evidence relied upon must, at a minimum, bear indicia of

17   reliability." *AtPac, Inc. v. Aptitude Sols., Inc*., No. CV 2:10-294 WBS JFM, 2011 WL 13242817,

18   at *1 (E.D. Cal. Apr. 13, 2011) quoting (*Sentis Grp., Inc., Coral Grp., Inc. v. Shell Oil Co.*, 559

19   F.3d 888, 901 (8th Cir. 2009)); *Juul Labs, Inc. v. Chou*, No. 2:21-CV-03056 DSF PDX, 2022 WL

20   2161063, at *6 (C.D. Cal. May 6, 2022) (accepting evidence that bears sufficient indicia of

21   reliability in a sanctions motion). Additionally, other pretrial, non-dispositive motions do not

22   require that evidence be submitted in a form that would be admissible at trial. *AtPac, Inc.*, 2011

23   WL 13242817, at *1. The Court is satisfied that the evidence relied upon bears indicia of

24   reliability, and therefore, the Defendants' objections are overruled for the purposes of this motion.

25                                       **DISCUSSION**

26   **A.     Federal Rule of Civil Procedure 37(e) and ESI**

27        "Federal Rule of Civil Procedure 37 authorizes the district court, in its discretion, to

28   impose a wide range of sanctions when a party fails to comply with the rules of discovery or with

                                              17

1   court orders enforcing those rules." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir.

2   1983). Federal Rule of Civil Procedure 37(e) states, "if electronically stored information that

3   should have been preserved in the anticipation or conduct of litigation is lost because a party

4   failed to take reasonable steps to preserve it, and it cannot be restored or replaced through

5   additional discovery" the court may impose sanctions.

6        In evaluating whether spoliation of ESI has occurred, courts should consider three

7   threshold criteria, whether: "(1) the ESI 'should have been preserved in the anticipation or

8   conduct of litigation'; (2) the ESI 'is lost because a party failed to take reasonable steps to

9   preserve it'; and (3) '[the ESI] cannot be restored or replaced through additional discovery.' "

10  *Facebook, Inc. v. OnlineNIC Inc.*, No. 19-CV-07071-SI (SVK), 2022 WL 2289067, at *6 (N.D.

11  Cal. Mar. 28, 2022); *Porter v. City of San Francisco*, No. 16-3771, 2018 WL 4215602, at *3

12  (N.D. Cal. Sept. 5, 2018) (quoting Rule 37(e)). Where these three threshold criteria are met and

13  the Court finds that the "party acted with the intent to deprive another party of the information's

14  use in the litigation," a court may issue terminating sanctions. Fed. R. Civ. Proc. 37(e)(2)(C).

15  Although Rule 37(e) does not define "intent," courts have found that "intent" in this context

16  means "the evidence shows, or it is reasonable to infer, that a party purposefully destroyed

17  evidence to avoid its litigation obligations." *Facebook, Inc. v. OnlineNIC Inc.*, No. 19-CV-07071-

18  SI (SVK), 2022 WL 2289067, at *6 (N.D. Cal. Mar. 28, 2022).

19       The moving party bears the burden of establishing that spoliation occurred by

20  demonstrating that the non-moving party destroyed the documents and had some notice of the

21  document's relevance to the litigation before they were destroyed. *Ramirez v. Zimmerman*, 2020

22  WL 905603 at *5 (S.D. Cal. Feb. 25, 2020) (quoting *Harfouche v. Wehbe*, 705 F. App'x 589, 590

23  (9th Cir. 2017)). Courts in this circuit have indicated that a preponderance of the evidence

24  standard of proof is applicable to spoliation motions. *CrossFit, Inc. v. Nat'l Strength &*

25  *Conditioning Ass'n*, 2019 WL 6527951 at *28 (S.D. Cal. Dec. 4, 2019) ((following Ninth Circuit

26  precedent permitting intent under Rule 37(e)(2) by preponderance of the evidence, not clear and

27  convincing evidence) (citing *OmniGen Research v. Yongqiang Wang*, 321 F.R.D. 367, 372 (D.

28  Or.) ("[t]he applicable standard of proof for spoliation motions in the Ninth Circuit is the

preponderance of evidence."); *Weride Corp. v. Kun Huang*, 2020 WL 1967209 at *9 (N.D. Cal.

Apr. 16, 2020); *Compass Bank v. Morris Cerullo World Evangelism*, 104 F.Supp.3d 1040, 1052–

53 (S.D. Cal. May 8, 2015); *Colonies Partners L.P. v. Cty. Of San Bernardino*, 2020 WL

1496444 at *6 (C.D. Cal. Feb. 27, 2020). Further, a court "may make factual findings and assess

the credibility of witnesses. *Weride Corp.*, 2020 WL 1967209 at *33.

### B.       The Duty to Preserve and Defendants' Spoliation

A duty to preserve arises the "moment that litigation is reasonably anticipated." *Apple*

*Inc., v. Samsung Elecs. Co.,* 881 F. Supp. 2d 1132, 1136 (N.D. Cal. July 24, 2012); *Brewer v.*

*Leprino Foods Co.,* 2019 WL 356657 at *25 (E.D. Cal. January 29, 2019). A party must preserve

evidence that the party knows or should know is relevant to another party's claim or defense, or

could lead to the discovery of such evidence. *Perkins v. City of Modesto,* 2020 WL 1333109 at

*46 (E.D. Cal. Mar. 20, 2020). Once the duty attaches, a party must ensure all policies related to

deleting or destroying files are suspended. *Perkins,* 2020 WL 1333109 at *46. Further, simply

making "some effort" is not sufficient. *Id.* (citing *Apple Inc., v. Samsung Elecs. Co.*, 888 F. Supp.

2d 976, 991–92 (N.D. Cal. Aug. 21, 2012)).

Agrigenix and Mahoney were on notice that ESI should have been preserved.  At a

minimum, Defendants were informed from a comprehensive litigation hold letter by their former

counsel, instructing Defendants that: "the company's employees and key custodians" had an

obligation to preserve "documents and data from all sources relating in any way to the

allegations," to create "a 'mirror' [backup] image of each hard drive and storage device" and "to

take steps to prevent deletion and ensure preservation of ESI." (Mahoney Decl., Exh. 1.)

Mahoney confirmed Defendants' duty to preserve by alerting Unity IT that cloud data must be

preserved. There is not any dispute that Defendants knew they must preserve ESI, and therefore

the Court will not further evaluate this criterion.

Here, the second spoliation criterion—that the party failed to take reasonable steps to

preserve the ESI—is also met. Fed. R. Civ. P. 37(e); *WeRide Corp*., 2020 WL 1967209, at *12.

Indeed, there is not any real dispute that Defendants failed to take reasonable steps to preserve

ESI. Defendants acknowledge that they "did not take adequate steps to preserve ESI." (Doc. 200

1   at 1 ("Despite [Defendants'] efforts, and reviewed with the benefit of hindsight, Defendants did

2   not take adequate steps to preserve ESI.") Again, the Court will not further evaluate this criterion.

3       The third criterion is that the ESI cannot be restored or replaced through additional

4   discovery. Fed. R. Civ. P. 37(e). There appears to be no real dispute that the ESI cannot be

5   recovered. For instance, current counsel for Defendants has contacted Unity IT, attempting to

6   locate this ESI, and the ESI is not available online given the amount of time that has passed.

7   (Doc. 200 at 17 ("In all candor to the Court, Unity IT has reported that it does not currently

8   believe that the data is still available online given the time that has passed.").) Significantly, the

9   laptops for various former employees no longer have the full ESI which was, more than likely,

10  created on those laptops as part of the employees' scope of employment. For instance, Mr.

11  Chow's laptop was "wiped" prior to being turned over to Plaintiff's counsel. The Towerton laptop

12  contained some email from other Agrigenix employees, but the emails are not from a period after

13  June 7, 2018. (Doc. 168-39, Beeson Decl. ¶12.)  Apparently, Mahoney had both a laptop and a

14  desktop, and neither have been turned over for evaluation of the ESI contents. Retained expert

15  Mr. Beeson states that the laptop of Steve Wilson is encrypted, and information is irretrievable.

16  No password has been provided despite repeated requests. (*Id.* ¶7.)   Mr. Beeson states that the

17  laptop given to Mahoney's mother has physical signs that the laptop case had been opened, which

18  would allow for the hard drive to have been replaced. (*Id.* ¶8 and Exh. 1.) Mr. Beeson opines that

19  if the hard drive had been removed deliberately, it resulted in forensically wiping all prior content

20  because the "computer does contain twelve empty files in a folder labelled Agrigenix," but not

21  ESI.  (*Id.* ¶8.) Ms. Kwong's laptop "crashed," and the most recent files in Towerton's local copy

22  are from July 18, 2019.  (*Id.* ¶¶10, 13.)  Plaintiff was able to recover some of the withheld and

23  deleted ESI through their forensic evaluation. Other responsive ESI will be unavailable because

24  the data was destroyed and no longer exists. It is impossible to know now what ESI was available,

25  but which is now no longer available.  Thus, even if the Unity IT ESI can be resurrected, much

26  more ESI is not recoverable.

27      Defendants argue that the Court could reopen discovery as a reasonable remedy. The

28  Court does not find that reopening discovery is a viable remedy.  This case has been pending

1  since April of 2018. The litigation has involved extensive law and motion practice and

2  voluminous discovery, including numerous discovery disputes, multiple changes of counsel, a

3  bankruptcy filing, and other complicating matters, all of which has resulted in large consumption

4  of party and judicial resources.  The Court declines to reopen discovery where there has been

5  adequate time for full disclosure.  Moreover, the Court does not find there is any point to

6  reopening discovery into data which no longer exists.

7       The Court finds that the three Rule 37(e) threshold criteria—ESI should have been

8  preserved, but is lost because a party failed to take reasonable steps to preserve it, and the ESI

9  cannot be restored—are easily satisfied here and that spoliation has occurred. Spoliation is the

10  "destruction or significant alteration of evidence, or the failure to preserve property for another's

11  use as evidence in pending or future litigations. *Kearney, Foley & Lardner, LLP*, 590 F.3d 638,

12  649 (9th Cir. 2009); *Brewer*, 2019 WL 356657 at \*24-25.  ESI which would have and should

13  have been on the various laptops of Agrigenix's and Mahoney's computers and on Unity IT is no

14  longer available. The only remaining issue before the Court is whether Defendants acted

15  intentionally and what sanction, if any, should be imposed.

16       **C.    Prejudice and Level of Intent**

17       When the Court finds spoliation, Rule 37 then provides for two distinct sets of sanctions.

18  First, pursuant to subdivision 37(e)(1), the court may order "measures no greater than necessary

19  to cure the prejudice" when the Court finds a party was prejudiced from the loss of the

20  information. *Winecup Gamble, Inc. v. Gordon Ranch LP*, 850 F. App'x 573, 574 (9th Cir. 2021)

21  (If the district court concludes that these threshold findings are met, it must then determine the

22  appropriate sanction. If the district court finds that the loss of ESI has prejudiced the moving

23  party, it "may order measures no greater than necessary to cure the prejudice.")

24       The second sanction is in subdivision 37(e)(2). Before a court may issue sanctions under

25  Rule 37(e)(2), it must find that "the party acted with the intent to deprive another party of the

26  information's use in the litigation." If the Court finds that the party who spoliated the ESI acted

27  with the "intent to deprive another party of the information's use in the litigation," the Court may:

28  ///

(A) presume that the lost information as unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter default judgment.

Fed. R. Civ. P. 37(e)(2). Spoliation of evidence raises a presumption that the destroyed ESI was both adverse to the party that destroyed it and relevant to the merits of the case. *Apple, Inc.*, 888 F. Supp. 2d at 998 (quoting *Dong ah Tire & Rubber Co.*, 2009 WL 1949124 at *10 (N.D. Cal. July 2, 2009)).

Courts have the discretion to determine if the spoliation of evidence is prejudicial, and neither party has the burden of establishing or disproving prejudice. *Hernandez v. Tulare Cty. Corr. Ctr.*, 2018 WL 784287 at *10 (E.D. Cal. Feb. 7, 2018) (citing Fed. R. Civ. P. 37(e), Committee Notes on Rules – 2015 Amendment)). However, a moving party must show the non-moving party had an intent to deprive another party of the spoliated information for subsection (e)(2) to apply. *See Ramirez,* 2020 WL 905603 at *5. If the moving party cannot show an intent to deprive but can show that information was lost because the non-moving party failed to take reasonable steps to preserve the information, a court may find prejudice. *See Id.* at *6.

Prejudice may be found where the spoiling party's actions impaired another party's ability to go to trial or threatens to interfere with a rightful decision of the case. *Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006) (quoting United States ex rel. Wiltec Guam, Inc., v. Kahaluu Contr. Co., 857 F.2d 600, 604 (9th Cir. 1988)).* Determining the prejudice from the loss of the information unavoidably includes an evaluation of the information's importance in the litigation. *Id.*

### 1.   Prejudice

Plaintiff argues that it is prejudiced. Plaintiff argues that the loss of ESI has impaired its ability to prove its case. (Doc. 168 at 21-24.) ESI regarding Agrigenix's communications with actual and potential customers was spoliated. No laptop contents from any Agrigenix employee responsible for sales was recovered. (Doc. 210 at 8.)  There is little to no ESI regarding development of the Green Machine or product formulas. (*Id.*)

///

Defendants argue that there was no prejudice, or if there is any prejudice, Plaintiff's lack of diligence was partially at fault. (Doc. 200 at 7.) First, Defendants argue that there is no evidence that any important or relevant data was permanently lost. (*Id.*) Defendants argue that Plaintiff's allegation that the evidence that was spoliated would have benefitted their case is based on misrepresentations of deposition testimony. (*Id.* at 22-24.) Defendants further claim that there is no prejudice because there is no evidence, just misrepresentations of documents and deposition testimony, that the destroyed evidence was relevant. (*Id.*)

Here, Defendants have acknowledged that there is ESI that was not preserved both on the laptops and in the cloud. However, Defendants then claim that Plaintiff's "misrepresentation" of documents and testimony shows there is no prejudice because Plaintiff is speculating as to what documents may be missing. Defendants cite to *Best Label Co. v. Custom Label & Decal, LLC*, to argue that speculation is not enough to support a finding of prejudice. 2022 WL 1525301 at *5 (N.D. Cal. May 13, 2022). However, the Court in *Best Label Co.*, found the claim of prejudice was highly speculative because the plaintiff failed to discuss the nature of the information that was missing and its bearing on the case, relied solely on a forensic examiner's report and did not ask any defendants or their representatives about the alleged missing files, or provide a declaration attesting to the likely subject matter of the missing material. 2022 WL 1525301 at *5. That is not the case here.

Here, Plaintiff has provided the Court with substantial documentation that Plaintiff attempted to determine what documents were missing. For example, Defendant Agrigenix produced a pamphlet that it presented to potential customers which claimed Defendants had "sophisticated fertigation equipment." (*See* Michaelson Decl. ¶5b). However, Defendants only produced a one-page sketch of the equipment. (*See id.* and Exh. 5.) The equipment is specialized and sophisticated, and as Plaintiff argues, discovery should have produced items such as design documents, equipment lists, schematics, wiring diagrams, software related to programming its control mechanisms, and testing data. (Doc. 168-41, "Miller Decl." ¶14.) Plaintiff had requested additional documents on the topic, but none was produced. (*Id.*) During the Chow deposition, Mr. Chow made statements that he had seen schematics for an Agrigenix fertigation device, which

1   also prompted Plaintiff to again request all documents be produced. (Michaelson Decl. ¶11; Doc.

2   200-1, Chow Depo. at 19.) Again, nothing was produced. (Michaelson Decl. ¶11.) Thus, it is not

3   speculative that such documents existed, as testified to by a former employee and as can be

4   reasonably inferred should exist.

5       Defendants also claim that Plaintiff is not prejudiced because Plaintiff has recovered ESI

6   from the recovered laptops. However, there is additional evidence to suggest that there is still

7   missing ESI from the cloud and other laptops. In one such instance, a screenshot of the cloud file

8   system used by Defendants showed 18 folders, while the Towerton laptop, which contained the

9   most ESI, only had 3,500 documents in 10 folders. (Michaelson Decl. ¶22, Exhs. 25, 26.)  The

10  laptop given to Mahoney's mother showed file folders labeled "Agrigenix," yet the folder(s) were

11  empty of any ESI. (Beeson Decl. ¶8.) Little to no sales information and communications were

12  produced, and little to no financial data was produced.

13      Therefore, it is reasonable that Plaintiff would need to engage in some level of speculation

14  to argue certain documents may exist. There is more than one source suggesting that certain

15  documents existed.

16      Further, Defendants argue that Plaintiff could have sought to examine the laptops, take

17  depositions, and "seriously pursue[] discovery before Agrigenix shut its doors, gave away its

18  laptops, and stopped being able to pay for cloud services." (Doc. 200 at 7.) And, that Plaintiff did

19  not inquire about the computers and documents claimed to be missing during depositions.

20  (Brucker Decl. ¶2.)

21      It does not appear to the Court that Plaintiff delayed in seeking discovery. Discovery

22  requests were propounded as early as the end of 2019, and Defendants repeatedly assured

23  Plaintiff that production of ESI was complete. (Michaelson Decl. ¶6.) Plaintiff then independently

24  discovered that there were previously undisclosed clients of Defendants that had additional

25  information, which Plaintiff then pursued. (Michaelson Decl. ¶9 ("Agriglobe documents included

26  general information about the existence and pricing of the new iteration of Agrigenix equipment

27  (called the "Grow Green Machine") that Deerpoint had located independently, about Mahoney

28  and Agrigenix sales efforts and resulting sales revenues, and about substantial dealings with a

1   supplier (Hydrite Chemical) that Mahoney and Agrigenix had not identified in prior disclosures

2   or production.").)  Additionally, discovery had not yet closed in this case when Plaintiff was

3   completing depositions, issuing subpoenas of third parties, and corralling and examining laptops,

4   (of which Plaintiff was unaware until January 2022). (Doc. 165.)[7]

5          Finally, Defendants claim that there is no evidence that the data stored in the cloud is

6   irretrievable. (Doc. 200 at 16-17.) Defendants claim that language used by Unity IT in

7   communications regarding data in the cloud prior to its suspension only suggests that the data

8   **may** have been purged. (*Id.*) However, Defendants also acknowledge that "Unity IT has reported

9   that it does not currently believe that the data is still available online given the time that has

10  passed." (*Id.* at 16.) Even if the language of the Unity communication is not definitive that the

11  data is irretrievable, Defendants have not yet produced any support that it may still exist. This

12  motion has been pending before the Court since April 21, 2022, with Defendants' opposition filed

13  August 12, 2022. There has been ample time for Defendants to discover if, at the very least, there

14  is data that could be retrieved. Moreover, the communication between Defendant Mahoney and

15  Unity IT shows that Defendants could have ascertained whether older ESI remained on the cloud

16  when the accounts were reactivated in March 2020. (Michaelson Decl., Exh. 17.) Defendants

17  have not provided the Court with such information.

18         The Court, therefore, finds that Plaintiff is prejudiced by the spoliation of ESI in the cloud

19  and on the laptops. While it is unclear how much ESI was lost, the Court finds that such

20  information, such as design, formula, sales information, financial information, email

21  communications, etc. could have benefited Plaintiff's claims. "In the Ninth Circuit, spoliation of

22  evidence raises a presumption that the destroyed evidence goes to the merits of the case, and

23  further, that such evidence was adverse to the party that destroyed it. *Apple Inc. v. Samsung*

24  *Elecs. Co*., 888 F. Supp. 2d 976, 993 (N.D. Cal. 2012) ("[T]hough neither Apple nor the Court

---

[7] At that point, the parties requested a continuance of the Scheduling Order dates. Part of the reason for the continuance as stated by the parties, "Mahoney and Agrigenix assert that they believed for a period of time that they had produced all responsive documents that were available to them and that it was not until the middle or end of January 2022 that they determined that certain sources of documents (in particular, employee laptops) were under their control or in the possession of past Agrigenix employees. Defendant Mahoney had thought (and had testified) that between January and April 2021, some of the laptops had been sold or donated to charities and could not be accessed."  (Doc. 164.)

may ever know the contents of any destroyed Samsung emails, the fact that the emails of key Samsung witnesses were among those destroyed permits the reasonable inference that Apple was prejudiced by Samsung's spoliation."). Here, Plaintiff has shown that the documents they believe were spoliated may have aided their case. Thus, the Court finds the spoliation resulted in prejudice to the Plaintiff.

## 2. Level of Intent

Once the Court finds prejudice, the Court may issue sanctions that are no greater than necessary to cure the prejudice. Fed. R. Civ. P. 37(e)(1). When employing subdivision (e)(2), courts must find that there was intentional conduct in the failure to preserve ESI. Destruction of evidence is willful spoliation if the party had "some notice that the documents were potentially relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 958 (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)). However, a court need not find that the party acted in bad faith, a finding of conscious disregard is enough for a court to issue an adverse inference instruction based on spoliation. *Apple, Inc.*, 888 F. Supp. 2d at 998 (The Court need only find that Apple acted with "conscious disregard" of its obligations*.); accord Al Otro Lado, Inc. v. Wolf*, No. 3:17-CV-02366 BAS KSC, 2021 WL 631789, at *5 (S.D. Cal. Feb. 18, 2021), report and recommendation adopted sub nom. *Al Otro Lado, Inc. v. Mayorkas*, No. 19-CV-01344-BAS-MSB, 2021 WL 1170212 (S.D. Cal. Mar. 29, 2021) ('The requisite culpable state of mind for purposes of spoliation and adverse inference instructions does not require a finding of bad faith, but only a party's 'conscious disregard' of its preservation obligations.")

Courts may find intentional spoliation where it is shown, or reasonably inferred, that the spoliating party acted purposefully to avoid its litigation obligations. *Brewer*, 2019 WL 356657 at *10 (pattern of conduct suggests intentional spoliation). Since the relevance of destroyed evidence cannot be clearly ascertained, a party cannot assume a presumption that the destroyed evidence was irrelevant. *Id.*; *Laub v. Horbaczewski*, 2020 WL 9066078, at *6 (C.D. Cal. July 22, 2020) ("Because courts are unable to ascertain precisely what was in a person's head at the time spoliation occurred, they must look to circumstantial evidence to determine intent."). While

"there need not be a 'smoking gun' to prove intent . . . there must be evidence of 'a serious and specific sort of culpability' regarding the loss of the relevant ESI." *Muhammad v. Jenkins*, No. CV 19-7970 JAK (PVC), 2022 WL 4292341, at *6 (C.D. Cal. Aug. 26, 2022), report and recommendation adopted, No. CV 19-7970 JAK (PVC), 2022 WL 4292308 (C.D. Cal. Sept. 15, 2022); *Mkrtchyan v. Sacramento Cty.*, No. 2:17-cv-2366 TLN KJN, 2021 WL5284322, at *10 (E.D. Cal. Nov. 12, 2021) (It is proper to "consider the timing of the document loss when evaluating intent." (internal citations omitted).)

Plaintiff argues that Defendants acted with the intent to deprive Plaintiff of the electronic information. Fed. R. Civ. P. 37(e)(2). (Doc. 168 at 24–25; Doc. 210 at 9-14.) Plaintiff argues: "Defendants knew their obligations to preserve ESI," "spoliation began shortly after Defendants were served with discovery," "Mahoney's 'understanding' and 'sincere' belief that cloud data would survive termination of licenses is unfounded and not credible," there are three or more computers that are entirely unaccounted for, including the two that Mahoney himself used, and "blaming others does not negate Defendants' intent." (Doc. 210 at 9-14.)

Defendants counter that there was no intent to deprive, and that Defendants did not act in bad faith. (Doc. 200 at 18–21.) First, as to the cloud data, Defendants argue that they believed that the request that Unity IT place a litigation hold on its records was sufficient to preserve the data in the cloud. (*Id.* at 15.) Defendants agree that they were warned that services would be terminated. (*Id.*) However, Defendants claim they did not understand that the information in the cloud would be lost and unrecoverable. Defendants also claim that Plaintiff misrepresents communications from Unity IT that it was clear that Defendants would lose access to the data. (*Id.* at 16-17.)

The Court finds that it is reasonable to infer that Defendants intended to deprive Plaintiff of the ESI in the cloud. Defendants had access to the data in the cloud from August 2018 to November 2019. (Michaelson Decl. ¶14a–c.) The parties began discovery in October 2019. (Doc. 168 at 10.) Based on the arguments and evidence raised in this motion, it does not appear that all the data stored in the cloud was disclosed to Plaintiff. Unity IT notified Defendants that cloud services would be terminated in about November or December 2019, Defendants' responses to

Plaintiff's discovery were provided in November 2019—at essentially the same time Defendants were failing to maintain the cloud storage license through Unity IT. Defendants took no action to download the cloud ESI. Mr. Beeson states that Agrigenix could have downloaded the ESI. (Beeson Decl. ¶3 ("[A]t any point before the licenses were disconnected, Agrigenix could have downloaded the data stored in the cloud and archived it locally.").)

Defendants had their Unity IT licenses suspended twice for failure to pay, both times with ample warning. (Michaelson Decl., Exhs. 9–16.) Defendants do not dispute that they had notice the licenses would be suspended. The first time, it is possible that Defendants were unaware of the consequences of the lapse, i.e., whether the data stored in the cloud would or would not be purged. Defendants claim that prior to reactivating Unity IT's services and licenses in February 2020, it was not clear if the data had been purged. (*Id.*, Exh. 17.) The language stated in the email was that the data **may** have been purged. The email referenced also states "the accounts are active now and you can check" if the old emails remained in the cloud. (*Id.*) Defendants do not explain if the request to place a litigation hold on certain email accounts held up to the first suspension of the licenses, or if the emails remained in the cloud. Defendants do not present any evidence of steps Defendants took to ensure the data remained viable after the reactivation of the Unity account. Mahoney states that he sincerely believed the data still existed in the cloud, but he does not state any steps he took to ensure the continued viability of that data, which he knew must be preserved during the litigation.  After the second instance of deactivation, Defendants would have been aware of the consequences and whether the data would be recoverable based on their experience with the first deactivation. Again, the Court is not informed of any steps taken to ensure the viability of the Unity cloud data. Thus, the Court cannot accept that Defendants were unaware that data would likely be purged when their licenses were again suspended. This disregard leaves the Court to believe that deprivation of the information was intentional.

Moreso, Defendants could have at any time before either deactivation, downloaded and saved the data on a local computer or hard drive. (*See* Beeson Decl. ¶ 3.) Defendants did not have a local back up and did not attempt to preserve the data by downloading it after several warnings that services would be suspended. Again, this might be excusable in the first instance, but when

licenses were suspended a second time, Defendants could have and should have preserved the data by downloading it, but did not. At best, Defendants acted with conscious disregard for the consequences of the second deactivation by failing to locally save the data. At worst, Defendants allowed the services to lapse knowing the results would be a purge of the data.

Second, as to the laptops, Defendants claim that they were under no duty to maintain ESI on the laptops when it was also stored on the cloud. Regardless of the cloud, Defendants allowed departing employees to take their laptops with them when they left from mid-2019 to late-2020. (Mahoney Decl. ¶20.) This was during the midst of discovery, and Defendants appear to have taken no steps to ensure the ESI relevant to this litigation was preserved. Defendants claim they did not take any steps to wipe the laptops before employees took them and are not responsible for employees' conduct thereafter. (*Id.*) The Court agrees with Defendants that Defendants are not required under the spoliation doctrine to maintain identical copies. *See Masterobjects, Inc. v. Amazon,* 2022 U.S. Dist. LEXIS 44052 at *13 (N.D. Cal. Mar. 13, 2022). However, Defendants should have taken steps, but did not, to ensure that the laptop ESI was preserved, either on the cloud or otherwise, before allowing the computers to be taken or given away.[8] The Court agrees with Plaintiff's argument that by allowing the computers to leave Defendants' control, and not preserving the data or ensuring that it existed in the cloud, and by giving the computers to departing employees over whom they no longer had authority, Defendants affirmatively failed to preserve. (Doc. 210 at 13.) Again, the Court need not find the party acted in bad faith, but only that it acted with conscious disregard in preserving ESI. *See Apple, Inc.*, 888 F. Supp. 2d at 998.

Defendants also argue that they are not responsible for former employees' actions regarding the laptops. Defendants argue they are not responsible for any "wiping" of data on the hard drives that occurred after the laptops were taken by employees. Defendants claim that (1) the Wilson laptop was not encrypted by Defendants, but by Wilson after he left Agrigenix, and (2) that the hard drive on the Chow laptop was not wiped but "cleaned" and even so was not

---

[8] During the time of both lapses of the Unity licenses, Defendants were represented by competent counsel in this case. There is no evidence presented by Defendants that they consulted with counsel regarding either of the Unity lapses, Defendants' duty to preserve data, or any other information communicated to counsel about ESI. While such communication is subject to attorney-client privilege, Defendants here are faced with a sanctions motion and the Court would anticipate if any consultation had occurred, some mention of that evidence would have been presented.

1   wiped by Defendants. (Doc. 200 at 14; Mahoney Decl. ¶¶21–23; Chow Decl. ¶8.) Defendants

2   support this claim by again saying they were under no obligation to maintain identical files, and

3   they sincerely believed all files would be backed up on the cloud.

4        This argument again fails because it was Defendants' duty to preserve the data before it

5   left Defendants' custody and control.  The Court finds that it was Defendants' conscious

6   disregard in letting the laptops leave their custody and control, knowing that Defendants had

7   potentially lapsed cloud data.  Defendants did not take steps to ensure such cloud data in fact

8   remained viable before they let the laptops leave their custody and control.

9        The Court's view of Defendants' ESI conduct is also colored by their lack of production

10  and by the bits and pieces of ESI Plaintiff has been able to sleuth forensically.  Plaintiff has

11  presented evidence that there were many documents that were not disclosed or produced by

12  Defendants. Plaintiff independently uncovered documents from third parties which should have

13  been produced by Defendants as responsive to document requests. For instance, Plaintiff

14  independently discovered Agriglobe had done business with Agrigenix and the documents

15  produced by Agriglobe were not produced by Defendants, but were responsive to multiple

16  discovery requests. The documents produced contained information about a new version of

17  Defendant Agrigenix's Green Machine, sales efforts and resulting revenues, and dealings with a

18  previously undisclosed supplier, Hydrite. Documents produced from Hydrite, but not by

19  Defendants, contained information relevant to Plaintiff's claims of trade secret misappropriation,

20  and breach of contract, such as using Deerpoint's fertilizer formulas.  Plaintiff subpoenaed Fresno

21  First Bank which produced documents that included information not previously disclosed about

22  transactions between Agrigenix and several third parties, such as GAR Bennet and Custom Ag,

23  among other customers and suppliers. The lack of full production of relevant discovery of

24  evidence and documents which Plaintiff independently located forces the Court to infer intent to

25  spoliate ESI by Defendants.

26       The Court wishes to emphasize that it is not solely the lapse of the Unity ESI that forces

27  the conclusion Defendants acted intentionally to spoliate ESI. The Court infers intent to spoliate

28  ESI from the totality of Defendants' conduct, including the lack of production, the laptops, and

the third-party information not disclosed.  Plaintiff has presented bits and pieces of ESI it has

uncovered in its forensic analysis, as mentioned *infra.*  It is not a large stretch for the Court to

make, on this record, that failure to produce documents and Defendants' actions in not disclosing

or producing those documents was intentional. The Court finds that Defendants intentionally

sought to avoid producing responsive documents and other ESI to Plaintiff.  In sum, the Court

finds that Defendants acted intentionally and with a conscious disregard of its obligations in

failing to preserve and produce ESI from the cloud and the laptops.

   **D.**  **Sanctions**

   Where the requisite intent is found, the Court may impose sanctions.  In determining

which sanctions to impose courts consider the following factors: "the degree of fault of the party

who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party;

and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing

party." *Apple, Inc.*, 888 F. Supp. 2d at 992 (quoting *Nursing Home Pension Fund v. Oracle*

*Corp.*, 254 F.R.D. 559, 563 (N.D. Cal. Sept. 2, 2008)). It is not necessary to find bad faith for a

court to impose an adverse inference sanction, however, a party's motive or degree of fault in the

spoliation is relevant to determining what sanctions should be imposed. *Apple, Inc.*, 888 F. Supp.

2d at 992. Courts should impose the least arduous sanction that corresponds to the willfulness of

the destruction and prejudice to the victim party. *Id.* Ultimately, the determination of what

sanctions, if any, should be imposed must be made on a case-by-case basis. *Id.*

   Here, Plaintiff seeks sanctions of:

- Costs and fees attributable to Defendants' spoliation. (Doc. 168 at 25.)
- Findings of fact to cure prejudice Plaintiff has suffered from loss of evidence that once existed. (*Id.* at 27.)
- Instruction to the jury that destroyed ESI would have been favorable to Deerpoint and unfavorable to Mahoney and Agrigenix.  (*Id.* at 27-28.)
- Entry of default judgment as to several Deerpoint causes. (*Id.*)

    1. <u>Monetary Sanctions</u>

Upon a finding of prejudice to the party deprived of the information, a court "may order

measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). "The range of such measures is quite broad if they are necessary for this purpose, and "[m]uch is entrusted to the court's discretion." Fed. R. Civ. P. 37(e)(1), Advisory Committee's Note to 2015 amendment; *see, e.g.*, *Sec. Alarm Fin. Enters., L.P. v. Alarm Prot. Tech., LLC*, No. 3:13-cv-00102-SLG, 2016 WL 7115911 (D. Alaska Dec. 6, 2016) (awarding reasonable attorney's fees incurred in bringing a discovery motion after determining the moving party was prejudiced by spoliation). In addition, monetary sanctions also are available under Rule 37(e)(2). Although Rule 37(e)(2) specifies three types of sanctions that may be imposed upon a finding that a party acted with the intent to deprive another of the use of information in litigation, these options are not exclusive. Instead, the Court may order any remedy that "fit[s] the wrong." Fed. R. Civ. P. 37(e), Advisory Committee's Note to 2015 amendment. On this basis, the Court concludes that monetary sanctions are available under Rule 37(e)(2). *See RG Abrams Ins. v. L. Offs. of C.R. Abrams*, No. 2:21-CV-00194 FLAMAAX, 2022 WL 3133293, at *45 (C.D. Cal. July 1, 2022).

a.    *Reasonable Fees and Costs*

As detailed above, the Court has found that Plaintiff has been prejudiced by the spoliation of ESI from various laptops and from Unity IT. The Court thus finds an award of attorneys' fees and costs is appropriate. Accordingly, Plaintiff is entitled to monetary sanctions under Rule 37(e)(1). Plaintiff requests they be awarded costs and fees of incurred (1) in performing forensic analysis on the spoliated laptops, (2) in depositions related to the spoliated evidence, (3) in issuing subpoenas to third parties, and (4) in preparation of this motion. (Doc. 168 at 25-27.) Plaintiff seeks a total of $133,002.26 in costs and fees. (Doc. 168-38.)

When an award of attorneys' fees is authorized, the court must calculate the proper amount of the award to ensure that it is reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983). To determine a reasonable attorneys' fee, a "Lodestar" is used. The starting point is the number of hours reasonably expended multiplied by a reasonable hourly rate. *Hensley*, 461 U.S. at 433. The Court, in considering what constitutes a reasonable hourly rate, looks to the prevailing market rate in the relevant community. *Blum v. Stenson*, 465 U.S. 886, 895 (1984).  The "relevant community" for the purposes of the lodestar calculation is generally the forum in which the

district court sits. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013). The relevant community here is the Fresno Division of the Eastern District of California.

In the Fresno Division of the Eastern District of California, attorneys with twenty or more years of experience are awarded $350.00 to $400.00 per hour. *See, e.g.*, *Leprino Foods Co. v. JND Thomas Co., Inc.*, No. 1:16-cv-01181-LJO-SAB, 2017 WL 128502, at *13 (E.D. Cal. Jan. 12, 2017), report and recommendation adopted in part, No. 1:16-cv-01181-LJO-SAB, 2017 WL 432480 (E.D. Cal. Feb. 1, 2017) (finding $400.00 per hour a reasonable hourly rate for attorney with more than thirty years of experience); *Sanchez v. Frito-Lay, Inc.*, No. 1:14-CV-00797 AWI-MJS, 2015 WL 4662636, at *18 (E.D. Cal. Aug. 5, 2015), report and recommendation adopted, No. 1:14-CV-797-AWI-MJS, 2015 WL 5138101 (E.D. Cal. Aug. 26, 2015) (finding reasonable rate for attorney with twenty years of experience was $350 per hour in a wage and hour class action). Generally, "$300 is the upper range for competent attorneys with approximately a decade of experience." *Barkett v. Sentosa Props. LLC*, No. 1:14–CV–01698–LJO, 2015 WL 5797828, at *5 (E.D. Cal. Sept. 30, 2015) (O'Neill, J.) (citing *Silvester v. Harris*, No. 1:11–CV–2137 AWI SAB, 2014 WL 7239371, at *4 (E.D. Cal. Dec. 17, 2014). For attorneys with "less than ten years of experience . . . the accepted range is between $175 and $300 per hour." *Silvester*, 2014 WL 7239371 at *4 (citing *Willis v. City of Fresno*, 1:09-cv-01766-BAM, 2014 WL 3563310 (E.D. Cal. July 17, 2014).

Recent cases have maintained the same hourly rates. *Accord Langer v. Cooke City Raceway, Inc.*, No. 1:21-CV-01488 JLT BAK, 2022 WL 2966172, at *16 (E.D. Cal. July 27, 2022), report and recommendation adopted, No. 1:21-CV-01488 JLT BAK, 2022 WL 3348015 (E.D. Cal. Aug. 12, 2022); *Webb v. Cty. of Stanislaus*, No. 1:19-CV-01716 DAD EPG, 2022 WL 446050, at *6 (E.D. Cal. Feb. 14, 2022) (In the Fresno Division of the Eastern District of California, generally, attorneys with twenty or more years of experience are awarded $325.00 to $400.00 per hour, attorneys with ten to twenty years of experience are awarded $250.00 to $325.00, attorneys with five to ten years of experience are awarded $225.00 to $250.00, and less than $200.00 for attorneys with less than five years of experience.) Finally, "[t]he current reasonable hourly rate for paralegal work in the Fresno Division ranges from $75 to $150,

depending on experience." *Silvester*, 2014 WL 7239371, at *4 (citations omitted); *accord Langer*, 2022 WL 2966172, at *16; *cf. Franco v. Ruiz Food Prods., Inc.*, No. 1:10–cv–02354–SKO, 2012 WL 5941801, at *20 (E.D. Cal. Nov. 27, 2012) (approving a rate of "$100 per hour" for "legal assistants").

Here, Plaintiff provides the Court with the following breakdown of rates and hours expended:[9]

- Partner Jon Michaelson: rate of $1,200.00 per hour; expended 31 hours for a total of $37,200 in fees.
- Senior associate Benjamin Kleinman: rate of $825.00 per hour; expended 63 hours for a total of $51,975 in fees.
- Junior associate Sarah Glendon: rate of $500.00 per hour; expended 3.5 hours for a total of $1,750 in fees.
- Legal assistants:[10] rate between $300 and $395 per hour; expended 9 hours.

(Doc. 168-38.) This results in a total of $90,925 in attorney fees, excluding fees attributed to legal assistants.

While Plaintiff does not provide the experience of the attorneys, the Court takes judicial notice of the State Bar of California website. Jon Michaelson was admitted to practice in California in 1978 and therefore, has more than 40 years of experience. Given this information, the Court finds a rate of $400 per hour to be reasonable for the services of Mr. Michaelson.

The Court takes judicial notice of the State Bar of California website, which shows that Benjamin Kleinman was admitted to practice in California in 2008 and has more than 10 years of experience. Given this information, the Court finds a rate of $350 per hour to be reasonable for the services of Mr. Kleinman. The Court takes judicial notice of the State Bar of California website, which shows that Sarah Glendon was admitted to practice in California in 2019 and has just under 3 years of experience. Given this information, the Court finds a rate of $200 per hour to

---

[9] All hours and rates are from Exhibit 37 of the Declaration of Jon Michaelson. (Doc. 168-38.)

[10] Plaintiff did not provide an exact hourly rate for legal assistants and included fees and some expenses attributed to legal assistants' work. Therefore, the Court cannot ascertain an average hourly rate or how much of the fees are specific to the legal assistants. However, the Court is able to determine those legal assistants expended 9 hours of work based on the information in Exhibit 37. (*See* Doc. 168-38.)

1  be reasonable for the services of Ms. Glendon. As for the legal assistants, courts in this district

2  have approved rates of $100 per hour.

3      The Court must also consider the reasonable number of hours spent. Defendants

4  challenge the amount of fees that Plaintiff seeks for two depositions which Plaintiff claims were

5  rendered "worthless," and Defendants argue that counsel's assertion of what took place "does not

6  make it so." (Doc. 200 at 25.) Defendants also argue that 88 hours allegedly spent in preparing

7  this motion is excessive.

8      "The party seeking an award of fees should submit evidence supporting the hours

9  worked." *Hensley*, 461 U.S. at 434. "The district court . . . should exclude . . . hours that were not

10  'reasonably expended' " and "hours that are excessive, redundant, or otherwise unnecessary." *Id.*

11  Ultimately, "the [opposing party] bears the burden of providing specific evidence to challenge the

12  accuracy and reasonableness of the hours charged." *McGrath v. Cnty. of Nevada*, 67 F.3d 248,

13  255 (9th Cir. 1995); *Blum v. Stenson*, 465 U.S. 886, 892 n.5 (1984), *Gates v. Gomez*, 60 F.3d 525,

14  534–35 (9th Cir. 1995)).

15      Defendants challenge Plaintiff's claims for fees and costs, $21,558.10, for the "worthless"

16  depositions of deponent Chow and Agrigenix Rule 30(b)(b) designee. (*See* Doc. 168-38 at 2.)

17  The Court agrees with Defendants. The depositions are not worthless, even if Plaintiff did not

18  obtain the information that it desired. Accordingly, the fees and costs requested by Plaintiff for

19  these depositions will be disallowed.

20      Defendants also challenge the number of hours claimed by Plaintiff for preparation for the

21  motion for sanctions. Plaintiff claims a total of 88 hours to prepare the motion with fees of

22  $78,270.00 (which fees will be reduced by the appropriate market rate). At first blush, 88 hours

23  for a single motion may appear excessive. (Doc. 168-38 at 3.) Mr. Michaelson claims 22 hours,

24  the senior associate claims 60 hours, and the legal assistant claims 6 hours. But both the motion

25  and the declaration of Michaelson (and Exhibits) provided the Court with considered and careful

26  recounting of Plaintiff's investigation and struggles with uncovering the ESI information that

27  should and could have been produced. The Court does not find the hours claimed, in *this*

28  particular motion, excessive.

Defendants do not challenge the time spent for subpoenaing third parties.  Therefore, that time will be allowed, subject to a reasonable rate.

Defendants assert it is unfair to assess Mahoney with fees and costs, as the only viable payor, since Agrigenix is now defunct.  (Doc. 200 at 26-27.)  The Court does not find assessment of fees and costs inappropriate, or inappropriate against a responsible Defendant.  Mahoney was the sole owner and sole manager of Agrigenix. (Doc. 168-1 ¶2; Doc. 200-1, Brucker Decl., Exh. 4 "Mahoney Depo." at 21. (Mahoney was the owner of the company).)  Mahoney testified that he "sold or donated" the laptops in the first quarter of 2021, during the course of this litigation. (Mahoney Depo. at 11.) Later, in his declaration in opposition to this motion, Mahoney states: "Agrigenix provided the laptops to its departing employees as they left on a staggered basis," in mid-2019 and late-2020, again while this litigation was ongoing. (Mahoney Decl. ¶20.) Assuming these two statements are not in conflict, it remained Mahoney's obligation to ensure compliance with his and Agrigenix's duty to preserve ESI. It is clear to the Court that he did not do so, and it appears to the Court he may have been actively shielding data, as explained *infra*.

Using the rates that are reasonable for the district and reasonable hours expended by counsel for Plaintiff, the Court will award $32,500[11] in attorney fees. The Court finds this amount reasonable based on the hours expended on this case.

b.    *Expert Fees*

Plaintiff argues that Plaintiff should be awarded all fees and costs incurred by the forensic expert for the expense of forensic analysis and attorneys' fees for identifying and engaging the forensic service and for overseeing the work of the forensic examiner. (Doc. 168 at 25-26.) This amount is at least $26,746.41.

Defendants argue that Plaintiff's counsel merely cites to a chart replete with hearsay and information that violates the secondary evidence rule (e.g., stating expert fees per invoices, but

---

[11] For Mr. Michaelson, partner, at $400 per hour for 3 hours for Rule 45 subpoenas and 22 hours for the motion for sanctions is a total of 25 hours at $400 per hour = $10,000. For Mr. Kleinman, senior associate, at $350 per hour for 60 hours for the motion for sanctions is 60 hours at $350 per hour = $21,000. For Ms. Glendon, junior associate, at $200 per hour for three hours for Rule 45 subpoenas is a total of 3 hours at $200 per hour = $600. For legal assistants, at $100 per hour for three hours for Rule 45 subpoenas and six hours for the motion for sanctions is a total of nine hours at $100 per hour = $900.  Total fees awarded are $32,500.

1    not providing invoices). (Doc. 168-38; Doc. 200 at 24.)

2         The Court agrees with Defendants.  The Court requires Plaintiff to provide supplemental

3    documentation as to the expert costs associated with the motion in their attempts to recover

4    spoliated evidence.

5              2.        Adverse Findings of Fact and Adverse Instructions

6         Courts employ a three-part test in *Zubulake* to determine whether an adverse inference

7    spoliation instruction is warranted. *Apple, Inc.*, 881 F. Supp. 2d at 1138; *see Zubulake v. UBS*

8    *Warburg LLC.*, 220 F.R.D. 212, 220 (S.D.N.Y. Oct. 22, 2003)). "A party seeking an adverse

9    inference instruction (or other sanctions) based on the spoliation of evidence must establish the

10   following elements: (1) that the party having control over the evidence had an obligation to

11   preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state

12   of mind' and (3) that the evidence was 'relevant' to the party's claim or defense such that a

13   reasonable trier of fact could find that it would support that claim or defense." *Apple, Inc.*, 881 F.

14   Supp. 2d at 1138 (quoting *Zubulake v. UBS Warburg LLC.*, 220 F.R.D. 212, 220 (S.D.N.Y. Oct.

15   22, 2003)) (*Zubulake* factors).

16        As illustrated above, Plaintiff established the first two elements of the *Zubulake* factors.

17   Defendants admit that there was a duty to preserve the data on either the laptops or the cloud.

18   Further, this Court has found that Defendants acted intentionally to deprive Plaintiff of the

19   spoliated ESI. As to the third factor, there is a presumption that spoliated evidence is relevant to

20   the non-spoiling party's claims.

21        Here, neither Defendants nor Plaintiff have identified how much ESI is actually gone from

22   the cloud data or laptops. Plaintiff believes that there were documents such as the price

23   comparison sheet that was not only relevant but also critical to prove that Defendants were in

24   possession of confidential, proprietary, and trade secret information. Further, Defendant Mahoney

25   has already acknowledged that he was in possession of at least one email that contained such

26   information. (Doc. 168 at 9.) Document productions from third parties including Agriglobe,

27   Hydrite, and GAR Bennet also suggest there may be documents that support Plaintiff's claims

28   that Defendants were in possession of such information and may have used it to conduct business.

(*See* Michaelson Decl. ¶10.) Productions from Agriglobe show a similar product to the White Box created by Plaintiff. (*See* Michaelson Decl. ¶9, Exh. 6.) The creation of sophisticated technology, in short order after Agrigenix's initial start-up, would only be possible with supporting technical documentation/ESI, which was not produced. Documents from Hydrite, none of which were produced by Defendants, show chemical blending strategies used by Plaintiff. (Michaelson Decl. ¶10.) Documents from GAR Bennett show the sale of components of that technology even after litigation in this matter began. (Michaelson Decl. ¶17, Exh. 23.)

Plaintiff requests that the Court establish certain facts as conclusive, with the first being a rebuttable presumption:

1. That when he left the employ of Deerpoint in October 2017, Mr. Mahoney possessed and retained documents that contained confidential, proprietary, and trade secret information belonging to Deerpoint with respect to the formulation, manufacture, cost, and pricing of Deerpoint products and with respect to Deerpoint customers and their needs.

2. Mr. Mahoney disclosed the above documents containing Deerpoint information to Agrigenix (through others who became or were Agrigenix employees) both before and after Agrigenix was formed.

3. Mr. Mahoney used documents containing the above Deerpoint information to advance the business of Agrigenix both before and after January 8, 2018, to the detriment of Deerpoint.

4. Agrigenix (through Mr. Mahoney and through its other employees) used documents containing the above Deerpoint information to advance the business of Agrigenix both before and after January 8, 2018, to the detriment of Deerpoint.

5. From and after no later than March 2018, when Chow joined Agrigenix, Mahoney and Agrigenix had in their possession documents containing confidential, proprietary, and trade secret information related to Deerpoint's White Box technology.

6. Agrigenix, at the direction of Mahoney, used documents containing confidential, proprietary, and trade secret information obtained with respect to Deerpoint White Box technology to create and offer for sale their "Green Machine" fertigation equipment, to the detriment of Deerpoint.

(Doc. 168 at 27–28.)

Adverse inference instructions range in their level of severity. *Apple, Inc.*, 881 F. Supp. 2d at 1150. The harshest type of adverse inference instruction directs the jury to deem certain facts

1  admitted and accepted as true. *Id.* When a spoliating party has acted willfully or recklessly a

2  lesser adverse inference instruction imposes a mandatory presumption. *Id.* The least harsh

3  instruction allows the jury to presume that lost evidence is both relevant and favorable to the

4  innocent party. *Id.* If the jury makes the presumption, "the spoliating party's rebuttal evidence

5  must then be considered by the jury, which must then decide whether to draw an adverse

6  inference against the spoliating party." *Id.* The Ninth Circuit has held that a trial court's "adverse

7  inference sanction should be carefully fashioned to deny the wrongdoer the fruits of its

8  misconduct yet not interfere with the party's right to produce other relevant evidence." *In re*

9  *Oracle Corp. Securities Litig.*, 627 F.3d 376, 386 (9th Cir. 2010).

10      To truly right the wrong Defendants have inflicted, Plaintiff is entitled to have some kind

11  of curative instructions given at trial. Simply, Plaintiff has been obstructed from proving its case.

12  Because the undersigned will not be the trial judge in this case, the precise contours of the

13  instructions will be left to the trial judge.  A magistrate judge's specific findings warranted

14  adverse inference jury instructions, but "[t]he precise contours of such instructions must be left to

15  the presiding judge who will determine the universe of jury instructions ultimately to be given in

16  this action." *Apple Inc.*, 888 F. Supp. 2d at 992; *Doe v. Bridges to Recovery, LLC*, No. 2:20-CV-

17  348-SVW, 2021 WL 4690830, at *16 (C.D. Cal. May 19, 2021) (The precise wording of the

18  instruction will be determined along with the remainder of the jury instructions).

19      However, based on the record before the undersigned, and regardless of the exact

20  wording, the Court recommends the contours of the instructions should be along the following

21  lines:  First, that the instruction(s) acknowledge that Agrigenix and Mahoney had a duty to

22  preserve evidence relating to Plaintiff's complaint. Second, the instruction(s) should inform the

23  jury that Agrigenix and Mahoney failed to preserve and produce electronically stored

24  information, and this is known as the "spoliation of evidence." Third, the instruction(s) should

25  instruct the jury that as a result of this spoliation of evidence, the jury should presume that the

26  contents of the electronically stored information would have been favorable to Plaintiff and

27  unfavorable to Defendants.  Fourth, the instruction(s) should specifically instruct the jury on what

28  the absent evidence would show: (1) that the spoliated evidence contained confidential,

1    proprietary, and trade secret information belonging to Deerpoint with respect to the formulation,

2    manufacture, cost, and pricing of Deerpoint products and with respect to Deerpoint customers;

3    and at the trial judge's discretion, the following: (2) Mahoney and Agrigenix used documents

4    containing Deerpoint's confidential, proprietary, and trade secret information to advance the

5    business of Agrigenix to the detriment of Deerpoint.

6        The instruction(s) preserve the Defendants' right to produce other relevant evidence. The

7    contours of the instruction(s) does not preclude Mahoney and Agrigenix, and others, from

8    testifying as to their own actions for development of equipment, formulas and the like for

9    Agrigenix, subject to cross-examination regarding the lack of ESI produced on these topics.

10                    3.        Terminating Sanctions

11        Courts may use dismissal as a sanction where a party has deliberately engaged in

12    deceptive practices that "undermine the integrity of judicial proceedings" because courts have an

13    inherent power to dismiss actions where parties engage in conduct that is wholly inconsistent with

14    the "orderly administration of justice." *Leon*, 464 F.3d at 958 (citing *Anheuser-Busch, Inc., v.*

15    *Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)). Prior to imposing such severe

16    sanctions, a court should consider the following factors: "(1) the public's interest in expeditious

17    resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the

18    party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and

19    (5) the availability of less drastic sanctions." *Leon*, 446 F.3d at 958 (quoting *Anheuser-Busch,* 69

20    F.3d at 348). A court need not make findings specific to each factor, however, there must be a

21    finding of "willfulness, fault, or bad faith" for dismissal to be proper. *Id.*

22        Plaintiff requests that the Court enter default judgment against Agrigenix as to the second

23    cause of action and against Defendant Mahoney as to the fourth and fifth causes of action. The

24    Court does not find that such a judgment should be entered. The Court has not found that

25    Defendants acted to such a degree that claim dispositive sanctions are warranted. While

26    Defendants did act intentionally and with conscious disregard for the preservation of documents,

27    there is no finding of bad faith that would warrant such an extreme sanction.

28    ///

1    **CONCLUSION AND ORDER**

2        For the reasons stated, the Court HEREBY ORDERS as follows:

3    1.  Plaintiff's Motion for Sanctions for failure to preserve ESI in violation of Federal Rule of

4        Civil Procedure 37(e), (Doc. 168), is GRANTED;

5    2.  Plaintiff is awarded THIRTY-TWO THOUSAND FIVE HUNDRED DOLLARS

6        ($32,500.00) in attorney fees, joint and several, against Defendants Agrigenix and

7        Mahoney;

8    3.  Plaintiff shall file supplemental briefing as to the expert costs associated with this motion

9        and the spoliated evidence within fourteen (14) days of this order.  Defendants may file a

10       reply within fourteen (14) days thereafter;

11   4.  Plaintiff's request for adverse findings of fact and jury instructions is GRANTED IN

12       PART, as identified above, and shall be given at a subsequent trial; and

13   5.  Plaintiff's request that default judgment be entered at to Plaintiff's second, fourth, and

14       fifth causes of action is DENIED.

15

16   IT IS SO ORDERED.

17   Dated:   __**October 31, 2022**__          ____/s/ _Barbara A. McAuliffe_____

18                                              UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28